UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEVE COMBEE,

       Plaintiff,

v.                     Case No.: 8:11-CV-00108-T-33MAP

CIRCLE K STORES, INC.
a Texas Corporation,

       Defendant.
_____/


     DEPOSITION OF:   STEVE COMBEE



     DATE:            July 19, 2011



     TIME:            9:32 a.m. - 11:44 a.m.
                       12:30 p.m. - 2:30 p.m.



     PLACE:          Anthem Reporting
                  101 S. Franklin St.
                  Suite 100
                  Tampa, Florida 33602



     REPORTED BY:     Rhonda Ellison
                  Court Reporter
                  Notary Public


ORIGINAL

1    APPEARANCES:

2    ON BEHALF OF DEFENDANT:

3        V. STEPHEN COHEN, ESQUIRE
         Bajo Cuva Cohen & Turkel, P.A.
4        100 North Tampa Street, Suite 1900
         Tampa, Florida 33602
5

6    Also Present:

7
         MR. DARRELL RODEN
8        Circle K Stores, Inc.
         Director of Human Resources/Training/LP
9

10

11                  *    *    *    *    *    *    *

12

13

14

15

16

17

18

19                             INDEX

20                                                    PAGE

21

22   EXHIBIT INDEX                                      3
     DIRECT EXAMINATION BY MR. COHEN                    4
23   CERTIFICATE OF OATH                              126
     REPORTER'S CERTIFICATE                           127

24                  *    *    *    *    *    *    *

25

```
 1                    EXHIBIT INDEX

 2
     DEFENDANT'S
 3
```

table

| | | |
|---|---|---|
| 1 | Charge of Discrimination | 10 |
| 2 | Complaint | 18 |
| 3 | Employees and Applicants for Employment | 43 |
| 4 | New Employee Training Participant Guide | 43 |
| 5 | Circle K Stores Policies and Procedures | 44 |
| 6 | Site Expectation Form "Expectation of Employees" | 45 |
| 7 | Defendant's first request of production of documents to Plaintiff | 84 |
| 8 | Counseling Notice dated 06/20/2008 | 86 |
| 9 | Counseling Notice dated 06/20/2008 (with handwriting on top left-hand corner) | 91 |
| 10 | Counseling Notice dated 07/03/2008 | 91 |
| 11 | Counseling Notice dated 12/13/2008 | 93 |
| 12 | Counseling Notice dated 02/06/2009 | 95 |
| 13 | Counseling Notice dated 04/07/2009 | 96 |

1  THEREUPON,

2                    STEVE COMBEE,

3  the witness herein, having been first duly sworn, was

4  examined and testified as follows:

5                 DIRECT EXAMINATION

6  BY MR. COHEN:

7      Q    Mr. Combee, my name's Steve Cohen.  I

8  introduced myself a minute ago.

9      A    Okay.

10     Q    I'm an attorney.  I represent Circle K, who is

11  the defendant in this action and your former employer.

12  Have you ever had your deposition taken before?

13     A    No, I haven't.

14     Q    Okay.  Well, it's a pretty simple process.  I'm

15  going to ask you a bunch of questions today.  You just

16  need to answer them.  The court reporter, the woman

17  sitting to your right --

18     A    Okay.

19     Q    -- is going to type everything you and I say --

20  actually, everything that everyone says in the room,

21  okay?

22     A    (Nods head.)

23     Q    So, it's very important that your answers are

24  verbal.  In other words, "uh-huh," "uh-uh," nodding the

25  head, she can't write that down.  So you have to answer

1    "yes," "no," or give an explanation.  Whatever it is,

2    but it has to be verbal.  Do you understand that?

3        A    Yes, I do.

4        Q    Okay.  Could you state your full name for the

5    record?

6        A    Steve James Combee.

7        Q    And you're the plaintiff in this lawsuit,

8    right?

9        A    Correct.

10       Q    And you filed a lawsuit against your former

11   employer, Circle K Stores, Inc., right?

12       A    That's correct.

13       Q    Okay.  Have you ever been known by any other

14   name, nicknames, anything like that?

15       A    No.

16       Q    Okay.  If you need a break at any time, all you

17   have to do is ask for one, okay?  It's not a -- it's not

18   a -- it's not an endurance test or anything like that,

19   okay?  It's important that one person talk at a time,

20   just like the nonverbal stuff that we talked about a

21   minute ago.

22       A    Uh-huh.

23       Q    If you and I are talking at the same time, it

24   becomes really hard for the court reporter to type it

25   all down, okay?

1    If you don't understand a question -- sometimes

2  I don't ask the best questions, so if you don't

3  understand a question, just ask me to rephrase it and I

4  will.

5    You understand the testimony today is under

6  oath, right?

7    A    Correct.

8    Q    Just like if you were in a court of law; do you

9  understand that?

10    A    Uh-huh.

11    Q    Okay.  And Darrell didn't tell you what he did.

12  But Darrell was the Director of Human Resources for the

13  state of Florida, the gentleman sitting to my right,

14  okay?  For Circle K.

15    What did you do to prepare for your deposition

16  today?

17    A    That's kind of a loaded question.

18    Q    Okay.

19    A    Can you be more specific?

20    Q    Sure.  Did you discuss your deposition, that

21  you were having a deposition, with anyone?

22    A    Yes.

23    Q    Okay.  With whom?

24    A    My parents.

25    Q    Okay.  Is that all?  Anyone else?

1     A    Not that I can recall right now.

2     Q    Okay.  What did you talk to your parents about?

3     A    Is this relevant?

4     Q    Yes.  Let me -- let me just put you a little

5 bit at ease, Mr. Combee, because I know you do not have

6 a -- you do not have a lawyer representing you in this

7 case, correct?

8     A    Not at this time, no.

9     Q    Okay.  The questions, that question that I

10 asked you, that you said sounded like a loaded question,

11 "What did you do to prepare," I believe in my

12 seventeen-or-so-year career I've asked that question at

13 every single deposition I have ever taken.  And that is

14 not an exaggeration.  So, these are typical questions.

15 I'm not trying to trick you.  If you want to explain any

16 of your answers, I'm happy to sit here and listen, and

17 the court reporter's going to write it all down.  Okay.

18        So, what did you and your parents talk about in

19 regards to your deposition today?  By the way, is it

20 your mother and father you talked to?  You said

21 "parents."  Your mom and dad?

22     A    Yeah, okay.

23     Q    Okay.  Yes.  Okay.  And so what did you guys

24 talk about?

25     A    Like I said, that's a loaded question.

1     Q    Okay.

2     A    I mean, there's a wide vast of "What did you

3 talk about?"  I mean, that's pretty...

4     Q    Okay.  You talked about the deposition, right?

5     A    Well, I told them I was going to a deposition.

6     Q    Okay.

7     A    I didn't go into any detail about really

8 deposition, you know.

9     Q    Okay.  Did you -- did you review any documents

10 before your deposition?

11     A    I always reveal documents.

12     Q    Review.  Did you look at?  Did you look at any

13 documents before your deposition today, in regards to

14 this case?

15     A    I don't recall.

16     Q    You don't recall specifically what you looked

17 at.  Do you recall looking at anything?

18     A    I'd rather not answer that question.

19     Q    I'm not allowed to give you legal advice, but I

20 am allowed to ask you a fairly wide range of questions

21 during a deposition, Mr. Combee.  And I don't want to

22 have to call the judge and talk to her about this,

23 because I think that's a waste of her time.  A question

24 like -- so, I'll ask you again.  Do you recall looking

25 at -- I know you said you didn't recall the specific

1   documents, but do you recall looking at any documents in

2   connection with preparing for your deposition today?

3        A    If I did, I don't recall it.

4        Q    Okay.  All right.  Are you taking any

5   medication right now that might affect your ability to

6   testify truthfully?

7        A    Well, I don't -- first of all, I'm not a

8   pharmacist or a physician.  I don't know what type of

9   drugs can make a person not testify truthfully.

10       Q    Okay.  Are you taking any medication that might

11   affect your ability to testify today, to recall events

12   and those kinds of things?

13       A    If the question is, have I taken any

14   medication, the answer is no.

15       Q    Fair enough.  So you're not on any medication

16   at all right now, right?  Is that your testimony?

17       A    That is correct.

18       Q    Okay.  Have you ever been convicted of a

19   crime other than driving infractions like speeding

20   tickets and stuff?

21       A    No, I haven't.

22       Q    Have you -- do you know what a charge of

23   discrimination is?  If you don't, it's okay.  But do you

24   know what a charge of discrimination is?

25       A    Well, I don't think I'd file this lawsuit if I

1    didn't know what discrimination is, now, would I?

2         Q    It's a specific type of document.  A charge of

3    discrimination.  Do you know what that is?

4         A    I'd rather not answer that question.

5         Q    Okay.

6              MR. COHEN:  Can we mark this as Exhibit 1.

7              (Thereupon, Deposition Exhibit No. 1 was marked

8         for purposes of identification.)

9    BY MR. COHEN:

10        Q    This is -- I'm going to hand you this.  I'm

11   going to represent to you that this is the Charge of

12   Discrimination that you filed with the EEOC, that was

13   delivered to Circle K.  Okay.  Can you take a look at

14   this document for me.  (Document tendered.)  Just read

15   it and tell me if you recognize that document and your

16   signature down there on the bottom left.

17        A    I recognize the document.

18        Q    You see in the top right there where it says

19   "Charge of Discrimination"?  I'm sorry, the top left

20   corner.  Do you see that?

21        A    Yes.

22        Q    Okay.  That's a document that is referred to as

23   a Charge of Discrimination, okay?  Do we agree on that,

24   for purposes of the deposition?  That's a government

25   document that you signed, right?

1    A    Yeah, I recognize that document.

2    Q    Okay.  Have you ever filed a charge of

3  discrimination against any employer or company other

4  than Circle K?

5    A    No, sir.

6    Q    Okay.  Have you ever assisted anyone else in

7  filing a charge of discrimination against a company,

8  Circle K or otherwise?

9    A    Not that I can recall.

10    Q    Okay.  What's your birthday?

11    A    February the 21st.

12    Q    Of what year?

13    A    1965.

14    Q    What's your current residence address?

15    A    3701 US Highway 92 East, Apartment C, Plant

16  City, 33566.

17    Q    How long have you lived at that address?

18    A    I don't know specifically.

19    Q    Can you give me an estimation?

20    A    Probably a little over a year, estimate, give

21  or take.

22    Q    Did you move there after your employment with

23  Circle K ended or before?

24    A    I moved there after.

25    Q    Okay.  Does anyone else live with you at that

1   residence?

2       A    No.

3       Q    And I assume you rent that apartment.  Is that

4   right?

5       A    That's correct.

6       Q    Where did you live prior to moving to 3701 US

7   Highway 92 East?  What was your address immediately

8   preceding that?

9       A    Okay.  It was 615 North Wiggins Road.

10      Q    W-I-G-G-I-N-S?

11      A    That's correct.

12      Q    Okay.

13      A    Plant City, Florida.

14      Q    Uh-huh.

15      A    33566.

16      Q    And how long did you live there for?

17      A    I don't recall the specifics.  As I recollect,

18  about two years.

19      Q    And is that a home?  An apartment?  What is

20  that at North Wiggins Road?

21      A    Does that matter?

22      Q    Yes.  I'm not going to ask you questions that

23  don't matter to me, Mr. Combee.  I don't waste my

24  clients' time and money.  Okay?  Honestly, this isn't a

25  game.  I'm not trying to trick you.  All right.

1          So was it a home?  Was it an apartment at 615

2    North Wiggins Road?

3          A    Since that is not my place of residence, I'd

4    rather not give out that information.

5          Q    It was your place of residence immediately

6    preceding where you live right now, and I suspect it's

7    the place where you met Renee McCorkle, okay, who is

8    obviously someone we're going to talk about in this

9    lawsuit.  So, Mr. Combee, tell me about what this place

10   was that you lived on North Wiggins Road, please.

11         A    I don't believe it's relevant to -- it's

12   not...

13         Q    So you're not going to -- you're refusing to

14   tell me what -- North Wiggins Road was not an apartment

15   complex, was it?  This 615 North Wiggins Road?  Was it,

16   yes or no?

17         A    Like I said, I would rather not, since that was

18   not my residence, answer the question.

19         Q    That wasn't your residence?  I'm sorry.  I

20   asked you what your prior residences were, and you said

21   615 North Wiggins Road, and you lived there for two

22   years.  Did you not say that?  Did I hear you wrong?

23         A    Yes, you did.

24         Q    I heard you wrong.  Okay.  So, I apologize.  My

25   fault.  Tell me where you lived before you moved to 3701

1    US Highway 92 Northeast (sic), Apartment C.

2         A    Like I said, 615 North Wiggins Road, Plant

3    City, 33566.

4         Q    So you did live at 615 North Wiggins Road,

5    right?

6         A    Correct.

7         Q    Okay.  For about two years, right?

8         A    Correct.

9         Q    Okay.  And is that a mobile home park?

10        A    Like I said, I'd rather not answer the

11   question.

12             MR. COHEN:  I'm going to take a break.

13             (Brief recess.)

14   BY MR. COHEN:

15        Q    Mr. Combee, I'm not your lawyer.  I cannot give

16   you legal advice, okay?  But you filed a lawsuit against

17   my client, Circle K stores, and as a result of that I'm

18   here to ask you questions about your lawsuit.  There are

19   things that you might -- that I might think are

20   important or relevant to defending my client in this

21   case that you might not think are important, but I'm

22   still allowed to ask you those questions.

23             Okay.  I believe that the type of residence at

24   North Wiggins Road is relevant.  Okay.  What I'm going

25   to do is this, if you don't want to answer the

1    questions, I obviously can't force you to answer a

2    question that you don't want to answer.  But I -- after

3    this deposition I'm going to ask the court reporter to

4    certify all these questions, and she's going to put them

5    all at the front of the deposition transcript.  She's

6    going to put my question and your refusal to answer that

7    question.  And I'm going to take it up with the judge.

8    And so I'm just putting you on notice that that is what

9    I'm going to do, so that perhaps we can get this done in

10   a reasonable fashion today.

11           So to recap, I asked you what your current

12   residence was, and you said it was 3701 US Highway 92

13   East, Apartment C, in Plant City.  I asked you what your

14   immediate prior residence was, and you said for about

15   two years you had lived at 615 North Wiggins Road in

16   Plant City, correct?

17        A    Can you repeat the question?

18        Q    Sure.  Do you currently live at 3710 US Highway

19   92 Northeast (sic), Apartment C in Plant City?  Correct?

20        A    Correct.

21        Q    And you live there alone, right?

22        A    That's correct.

23        Q    Okay.  Immediately before moving to that

24   apartment you lived at 615 North Wiggins Road in Plant

25   City, correct?

1    A    That's correct.

2    Q    And you lived there for about two years, right?

3    A    Give or take.

4    Q    Okay.  Mr. Combee, if you tell us that -- you

5  can always tell us that a date is an approximate date.

6  We don't expect you to have a perfect recollection on

7  dates, okay?  And the court reporter just wrote all that

8  down, okay?  So you can hold me to that.

9        What type of residence was 615 North Wiggins

10  Road?  And by that what I mean is this:  Was it an

11  apartment complex?  Was a single-family home?  Was it a

12  duplex?  Was it a mobile home park, sir?

13    A    Like I said before -- and you know what I said

14  before.

15    Q    Tell me what you said before.  I don't recall.

16    A    And, you know, I don't either.

17    Q    Okay.  Okay.  Well, then why don't you tell me

18  what 615 North Wiggins Road -- what type of residence

19  that was.

20        Are you going to answer the question, sir?

21    A    No, I'm not.

22    Q    Okay.

23        MR. COHEN:  Please certify that question and

24    the answers -- or the refusal to answer.

25  BY MR. COHEN:

1     Q   Did anyone live with you during the two years

2  you lived at 615 North Wiggins Road at any time during

3  that approximate two years?

4     A   Of course, because, like I said, I didn't rent

5  the resident, I didn't own the resident, so it's obvious

6  that somebody else was there, correct?  Isn't that what

7  I said?

8     Q   No.  I didn't ask you the question of whether

9  you owned it or rented it.

10     A   Oh, I'm sorry.  I apologize.

11     Q   I'll ask you now, though.  Did you own or rent

12  the residence -- the residence at 615 North Wiggins

13  Road?

14     A   Can you repeat the question?

15     Q   Sir, did you own that residence at 615 North

16  Wiggins Road?

17     A   No, I did not.

18     Q   Did you rent the residence at 615 North Wiggins

19  Road?

20     A   No, I did not.

21     Q   Did you live with anyone at that residence at

22  615 North Wiggins Road?

23     A   Yes, I did.

24     Q   Can you tell me who you lived with, and if it

25  was more than one person, tell me all their names?

1    A    No, I will not.

2    Q    The time period you lived there, at 615 North

3   Wiggins Road, approximately two years, that's the time

4   period when the alleged discrimination and harassment

5   that we're going to talk about today occurred, right?

6    A    Can you repeat the question?

7    Q    Sure.  In this lawsuit you're alleging that --

8   that during part of 2008 and 2009 that you were harassed

9   and retaliated against at Circle K, right?  Basically?

10    A    I don't have my documentation with me at the

11   time, so...

12    Q    Okay.  Well, I got your documentation with me.

13         MR. COHEN:  Let's mark this as Exhibit 2.

14         (Thereupon, Deposition Exhibit No. 2 was marked

15    for purposes of identification.)

16   BY MR. COHEN:

17    Q    Here, Mr. Combee.  (Document tendered.)  Let me

18   show you what we've marked as Deposition Exhibit 2.

19   This is the complaint that you filed in federal court.

20   Okay.

21         Exhibit 1 is the document that you filed with

22   the federal government, the charge of discrimination.

23   So why don't you read through those documents.  These

24   are your documents.  Okay.  And see if you can -- if

25   that refreshes your recollection regarding the time

1 frame that you're complaining about in this case.

2     A    Well, can you repeat the question that you

3 asked me before you presented these documents to refresh

4 my memory?  Do you recall?

5     Q    I recall what I asked, but I'm going to go

6 about it a different way.  In this case, you're alleging

7 that you were sexually harassed and retaliated against

8 at Circle K, right?  Basically?

9     A    Yes, I was.

10     Q    Okay.  And that's what this case is about,

11 right?  That's why you --

12     A    Not solely.

13     Q    Okay.  But part of it, right?

14     A    Small part of it.

15     Q    All right.  Tell me what the case is about,

16 Mr. Combee.  Why did you sue Circle K?

17     A    You don't know?

18     Q    Mr. Combee, this is your opportunity to explain

19 to us why you sued Circle K, so I'm going to ask you

20 that question again.  Can you please explain to us why

21 you sued Circle K in this lawsuit?

22     A    If you -- if you can read, I believe you know

23 the answer to that question you just asked me.

24     Q    Okay.  But I'm allowed to hear it from your

25 mouth, so that's why I'm asking you to please tell me

1   why you sued Circle K.

2        A    I'd rather not respond to that.

3             MR. COHEN:  Okay.  Certify the question.

4   BY MR. COHEN:

5        Q    In the documents, Exhibit 1 and Exhibit 2,

6   okay, you allege that you were discriminated against and

7   retaliated against during 2008 and 2009; is that

8   correct?

9        A    Between 2008 -- the year 2008 and 2009, that is

10  correct.

11       Q    And you lived during 2008 and 2009 at 615 North

12  Wiggins Road; is that correct?

13       A    Can you repeat the question, please?

14       Q    Sure.  During 2008 and 2009, you lived at 615

15  North Wiggins Road in Plant City, is that correct?

16       A    I don't want to guess -- speculate.  I --

17  honestly -- I mean, I could figure it out.  I'd have to

18  do some, you know...

19       Q    So you don't recall?  Is that correct?  You

20  don't recall right now; is that correct?

21       A    At this present moment, yes.

22       Q    When you allege you were being harassed and

23  discriminated against, where did you live?

24       A    I lived at 3601 Paul Buchman Highway, Plant

25  City, Florida -- Plant City, 33566.

1    Q    How long did you live at that address for?

2    A    Estimating, off and on, since -- just

3    estimating, I would estimate '95 to -- I don't want to

4    assume or guess, so, I mean, I --

5    Q    But that's where you were living when the

6    harassment occurred, right?  At 3601 Paul Buchman

7    Highway?

8    A    Yes.  I relive -- call -- I -- I -- I -- I

9    recollect living there when the harassment and problems

10   arised.

11   Q    Okay.  So were you living at Paul Buchman

12   Highway and 615 North Wiggins Road kind of at the same

13   time, or were they at different times?  Did you maintain

14   two residences?

15   A    No.

16   Q    Was 3601 Paul Buchman Highway -- was that a

17   residence, a home -- a single-family home, an apartment

18   complex, a mobile home park?  What was that?

19   A    An RV resort.

20   Q    An RV resort.

21        Did you have your own RV there?

22   A    Yes, I did.

23   Q    Did you own it or rent it?

24   A    I owned it.

25   Q    Did you live with anyone in the RV -- in your

1    RV?  Did you have any cohabitants?

2    A    No.  No.

3    Q    Are you married?

4    A    No.

5    Q    Have you ever been married?

6    A    Yes.

7    Q    What was your wife's name?

8    A    Tammy.

9    Q    What was her maiden name?

10    A    Jackson.

11    Q    How long were you married for?

12    A    As I recall, seven years.

13    Q    And did you get divorced?  Is that how the

14  marriage ended?

15    A    Yeah.

16    Q    Okay.  Unfortunately, marriages end in

17  different ways, but -- so that's why I ask.

18        And when did you-all dissolve your marriage?

19  When did you get divorced -- the year?

20    A    I believe, as I recall, 1994.

21    Q    And you haven't been married again since?

22    A    No.

23    Q    Do you have any kids?

24    A    Yes.

25    Q    How many?

1      A      I have a son.

2      Q      How old is he?

3      A      21.

4      Q      Does Ms. Jackson live in Plant City?

5      A      I don't know where she lives.

6      Q      When was the last time you spoke to her?

7      A      Is this relevant, really?

8      Q      Yeah.

9      A      Why?

10     Q      Because she could very well be a witness in

11  regards to some of the damages that you're seeking in

12  this case.  If you haven't talked to her in a long time,

13  just tell me that, and I'm not going to ask any more

14  questions.

15     A      Okay.  No, I haven't talked to her in an

16  extremely long time.

17     Q      Okay.  Did you attend high school?

18     A      Did I attend high school?

19     Q      Yes.

20     A      Yes, I did.

21     Q      Okay.  What high school?

22     A      Plant City.

23     Q      Is it Plant City High School?  That's the name

24  of it?

25     A      Yes.

1    Q    Okay.  Did you graduate?

2    A    Yes, I did.

3    Q    What year?

4    A    '84.

5    Q    Do you have any post high school education?

6  Vocational school?  College?  Community college?

7  Anything like that?

8    A    No.

9    Q    Were you ever in the military?

10   A    No.

11   Q    Are you currently employed?

12   A    No.

13   Q    Where was the last place you were employed?

14   A    Speed Lane Express.

15   Q    And where is that located?

16   A    It's located on 501 County Line Road.

17   Q    Is that Plant City as well?

18   A    It's on the line, so --

19   Q    Okay.  That's fine.

20   A    Hillsborough, Polk.

21   Q    What is Speed Lane Express?

22   A    It's a convenience store.

23   Q    What was your job there?

24   A    Cashier.

25   Q    How long were you employed there?

1    A    I don't -- I don't recall.

2    Q    A year or less?

3    A    Over a year.

4    Q    Before Speed Lane Express, where were you

5    employed?

6    A    Where -- where is this all going?  I mean,

7    really.

8    Q    Mr. Combee, you're -- you're asking for money

9    damages from Circle K in this lawsuit, right?

10   A    Correct.

11   Q    Okay.  And part of your money damages, I'm

12   going to assume, is based on an assertion from you that

13   you've lost income, is that right, as a result of being

14   fired?

15   A    No.

16   Q    That's not correct?

17   A    That's not -- that's not the whole ball of wax

18   here.

19   Q    I understand that.  I understand that.  We're

20   going to -- but I have to walk through each segment of

21   the ball of wax, okay?  All right.

22   A    Uh-huh.

23   Q    So, because you're asking for lost wages, I'm

24   entitled to find out where you worked before and after

25   you worked at Circle K, because --

1    A    Who's --

2    Q    -- just like you're allowed to make allegations

3    against Circle K, Circle K is allowed to present its

4    defenses to the court, okay?  So part of our defense --

5    as part of our defense, we need to understand where you

6    worked before and after Circle K.  That's all I'm trying

7    to ask you.  I'm trying to get a chronology -- a time

8    line of the places you worked.  And you told me you

9    worked at Speed Lane, and now I'm just asking where did

10   you work before Speed Lane?

11       A    I worked for Circle K.

12       Q    Okay.  And the dates I have for your employment

13   with Circle K -- this comes from Circle K's records --

14   are November 20, 2007, the hire date, through June 11,

15   2009.  Do you agree with those dates, as best you can

16   recall?

17       A    As I can recollect, it was June 10th, '09.

18       Q    Okay.  That's fair enough.  So it was 11/20/07

19   to 6/10 of '09, that's...

20       A    That sounds right.

21       Q    Okay.  Before -- was that the only time you had

22   ever worked for Circle K before that time period?

23       A    Yes.

24       Q    Okay.  Where did you work prior to Circle K?

25       A    I'd rather not answer that question.

1    Q    Okay.  Did you work, before you worked at

2  Circle K, anywhere?

3    A    Can you repeat the question?

4    Q    Did you work anywhere before you worked at

5  Circle K?

6    A    I'd rather not answer that question.

7         MR. COHEN:  Certify that one.

8  BY MR. COHEN:

9    Q    Did you only work at one store while you were

10  at Circle K during that whole time period from November

11  of '07 through June of '09?

12    A    As I recall, I worked one night over at the

13  Circle K on Jap Tucker Road.

14    Q    One night on Jap Tucker Road?

15    A    As best as I can recollect, yeah.

16    Q    Okay.  Where did you work the rest of the

17  time?  What location?

18    A    2210 Park Road.

19    Q    Park Road?

20    A    (Nods head.)

21    Q    In Plant City?

22    A    That's correct.

23    Q    Is it fair to say that the 2210 Park Road

24  address, that's the store you were based out of during

25  your entire time at Circle K?

1    A    Yes.

2    Q    Okay.  The store manager for that entire time

3  that you were there, was that Renee McCorkle?

4    A    That's correct.

5    Q    And for part of the time you were there Sharon

6  Pulaski was an assistant manager; is that correct?

7    A    That's correct.

8    Q    And I apologize if I get her name wrong.

9         And for another part of the time, Kathy --

10  Kathy Mitchell was an assistant store manager; is that

11  right?

12    A    That's correct.

13    Q    And during your entire time of employment you

14  were a customer service representative, right, at Circle

15  K?

16    A    That was my job class, yes.

17    Q    Okay.  And therefore that also was a CSR; is

18  that right?

19    A    That sounds right.

20    Q    Other than Mrs. Pulaski and Mrs. Mitchell, were

21  there any other assistant store managers while you were

22  at Circle K, at that store that you worked at?

23    A    Can you repeat the question?

24    Q    Sure.  The store you worked at at Circle K --

25    A    Uh-huh.

1    Q    -- do you recall that that store had any other

2    assistant managers besides Sharon Pulaski and Kathy

3    Mitchell?

4    A    Any other assistant managers?

5    Q    Yes.  Just during your employment.

6    A    Yes.

7    Q    It did have.  Who else was an assistant

8    manager?

9    A    There was, as I recall, a Katherine Hyde.  And

10    I don't recall if Evan was -- I can't really pronounce

11    his last name, but -- if he was an assistant.  Which is

12    a possibility.

13    Q    Okay.  But you're sure Katherine Hyde was?

14    A    No, I'm not certain.  I'm not certain.

15    Q    Okay.  Evan --

16    A    I'm assuming she was.

17    Q    Evan is Evan -- I'm not going to be able to

18    pronounce the name either -- Cochuyt, C-O-C-H-U-Y-T.

19    Does that sound about right?

20    A    Uh-huh.

21    Q    Okay.  Do you recall what your initial rate of

22    pay was at Circle K?

23    A    Yeah.  It was like -- gross, I think it was,

24    320 a week or something like that.

25    Q    It was based on the number of hours you worked,

1    right?

2         A    Correct.  I was an hourly employee.

3         Q    Okay.  You received one or two raises while you

4    were at the Circle K, right?  During the whole time you

5    were there, right?

6         A    I received one.

7         Q    One raise.  Okay.  You never received a

8    decrease in salary, right?  In other words, your hourly

9    rate never went down from its initial rate; is that

10   right?

11        A    That -- that's correct.

12        Q    Did you ever apply for any promotions at Circle

13   K, if you can recall?

14        A    I'd rather not answer that question at this

15   time.

16        Q    Okay.  At Speed Lane Express -- now, if you --

17   your employment with Circle K terminated in June 10th,

18   2009, right?  That's the date we're going with?

19        A    As I recollect, that's the date.

20        Q    Okay.  And that's really close to Circle K's

21   records, too, so I think we can probably agree on that

22   date.  When about did you start working for Speed Lane

23   Express?

24        A    I don't have a specific date.

25        Q    It's okay.

1       A    But estimating, month, month and a half

2    after --

3       Q    Okay.

4       A    -- separation.

5       Q    Okay.  And did you make more or less when you

6    went to work for Speed Lane Express?  Were you paid

7    hourly at Speed Lane Express?

8       A    Yes.

9       Q    Did you make more or less an hour?

10      A    More.

11      Q    You made more at Speed Lane Express?

12      A    Uh-huh.

13           THE COURT REPORTER:  Is that a yes or no?

14           THE WITNESS:  Yes.

15           MR. COHEN:  He said he made more money at Speed

16      Lane Express.

17   BY MR. COHEN:

18      Q    Right?

19      A    Yes.

20      Q    And did you work about the same number of

21   hours, or more?  Or less?

22      A    More.

23      Q    More hours at Speed Lane Express?

24      A    Uh-huh.

25           THE COURT REPORTER:  I'm sorry.  You keep

1    saying "Uh-huh."  Is that a yes or no?

2          THE WITNESS:  Excuse me.  I'm sorry.  Yes.

3    Q    And why did you -- did you resign from Speed

4    Lane Express, or were you terminated?

5    A    Same thing, isn't it?  One's a voluntary, one's

6    a involuntary.  You just asked me the question.  Am I

7    wrong?

8    Q    Why don't I rephrase the question?

9    A    Okay.

10   Q    Did you resign from your employment at Speed

11   Lane Express?

12   A    No, I did not.

13   Q    Okay.  So did Speed Lane Express separate your

14   employment?

15   A    Yes.  The business was slow, and they laid me

16   off.

17   Q    Okay.  That was my question.  That's the

18   reason, it was just -- just -- it was a layoff?

19   A    A layoff.

20   Q    Okay.  Have you ever been self-employed?  And

21   by that I mean, have you ever worked for yourself, just

22   doing jobs for businesses, people, which you didn't get

23   paid -- you weren't a W-2 employee, you were just --

24   just working for yourself?

25   A    I think I need a break right now, if you don't

1    mind.

2        Q    Don't mind at all.  If you want to get up and

3    walk around, you're free to do that.  If you want a --

4        A    Yeah.  Can I get just a little bit of fresh

5    air?

6        Q    Yeah.  And if you want a bottle of water, I

7    think there's water in the fridge there.

8             (Brief recess.)

9    BY MR. COHEN:

10       Q    So before Circle K, have you ever been

11   self-employed, or did you always work for a business?

12       A    I'd rather not answer that question.

13       Q    Okay.  All right.  In the lawsuit that you

14   filed against Circle K and that we're talking about

15   today, the reason we're here, are you going to ask the

16   court to award you back pay or front pay, damages based

17   on loss of income?

18       A    I'd rather not answer that question.

19       Q    Okay.  Mr. Combee, you've sued Circle K,

20   right?  Yes?

21       A    I filed a complaint.

22       Q    You understand that's a lawsuit, right?

23       A    Correct.

24       Q    Okay.  And you're asking for damages, correct?

25   You're asking for money, right?

1    A    I'm asking for justice, and if money comes with

2    it -- punitive damages.  Okay.

3    Q    Okay.  Tell me, Mr. Combee, how you're going to

4    calculate or ask the court to calculate the money that

5    you think you're owed from this lawsuit?

6    A    I'd rather not answer that question.

7         MR. COHEN:  Okay.  I'd like you to certify the

8    last two questions that he refused to answer.

9    BY MR. COHEN:

10   Q    Have you ever been on unemployment, sir?

11   A    Yes.

12   Q    Can you tell me when, the dates, basically?  I

13   mean, approximately the dates.

14   A    When you say dates, can you be more specific?

15   Q    Sure.  The dates when you received -- the dates

16   when you were receiving unemployment benefits from the

17   government.

18   A    Dates, as plural?

19   Q    Sure.  If you were on unemployment only once,

20   then those dates.  If it was more than once, then all

21   the dates, if you can.

22   A    I'd rather not answer that question.

23        MR. COHEN:  Certify it.

24   BY MR. COHEN:

25   Q    Have you ever applied for or received Social

1    Security disability benefits?

2        A    Not that I can recall.

3        Q    What about any other government benefits other

4    than unemployment?

5        A    I'd rather not answer that question.

6             MR. COHEN:  Certify it.

7    BY MR. COHEN:

8        Q    When was the last time you talked to Renee

9    McCorkle, as best as you can recall?

10       A    As I recall, the last time I've spoken to Renee

11   McCorkle was on my termination from Circle K.

12       Q    That day?  The day of your termination?

13       A    Yeah.

14       Q    Okay.

15       A    The best I can remember.

16       Q    Okay.  What about Kathy Mitchell; when was the

17   last time you spoke with Kathy Mitchell?

18       A    I don't recall.

19       Q    Was it before your termination from Circle K,

20   or after?

21       A    I'd rather not answer that question.

22       Q    Do you recall speaking with Kathy Mitchell

23   after you were terminated from Circle K?

24       A    I'd rather not answer that question.

25       Q    Have you ever talked to Kathy Mitchell about

1   the fact that you're suing Circle K?

2        A    I'd rather not answer that question.

3             MR. COHEN:  Certify all of those questions.

4   BY MR. COHEN:

5        Q    Have you spoken to any Circle K employees about

6   the fact that you're suing Circle K?

7        A    I'd rather not answer that question.

8             MR. COHEN:  Certify it.

9   BY MR. COHEN:

10       Q    Kathy Mitchell was an assistant store manager

11  during at least -- for at least part of the time you

12  worked at Circle K, right?  You testified to that

13  previously, right?

14       A    Can you be more specific on partly?

15       Q    Sure.  During part of the time you were

16  employed by Circle K, a portion of that time, Kathy

17  Mitchell was the assistant store manager, right?  Or was

18  it -- right?

19       A    Kathy was Renee's assistant.

20       Q    Okay.

21       A    Kathy Mitchell --

22       Q    Yes.

23       A    -- was Renee's assistant.

24       Q    And --

25       A    Not Kathy Hyde.

1      Q    Okay.  Kathy Mitchell.  So Kathy Mitchell, have

2  you talked to her since you left Circle K?

3      A    I'd rather not answer that question.

4      Q    What about Kathy Hyde?  Have you talked to

5  Kathy Hyde since you left Circle K?

6      A    I'd rather not answer that question.

7      Q    What about Evan, who you mentioned earlier;

8  have you --

9      A    I'd rather not answer that question.

10      MR. COHEN:  Certify all those.

11  BY MR. COHEN:

12      Q    How did you come to apply for a job at Circle

13  K?

14      A    I'd rather not answer that question.

15      MR. COHEN:  Certify it.

16  BY MR. COHEN:

17      Q    Who -- were you interviewed for the job -- for

18  your customer service representative job at Circle K?

19      A    Can you be more specific on clar --

20      Q    Sure.  Before you were hired at Circle K, were

21  you interviewed by someone at Circle K for the job?

22      A    As I recall, Renee briefly introduced me to

23  Janice Teeter.

24      Q    Okay.  And Janice Teeter was Renee's boss,

25  right?

1    A    What I understand.

2    Q    Do you understand what I mean by -- excuse

3    me -- a job interview?

4    A    Can you expound a little more, so I can

5    understand?

6    Q    I'll come back to that.

7    A    Okay.

8    Q    Who was it that actually offered you the job at

9    Circle K; do you recall?

10   A    The company offered me a job.

11   Q    But what person with the company?

12   A    All I know is the company offered me a job.

13   Q    Okay.  Did a person communicate to you that the

14   company was offering you a job?

15   A    Will you repeat the question?

16   Q    Sure.  Did a person, an individual, tell you

17   that you were being offered a job with Circle K?

18   A    I'd rather not answer that question.

19        MR. COHEN:  Certify that question.

20   BY MR. COHEN:

21   Q    Who trained you?  Did you receive any training

22   when you became employed by Circle K?

23   A    I'd rather not answer that question.

24   Q    Were you ever counseled while you were at

25   Circle K?

1    A    There's many different ways to counsel.  How --

2    Q    Any way.  I'm -- just very broad question.  I

3  just want to -- and then I'll break it down.  Were you

4  ever counseled at Circle K?  Yes or no?

5    A    Like I said, there's different -- many

6  different ways to counsel someone.  Can you be more

7  specific?

8    Q    No.  I want to know if you were ever counseled

9  in any way at Circle K.  It's not a trick question.

10    A    I'd rather not answer that question.

11    Q    Were you ever written up while you were at

12  Circle K?

13    A    I'd rather not answer that question.

14        MR. COHEN:  Certify that.

15  BY MR. COHEN:

16    Q    Is that part of your lawsuit, being written up

17  at Circle K?

18    A    Will you repeat the question, please?

19    Q    Sure.  Is part of your lawsuit that you were

20  written up at Circle K?

21    A    I would say that's fair to say.

22    Q    So, were you ever written up when you were at

23  Circle K?

24    A    Yes.  Unjustly, yes.

25    Q    And the -- the writeups -- you refer to them as

1  writeups.  Those were called counseling notices.  Do you

2  recall that?

3      A    Will you repeat the question, please?

4      Q    Sure.  The writeups, the form that they use for

5  the writeups --

6      A    Yeah.

7      Q    -- were those called counseling notices?  They

8  were, right?

9      A    That sounds right.

10     Q    Okay.  Now, that's a fairly formal means of

11 counseling, right, an actual writeup?  Do you agree with

12 me on that?

13     A    In general.  That's a tool.

14     Q    A fairly formal tool, right?

15     A    (Nods head.)

16     Q    Okay.  Yes?

17     A    Yes.

18     Q    Were you ever given any verbal counseling or

19 constructive criticism from the manager or assistant

20 manager at Circle K regarding job issues?

21     A    Will you repeat the question, please?

22     Q    Sure.  Were you ever given any verbal

23 counseling or warnings or notices from the manager or

24 assistant manager of Circle K about any issue?  In other

25 words, we're talking --

1     A    Oh, you mean a verbal writeup?

2     Q    Sure.  Yes, verbal.

3     A    As I recall, there was one.

4     Q    Okay.

5     A    And it was from Sharon.

6     Q    Pulaski?

7     A    (Nods head.)

8     Q    Okay.  Now, you recall actually receiving the

9 written writeups, right, during your tenure at Circle

10 K?  Whether they were right or wrong, I'm not asking,

11 but -- I'm asking if you actually recall receiving them,

12 correct?  When you were written up at Circle K, you were

13 actually presented with a counseling notice; is that

14 right?

15     A    That's fair to say.

16     Q    Okay.  And that form that you were given, it

17 had a space on it for the employee to explain what

18 happened and to sign it, right?

19     A    Correct.

20     Q    Okay.  And some of the counseling notices you

21 actually did sign, right?  Do you recall that?

22     A    That would be fair to say.

23     Q    And some of them you -- you didn't sign, or you

24 actually wrote on those that, "Hey, this isn't correct.

25 This is false," right?

1     A    That's correct.

2     Q    And the ones where you said, "I'm not signing

3 this" or you said "This is false," those are the ones

4 you disagreed with, right?  That's why you didn't sign

5 them, right?

6     A    Will you repeat the question?

7     Q    Sure.  The counseling notices that you believed

8 were false, that you did not agree with, you refused to

9 sign those, because you didn't agree with them, right?

10    A    As I recall, I put "These statements are

11 false," and signed my name.

12    Q    Okay.  That's what I'm asking.

13    A    Verifying that I'm --

14    Q    Disagreeing?

15    A    Yes.  Signing my name, saying "This is not

16 true."

17    Q    Okay.  But the ones that you signed -- and

18 there were some that you signed and you didn't write

19 that they're false on, right?

20    A    I'd rather not answer that question.

21         MR. COHEN:  Certify it.

22 BY MR. COHEN:

23    Q    If you received a writeup and you did not agree

24 with it, you said so on the form, right?

25    A    That's fair to say.

1     Q    Let me show you what we've marked as Deposition

2  Exhibit No. 3.

3          (Thereupon, Deposition Exhibit No. 3 was marked

4     for purposes of identification.)

5  BY MR. COHEN:

6     Q    And this is the first page of the applicant's

7  employment, Mr. Combee.

8          Do you recall -- is that your signature down

9  there in the bottom left-hand corner?

10    A    It's -- it's possible, but not an absolute,

11  okay.

12    Q    Okay.  Does that -- does that look like the

13  date that you applied at Circle K?  Applied, not -- if

14  you don't recall, you don't recall.  That's okay.

15    A    I don't.

16    Q    Okay.

17    A    I mean, it looks --

18          MR. COHEN:  Okay.  Let's go ahead and mark this

19     as No. 4.

20          (Thereupon, Deposition Exhibit No. 4 was marked

21     for purposes of identification.)

22  BY MR. COHEN:

23    Q    What we've marked as Deposition Exhibit No. 4

24  is the New Employee Training Participant Guide, and I'm

25  going to ask if you recognize your signature there.  Do

1    you recognize your signature on that document?

2        A    It sure does look like it.

3        Q    Okay.

4        A    But I'm not absolute sure.

5        Q    All right.  You can flip that one over.

6             MR. COHEN:  Let's mark this as Exhibit No. 5.

7             (Thereupon, Deposition Exhibit No. 5 was marked

8        for purposes of identification.)

9    BY MR. COHEN:

10       Q    Would you go ahead and take a look at the front

11   page of that and tell me if that's your signature there,

12   Mr. Combee.  (Document tendered.)

13       A    It looks like it.

14       Q    Okay.  And the last three documents that we've

15   looked at, the application, the training participation

16   guide and the sexual harassment policy, these were in

17   your personnel file at Circle K.  You have no reason to

18   believe that this isn't your signature, right?

19       A    Can you -- will you say that again?

20       Q    Sure.  You say you can't -- it looks like your

21   signature, but you can't be a hundred percent sure.  But

22   you have no reason to believe that it's not your

23   signature, right?

24       A    I do have a reason.

25       Q    You think that these -- okay.  Tell me why.

1      A    Because I can prove -- I know that I have a

2  document that's forged, and I can prove it.

3      Q    Okay.  What document is that?

4      A    I'd rather not answer that question.

5      Q    Where is that document?  As we sit here today,

6  where is that document located?

7      A    I'd rather not answer that question.

8      Q    Do you have possession -- do you have -- is the

9  document with you today?

10     A    I'd rather not answer that question.

11     MR. COHEN:  We're certifying all of these.

12  BY MR. COHEN:

13     Q    So you're not going to tell me where the

14  document is; is that correct?

15     A    I'd rather not answer that question.

16     MR. COHEN:  Mark this as 6.

17     (Thereupon, Deposition Exhibit No. 6 was marked

18    for purposes of identification.)

19  BY MR. COHEN:

20     Q    Could you please, sir, take a look at

21  Deposition Exhibit No. 6 for me? (Document tendered.)

22     Have you looked through it?  Does that look

23  like your signature at the -- on the last page of this

24  document?

25     A    It looks like it.

1    Q    And do these look like your initials down

2    there, the left-hand column?  Do you see where it says,

3    handwritten, "SC," "SC," all the way down there?  Do you

4    recall initialing this document?

5    A    It looks like my initials, but like I said, I'm

6    not 100 percent sure.

7    Q    Okay.  Did you know Renee McCorkle prior to

8    working at Circle K?

9    A    No, sir.

10   Q    What about Kathy Mitchell did you know her

11   before you worked at Circle K?

12   A    No.

13   Q    No?

14   A    No.

15   Q    And those were the -- well, along with Sharon

16   Pulaski, those were the individuals who you directly

17   reported to at Circle K; is that right?  Ms. McCorkle,

18   Ms. Mitchell, and Mrs. -- and Sharon?  Directly report

19   to.

20   A    Well, there might be a little situation here,

21   okay?

22   Q    Okay.  Go ahead.

23   A    Because when you ask that question -- when you

24   work at the store and you bring in another assistant,

25   okay --

1    Q    Uh-huh.

2    A    -- then you have two assistants and you've got

3    one manager.  And so you are asking the question:  Who

4    do you directly report to?  So there could be a conflict

5    there, possibly.

6    Q    Okay.  Was there ever a conflict when you were

7    at Circle K, like you just described, in regards to who

8    you reported to?

9    A    Will you repeat the question?

10    Q    Sure.  I think you said that sometimes there

11    could be a conflict in regards to who you directly

12    reported to, right?

13    A    No, I didn't say that.

14    Q    Okay.  I'm sorry.  I didn't understand.  Go

15    ahead.

16    A    I just -- I just said that there could possibly

17    be a conflict --

18    Q    Okay.

19    A    -- if you bring someone from another store

20    into --

21    Q    Your store.  Did that ever happen?  Did they

22    ever bring anybody else into the store?

23    A    Sure.

24    Q    To manage the store?

25    A    To manage the store?

1      Q    Or to be the assistant manager, other than

2    Mrs. Pulaski or Mrs. Mitchell?  Do you recall?

3      A    If it was and it was done by the company, the

4    company did not make me aware of it, or the persons

5    representing the company did not make me aware of it.

6      Q    Okay.  So can you tell us why you sued Circle K

7    in this lawsuit?

8      A    I'd rather not answer that question.

9           MR. COHEN:  Certify it.

10   BY MR. COHEN:

11     Q    Can you tell me what you're alleging Circle K

12   did wrong in this lawsuit?

13     A    Will you repeat the question?

14     Q    Sure.  Can you tell me what you are alleging

15   that Circle K did wrong in this lawsuit?

16     A    I'd rather not answer that question.

17          MR. COHEN:  Certify that.

18          Just for the record, it's about 11:20 right

19          now.  What I'd like to do is, if it's okay with

20          you, work until about noon, take about a half-hour,

21          45-minute break, and then come back and finish up.

22          Is that okay?

23          THE WITNESS:  Fine with me.

24          MR. COHEN:  Okay.  So around noon when we get

25          to a logical stopping point, we'll take a break,

1    okay?

2  BY MR. COHEN:

3     Q    You had a relationship with Renee McCorkle

4  outside of the Circle K store, right, at some point?

5     A    Can you repeat the question?

6     Q    Sure.  Renee McCorkle was the store manager

7  while you were at Circle K, right?

8     A    Correct.

9     Q    And at some point in time you and Ms. McCorkle

10 had a relationship outside of business, right?

11    A    But --

12    Q    Well, yes or no, and then I'll give you an

13 opportunity to explain, okay?  Did you and Ms. McCorkle

14 have a relationship?

15    A    Will you repeat the question?

16    Q    Sure.  Did you and Mrs. McCorkle have a

17 relationship outside of your -- outside of the Circle K

18 employment?

19    A    Can you be -- can you clarify when you say

20 "outside"?

21    Q    Sure.  It wasn't part of running or operating

22 the convenience store.

23    A    It got intertwined.

24    Q    Okay.  But you had a -- a friendship,

25 boyfriend-girlfriend, sexual relationship, with

1   Ms. McCorkle; is that right?

2       A    I wouldn't say boyfriend-girlfriend.

3       Q    Okay.

4       A    We had a relationship.

5       Q    Okay.  Can you tell me when that -- that --

6   when that relationship began?

7            And I'll let you refer to your complaint and

8   your charge of discrimination -- that's the complaint,

9   and that's the charge of discrimination.  (Documents

10  tendered.)  If you'd like to refer to those two

11  documents.

12      A    What would you like me to do?

13      Q    I would like for you to tell me when the

14  relationship began, as best you can recall.

15      A    As I can recollect, it was in May.  May.

16      Q    Of 2008?

17      A    Correct.

18      Q    And how did it begin?

19      A    Is all this necessary?

20      Q    Yes.  Yes.  And it's necessary because in the

21  documents that you filed with the federal government you

22  talk about this, so -- about this relationship, so I am

23  entitled to know about it.  So how did this relationship

24  begin?

25      A    She basically invited herself over to my place

1    to watch the races.

2         Q    Okay.  And did you say yes?  I mean, did she

3    come over and watch the races with you?

4         A    Yes.  Yes, she did.

5         Q    Okay.  How long did the relationship -- and was

6    that the first -- that was the first interaction in the

7    relationship?

8         A    That would be fair to say.

9         Q    Okay.  And how long did it last from there

10   until it was ended?  And, again, I'm not really trying

11   to trick you.  I think you put the dates in the

12   complaint here, so if you want to read that, maybe it

13   will refresh your recollection as to the dates of the

14   affair or the relationship or whatever you want to call

15   it.

16        A    But you asked specifically a question.  Will

17   you repeat the question, so...

18        Q    Sure.  When did -- let me do it this way.

19   It'll be easier.  Sure.  I want to know when the

20   relationship ended.  In this document here that you

21   filed with the EEOC, you said, "After I ended the sexual

22   relationship with her in early" -- and then it's June

23   2009.  That looks like it was scratched out and meant to

24   be July of 2009.  That's why I'm asking.

25        A    Well, I gave her the benefit of the doubt right

1    here.

2         Q    Okay.  I -- I just want to know from your

3    recollection when the relationship began.  You said May

4    of 2008.

5         A    Uh-huh.

6         Q    And when it ended.  Is that July of '08, or --

7         A    As I can recollect, it was early June of '08.

8         Q    Okay.  And did you guys date?  Did you -- did

9    you go anywhere together?

10        A    That's fair to say.

11        Q    Okay.  It was consensual while it was

12   happening?  In other words --

13        A    Of course.

14        Q    Okay.  And did anyone at work know about it

15   besides you and Ms. McCorkle?  Anyone at Circle K?

16        A    That's a possibility.

17        Q    While it was happening, did you tell anyone?

18        A    Not that I recall.

19        Q    Okay.  Do you know if Ms. McCorkle told anyone

20   or not?

21        A    I don't know.

22        Q    Okay.  Now, can you describe to me the

23   circumstances of how the relationship ended?

24        A    Will you repeat the question?

25        Q    Sure.  How did the relationship end in June of

1   '08?

2      A    It was early June of '08, and we -- we -- we

3   had gotten into an argument at the RV park -- the RV

4   resort.

5      Q    Okay.

6      A    Okay.

7      Q    Uh-huh.

8      A    And that's pretty much -- it was pretty bad.

9      Q    Okay.  And that's when it ended, the

10  relationship?

11     A    As far as I'm concerned.

12     Q    Okay.  Was it a mutual ending, or did one of

13  you-all say something that would have said, "This is

14  over"?

15     A    As far as I'm concerned, I ended it.  Okay.

16     Q    Okay.  And why do you say that?  What did you

17  say that would have indicated it was ended?  Or do?

18     A    I really don't want to go into details about

19  it, but, you know, it's basically -- I will say this.

20  We got into an argument.  It was a pretty bad argument,

21  and then we had to go see each other at work.  You see

22  the -- that's when she started discriminating, not long

23  after.

24     Q    Okay.

25     A    Okay.  That's what started happening.

1    Q    So in June of 2008 you guys got into an

2    argument at the RV park, and that left bad feelings on

3    both sides.  Is that fair to say?

4    A    Will you repeat that again?

5    Q    Sure.  The argument that you had at the RV park

6    that ended the relationship --

7    A    Yeah.

8    Q    -- left bad feelings on both sides, right?

9    A    I can't speak for her.

10   Q    Okay.  Do you think that she was mad at you

11   because the relationship ended, or mad at all?

12   A    I would say, that would be fair to say.

13   Q    Were you mad or upset?

14   A    About the relationship ending?

15   Q    Yes.

16   A    No.  I could have cared less.

17   Q    Okay.  Did the job expectations change?  Did

18   your job expectations -- strike that.  Let me ask a

19   better question.  Did your job change at Circle K after

20   the relationship ended?

21   A    Can you be a little more specific?

22   Q    Sure.  Your -- your -- well, no, actually I

23   can't.  In any way, did your job change?

24   A    I'd rather not answer that question.

25   Q    Prior -- before the relationship with Renee

1    began, had you received any counseling notices that you

2    can recall, verbal or written?

3        A    Before?

4        Q    Yes.

5        A    I don't recall.

6        Q    Okay.  Did Kathy Mitchell's attitude towards

7    you change after the relationship ended?

8        A    Kathy Mitchell?

9        Q    Uh-huh.  Yes.

10       A    Where does Kathy Mitchell come into play at?

11       Q    She was the assistant manager at Circle K.

12       A    Right.  But the question you're asking me

13   doesn't match, right?  Or am I just getting foggy-headed

14   here?

15       Q    No.  I want to know if Kathy Mitchell's

16   attitude -- she -- she -- you interacted with her prior

17   to your relationship with Renee, right, at work?

18       A    As I recall, prior and after.

19       Q    Okay.  Fair enough.

20            Did the way you-all interacted change at all

21   after the relationship with Renee ended?

22       A    As far as Kathy Mitchell goes?

23       Q    Yeah.  Did she treat you any better or any

24   worse, or was it just the same?

25       A    I wouldn't -- there you go, you're assuming

1  that Kathy knew about our relationship; is that

2  correct?  I mean, that's --

3        Q    No, no, no.

4        A    -- what I'm getting out of what you're asking.

5        Q    No, no.  I'm not assuming that at all.  I am

6  simply asking you if your interaction with Kathy

7  Mitchell was any different before or after your

8  relationship with Renee McCorkle.

9        A    And, there again, to be fair about it, I'd have

10  to know -- I mean, that's a loaded question, and I can't

11  honestly answer it because, you know, I'm not going to

12  guess.  I don't --

13        Q    If you don't recall, you don't recall.

14        A    No, I don't recall.

15        Q    Okay.  What about Sharon Pula -- Sharon?

16        A    Sharon.  Yeah, it's hard for me, too.

17        Q    What about Sharon; did your relationship with

18  her, do you recall, really change at all before or after

19  your -- your relationship with Renee?

20        A    And, there again, you know, to be honest and

21  give you an honest answer, I mean, I can't recall.

22        Q    Okay.  You don't recall anything extraordinary

23  or exceptional with regard to either of those women,

24  though, right?

25        A    And to what sense?

1      Q    If something crazy happened that was different,

2  you would recollect that, right?

3      A    You mean as their -- as working with them?

4      Q    Yeah.

5      A    Their -- I don't recall.

6      Q    Okay.  Do you believe that you are you suing

7  Circle K because you were wrongfully terminated?

8      A    I'd rather not answer that question.

9      MR. COHEN:  Certify that.

10  BY MR. COHEN:

11      Q    Are you suing Circle K because you believe you

12  were sexually harassed?

13      A    I'd rather not answer that question.

14      MR. COHEN:  Certify that.

15  BY MR. COHEN:

16      Q    Do you believe that you were retaliated against

17  while you were working at Circle K?

18      A    I'd rather not answer that question.

19      MR. COHEN:  Certify it.

20  BY MR. COHEN:

21      Q    Did you ever make a report of harassment or

22  discrimination to anyone at Circle K?

23      A    I would say that's fair to say.

24      Q    Can you tell me when you made the report?  If

25  you don't recall the date, that's okay.

1    A    Well, when I wrote on the writeups that "These

2    statements are false," I assumed that when the paperwork

3    went to Human Resources, a red flag would have popped

4    up, and someone would have come in and talked to me.

5    Q    Okay.  So that's -- that was -- okay.  Okay.

6    Fair enough.  So it's when you wrote those statements on

7    the counseling notices?

8    A    Yeah.  I was indirectly letting Human Resources

9    know there's a problem, but I didn't hear anything from

10   Human Resources.

11   Q    Okay.  So you never picked up the phone and

12   called the hotline or called Human Resources or anything

13   like that?

14   A    Sure, I called the hotline.

15   Q    You did call the hotline?

16   A    I called the Circle (sic) hotline.  Sure did.

17   Complained for, I don't know, it must have been 30

18   minutes, I'm guessing.

19   Q    When did you call the hotline?

20   A    I don't know the exact date, but I did call.

21   Q    That was right around the time of your

22   termination, right?

23   A    Let me see.  I don't recall.

24   Q    Okay.  Do you recall if you called from a cell

25   phone or home phone or what kind of phone you called

1   from?

2       A    Yeah, I called from a home phone.

3       Q    Would there be any record of when that call was

4   made or that --

5       A    Your guess is as good as mine.

6       Q    I guess.

7            MR. COHEN:  Why don't we go ahead now and take

8       a break.  And -- and -- why don't we agree to come

9       back at, let's say, 12:30.  Is that okay?

10           THE WITNESS:  Fine with me.

11           (Break for lunch.)

12  BY MR. COHEN:

13      Q    Okay.  So we're back on the record.

14  Mr. Combee, earlier I asked you if you thought you had

15  been wrongfully terminated, and then you refused to

16  answer that question.  So let me ask, do you know why

17  you were terminated from Circle K?

18      A    I don't recall you asking me that question.

19      Q    Okay.

20      A    I don't recall you asking it.

21      Q    Okay.  I'll ask it again.  Do you believe you

22  were wrongfully terminated from Circle K?

23      A    I don't believe.  I know I was.

24      Q    Okay.  Can you tell me why that is?

25      A    I'd rather not answer that question.

1          MR. COHEN:  Certify that.

2    BY MR. COHEN:

3      Q    Do you know why you were terminated from Circle

4    K?

5      A    I'd rather not answer that question.

6          MR. COHEN:  Certify that.

7    BY MR. COHEN:

8      Q    What are you looking for from Circle K in this

9    lawsuit?

10     A    I'd rather not answer that question.

11     Q    Okay.  You testified earlier that you had never

12   received a decrease in pay at Circle K, right?  I think

13   you said you received one pay raise during your time

14   there, but no decreases, right?  You testified to that

15   earlier.

16     A    That sounds correct.

17     Q    Okay.  You were never demoted from your

18   position as a CSR in Circle K, right?

19     A    Can you clarify "demoted"?  Can you be more

20   specific?

21     Q    Well, sure.  Well, were you ever busted down to

22   a lower job classification?

23     A    I'd rather not answer that question.

24     Q    Okay.

25         MR. COHEN:  Certify it.

 1    BY MR. COHEN:

 2        Q    Were you ever suspended from your job at Circle

 3    K?

 4        A    I would say, yeah.

 5        Q    When was that?

 6        A    The exact date, I don't recall.

 7        Q    Tell me what happened.

 8        A    As I recall, Renee made out the schedule

 9    back -- I -- as I recall -- don't take this as the --

10    you know, specific.  But what I can recollect -- and I

11    don't like to guess, but we're just estimating here,

12    correct?  You don't need exact dates, right?

13        Q    Just do your best.

14        A    Okay.  What this was all about was, she made

15    out the schedule, two-week schedule.  She reduced my

16    hours.  And this, as I recall, was -- she made out the

17    schedule two weeks, as I recall, and this was in --

18    right before -- right before or on June of '09.  I mean,

19    it was -- as I recall, it was from -- like, the schedule

20    was for two weeks, and it was made out from, like, maybe

21    June the 1st through the 18th.  Okay.

22        Q    This is of 2009?

23        A    Yes, 2009.

24        Q    Okay.

25        A    And she reduced my hours, as I recall -- and I

1   have the documentation -- but it was from 40 to -- from

2   forty-plus to 31 hours.

3        Q    Okay.  Now, up until June of 2009 --

4        A    Uh-huh.

5        Q    Okay.  So we're talking from November of '07,

6   right, when you started --

7        A    Okay.

8        Q    -- through -- up until this point you just told

9   us about in June of '09, had your hours been pretty

10  consistent?  The hours you were scheduled to work?

11       A    Up to this incident?

12       Q    Yes.

13       A    I would have to say, that's fair to say, yeah.

14       Q    Do you know why Renee reduced your hours in

15  June 1 to 18 of '09?

16       A    Well, if you look at June -- what did we say,

17  June 1, '09 -- of '09?

18       Q    That's what you said.

19       A    Yeah, the schedule for there.  And you look at

20  when I was terminated on June the 10th of '09, okay --

21       Q    Okay.

22       A    --  and this discrimination's been going on and

23  this retaliation's been going on since, let's say, the

24  breakup of -- as I recall, it was -- the breakup was in

25  early, early June of '08.  So this has been going on for

1    quite some time.  It was at the breaking point, okay?

2    And this is what sort of broke the camel's back.  So

3    that's why I called Janice Teeter.

4         Q    You called --

5         A    Actually, I called Renee first, okay?  I called

6    Renee first.  And, you know, it was obvious I was upset

7    about it, so -- well, I called Janice at work, and she

8    told -- and I was telling her what was going on with

9    Renee, with her screaming.  As I recall, I'm pretty sure

10   I told her she was getting irate.  I don't know exactly

11   the conversation.  But she told me to take some time

12   off, okay?  She told me to take some time off, so I did,

13   for a few days.  I don't recall how many.  Okay.  She

14   called a meeting.  As I can recollect, she called me at

15   the house to have me to come into the office.  They were

16   going to hold a meeting.  Okay.

17        Q    Okay.  Janice called you at the house, right?

18        A    Yes.  Janice called me at the house.

19        Q    Now, was any -- did you actually go to a

20   meeting?

21        A    Yes, I did.

22        Q    Who else -- who was there besides you?

23        A    In the office, there was myself, Renee

24   McCorkle, Janice Teeter, Heather Rainey.  And that's who

25   was in the office.

1     Q   And was this at the actual store?

2     A   2210 Park Road, Plant City, Circle K.

3     Q   Okay.  Now, did you meet with Janice and

4 Heather Rainey -- I'm sorry.  Did you meet with Janice

5 Teeter and Heather Rainey privately outside of Renee's

6 presence, as well, that day?

7     A   Can you repeat that?

8     Q   Sure.  You say you met with -- with Janice

9 Teeter, Heather Rainey, and Renee, right?

10    A   In Renee's office.

11    Q   In Renee's office, right.

12        Did you meet in Renee's office, though, with

13 just Heather Rainey and Janice when Renee wasn't there

14 as well?  Do you recall that?

15    A   That's a possibility, but it's not a --

16    Q   Okay.

17    A   It's not something that I, you know, would say

18 100 percent I recall, okay?

19    Q   What did you guys meet about on this day you've

20 been describing?

21    A   She called a meeting to the office.

22    Q   Okay.  But what did you-all talk about?  What

23 was the meeting about?

24    A   Pretty much the same thing you asked me earlier

25 about the relationship.  She asked me what was our

1  relationship.  Heather did.  And I -- as I recall, I

2  said, "It's pretty good."

3          And she goes, "No, I mean, did y'all have sex,

4  Steve?"

5          And I confessed.  Okay.  So she knew -- she

6  knew all about the employee thing, you know.

7      Q    Okay.  So -- so, do you know how she knew about

8  it?

9      A    Because I --

10     Q    In other words, you said she knew.  She knew

11  before you walked in there, you think?

12     A    I didn't say -- I didn't say that.

13     Q    All right.

14     A    I didn't say that.

15     Q    Did you tell Heather about that prior to the

16  meeting?  Had you ever met Heather prior to the meeting

17  or talked to her?

18     A    I -- as I -- the best that I can remember, I --

19  it's possible I've seen her in the store.  It's

20  possible.  It's very possible, and I think I have.

21     Q    Did you ever talk to her about your

22  relationship with Renee prior to this meeting, that you

23  can recall?

24     A    Can you repeat the question?

25     Q    Sure.  Before the meeting you just described --

1     A    Uh-huh.

2     Q    -- did you ever talk with Heather Rainey about

3 your relationship with Renee?

4     A    Not directly.

5     Q    Okay.  Did you ever talk to Janice prior to

6 this meeting?  Had you ever talked to Janice Teeter

7 about your relationship with Renee?

8     A    You're -- you're talking about -- okay.  I was

9 getting off base there.  I thought you were talking

10 about something else.  I thought you were talking

11 about -- when you said relationship, I wasn't -- you

12 know, I was thinking about, you know, work relationship.

13    Q    Oh, okay.  Let me be real clear.

14    A    Okay.

15    Q    When I say relationship --

16    A    Okay.

17    Q    When I said relationship through this

18 deposition, I've been referring to the outside of work,

19 if you will, relationship.  So --

20    A    Oh, okay.  I -- I was under the assumption that

21 you were talking about working relationship.

22    Q    No.

23    A    Not the relationship --

24    Q    The sexual?

25    A    No.

1        Q     The boyfriend, girlfriend relationship.

2        A     No.  That's why I asked you that.

3        Q     Okay.  Prior to the meeting, had you ever

4    talked about the boyfriend-girlfriend relationship with

5    Heather Smith -- Heather Rainey?

6        A     Oh, okay.  Yeah.  No, I haven't.

7        Q     Prior to that meeting that you described, had

8    you ever talked to Janice Teeter about the

9    boyfriend-girlfriend relationship with --

10       A     Me, personally?

11       Q     Yeah.

12       A     No.

13       Q     Okay.  And you don't recall even talking about

14   your working relationship with Heather Rainey, right?

15   You and Renee's working relationship.  Had you talked to

16   Janice Teeter about your working relationship, that you

17   can recall?

18       A     I -- I talked to Janice -- I've talked to

19   Heather Rainey indirectly.  I didn't --

20       Q     How?

21       A     -- call her on the phone and say, "Hey, this is

22   what's going on."

23       Q     Okay.  What did you -- how did you talk to her

24   indirectly?

25       A     As I discussed before, the documents that I

1    signed said, "These statements are false."  And I signed

2    it.

3         Q    Okay.

4         A    One should go to --

5         Q    Okay.

6         A    Understand what I'm saying?

7         Q    Yeah.  What about Janice Teeter?  Did you talk

8    to her directly about what was happening in the store

9    before the meeting?

10        A    I don't recall.  I --

11        Q    It's all right.

12             At the meeting itself now --

13        A    Oh, you mean at the meeting?

14        Q    No, no, no.  Before the meeting.  But you said

15   you didn't recall that, right?

16        A    Well, can you ask the question again?

17        Q    Sure.  I was actually going to ask what you

18   talked about at the meeting now.

19        A    Okay.  Well, I'm -- I'm a little confused,

20   okay?

21        Q    Okay.

22        A    If you could just --

23        Q    Sure.  First of all, tell me what you guys

24   talked about at the meeting, the meeting with Janice and

25   Heather.  As best you can recall, what did you tell

1    them?

2       A    Basically, Heather was asking about our

3    relationship.  And -- and pretty much -- pretty much

4    said, "Well, y'all" -- in a nutshell, kind of, "Y'all

5    keep it professional."  You know, kind of

6    slide-it-under-the-rug type of thing, you know.  That's

7    what I was assuming.  Can -- she's like, "Well, can

8    y'all work together professionally without, you know" --

9       Q    Heather asked that?

10      A    Yeah, she asked that.

11      Q    So what did you say?

12      A    I said, "I believe so.  I believe we can -- we

13   can go on and do our job professional -- as

14   professionals and, you know, keep this" -- but

15   unfortunately, it didn't -- it didn't happen like that.

16      Q    Well, what did -- what did you tell Heather and

17   Janice?  I don't want to know what they told you.  I

18   want to know what you told them.  Did you tell them

19   anything about the working conditions with Renee at this

20   meeting?

21      A    It's a possibility.

22      Q    Do you recall any specifics?

23      A    Not at this present moment, no.

24      Q    Did Renee say anything to them about the

25   working conditions, that you can recall?

1     A     Will you repeat the question?

2     Q     Did Renee say anything about the working

3     conditions, that you can recall?

4     A     Still didn't understand the question.

5     Q     Sure.  You said that Renee was at this meeting

6     at least part of the time, right, the meeting with

7     Janice and Heather?

8     A     Yes.

9     Q     Okay.  Did Renee say anything at that meeting

10    about your working relationship at the store with her?

11    A     Not that I can recall.

12    Q     Now, this meeting we're talking about, do you

13    remember that this meeting happened in December of 2008?

14    A     You're asking me, did I know?

15    Q     Do you remember when the meeting occurred?  You

16    said the relationship ended in June of '08, right?

17    Yours and -- your boyfriend-girlfriend, for lack of a

18    better way to say it, relationship --

19    A     Okay.

20    Q     -- with -- let me say personal relationship.

21    Is that a fair way to say it?

22    A     That's fine.

23    Q     Your personal relationship with Renee ended in

24    June of '08, right?

25    A     Yes, the best of my, you know --

```
 1       Q    Okay.  Your professional relationship obviously
 2  carried on until the end of your employment with Circle
 3  K, right?
 4       A    Will you repeat the question?
 5       Q    I'll strike it.  Your meeting with Renee --
 6  with Heather and Renee and Janice --
 7       A    Uh-huh.
 8       Q    -- that occurred after the breakup of the
 9  personal relationship with Renee, right?
10       A    I don't recall.
11       Q    Would there have been a reason to have had a
12  meeting like that before your relationship with Renee?
13  I mean, that was one of the things you were talking
14  about, right, was the personal relationship?
15       A    See, I'm sorry.  I just get that so confused
16  when you say relationship.
17       Q    Okay.
18       A    I'm thinking working.  I'm thinking working.
19       Q    The sex relationship.
20       A    Okay.  That's better.
21       Q    The sex relationship.  We'll just be blunt.
22  The sex relationship.
23       A    Yeah.
24       Q    Your meeting with Janice --
25       A    Okay.
```

1     Q    -- Heather and Renee --

2     A    Right.

3     Q    -- happened after the end of the sexual

4 relationship with you and Renee, right?

5     A    If you say it one more time.

6     Q    Sure.  The meeting that you described --

7     A    Uh-huh.

8     Q    -- with Heather and Janice and Renee --

9     A    That Janice had --

10    Q    Did that meeting occur after the end of your

11 sex relationship with Renee?

12    A    To be honest, I'd rather not answer that

13 question.

14    Q    Okay.  Will you answer the question of whether

15 you recall that the meeting occurred in December of

16 2008?

17    A    I do not -- I do not recall the exact date.

18    Q    Okay.  Do you know whether or not Renee was

19 written up as a result of that meeting?  If you don't

20 know, you don't know.

21    A    No, I don't know.

22    Q    Okay.  At that meeting, in addition to the

23 sexual relationship between you and Renee, did Janice

24 and Heather also talk to you about job expectations, if

25 you recall?

1     A     Can you clarify "job expectations?"

2     Q     Sure.  Your job duties, what your performance

3  as a CSR, whether you were meeting the expectations of

4  Circle K?

5     A     And your question is?

6     Q     Did you discuss that with Heather and Janice at

7  the meeting?

8     A     If it was, I don't recall it.

9     Q     Do you recall Heather and Janice presenting you

10  with a counseling notice, a written counseling notice,

11  during the meeting, that you signed?

12     A     As I recall, Heather -- Heather gave me a piece

13  of paper and I signed it.

14     Q     That was a counseling notice, right?

15     A     Yes.  And I -- if I recall, it had something to

16  do with something about the kitchen duties or something

17  like that.  That sounds familiar.  I'm not exactly sure.

18     Q     Okay.

19     A     But, you know, I mean, that's --

20     Q     Okay.

21     A     I'm not trying to guess.  I'm just trying to

22  give you --

23     Q     And, for the record, so that everybody knows,

24  you don't have it in front of you, so that's -- you're

25  just doing your best to recollect.

1    A    Yep.

2    Q    About how long -- now, you weren't suspended

3 during this meeting, right?  In other words, nobody

4 said, "You're on suspension," did they?

5    A    I took it indirectly as that.

6    Q    Why?

7    A    If you call someone's -- if you have to answer

8 to somebody and you can't get, you know, your

9 differences worked out, you call somebody else, right?

10 You call their boss.  She says, "Take a few days off.

11 Take a few" -- I'll give you a call.

12    Q    Okay.  So Janice said to take a few days off?

13    A    Yeah.

14    Q    After or during the meeting, or at what point

15 did she say, "Take a few days off"?

16    A    This was before the meeting was ever called.

17    Q    Okay.

18    A    So I had to take a few days off.  Then she

19 called me back in, and we had a little powwow in the

20 office.

21    Q    Okay.  Okay.  Did you say any -- all right.

22 Since I'm not sure I asked the question, I'm going to

23 ask it again, and if you don't recall, you don't

24 recall.  So I apologize if I already asked this

25 question.  But during the meeting with Janice and

1    Heather, did you say anything -- anything to them about

2    your working relationship with Renee?

3        A    Working relationship?

4        Q    Yes.

5        A    Did I say anything to Heather Rainey and Janice

6    about the working relationship with Renee and I?

7        Q    Yes.

8        A    It's not real clear, but I would -- I would --

9    it's not real clear, but it's a very strong possibility

10   that it did happen, okay?

11       Q    Okay.  Can you recall with any certainty what

12   it is you said about --

13       A    It had -- it had -- it had to do with the

14   cutting of the hours, okay?  You know.

15       Q    Okay.  So Renee had cut your hours prior to

16   this -- prior to the meeting?

17       A    Yes.  That's what the big thing was.  I called

18   her up and I said, "Hey, why did you cut my hours down

19   to 31?"  You know, ain't making any money now, you know,

20   and she was -- she was -- she was harassing me, you

21   know.

22       Q    Okay.  Besides cutting down your hours, what

23   else was she doing to harass you, if anything?  Strike

24   that.  Let me ask a better question.  Was she doing

25   anything else that you considered harassing besides

1  cutting down your hours?

2      A    Oh, yes.  Oh, Yes.

3      Q    What was she doing?

4      A    It will come out in trial.

5      Q    Okay.

6      A    I don't want to release that information.

7      Q    All right.  Mr. Combee, after this deposition I

8  am going to have to file a motion with the court, asking

9  them to force some sort of sanctions because you're not

10  answering some -- many of the questions I'm asking you.

11  The federal rules of civil procedure require me to try

12  and resolve that with you, okay, in advance of my filing

13  the motion.  And that's what I'm going to do right now.

14  A lot of times during this deposition you haven't --

15  you've said, "I'm not going to answer a question."

16      A    Yeah, I plead The Fifth.

17      Q    Okay.  I don't think it's something you need to

18  plead the Fifth on, but --

19      A    I'm just letting you know my position.

20      Q    Okay.  I understand.  I understand what you're

21  doing here, okay?  But now I've asked you, can you

22  describe to me what -- you said, you know, that Renee --

23  part of the harassment was she cut your hours back,

24  although you weren't certain of the time frame.  That's

25  fine.  I can go back and look at the hours you were

1    scheduled to work, okay?  So, what I'd like to know is,

2    if you will, please, given what I just explained to you

3    about my -- my attempt right now to resolve this, if you

4    will tell us what else, besides cutting your hours,

5    Renee did that you thought was harassing?

6        A    It's in the complaint.

7        Q    Let's go look.  We're talking about Exhibit 2

8    that I've just put in front of you; is that right?

9        A    That's my complaint.

10       Q    So it's -- it's -- this is what you're talking

11   about, what's in this document, right?  As far as being

12   the harassment, right?

13       A    Well, the discrimination, the harassment, the,

14   you know, retaliation, the, you know --

15       Q    Okay.

16       A    -- just -- I could go on and on and --

17       Q    So, why don't you read this, and maybe it will

18   refresh your recollection, if that's what you need, and

19   tell me what it is that Renee McCorkle did that you

20   consider to be harassment.

21       A    And, like I said earlier, I'd rather not answer

22   that question.

23       Q    Okay.  Can you tell me why you believe that

24   Renee McCorkle would have harassed you?

25       A    I'd rather not answer that question.

1    Q    Did you ever have any disputes with -- with
2  Kathy Mitchell while you were at Circle K?
3    A    Can you clarify "disputes"?
4    Q    Disagreements.  Did you have any disagreements
5  with Kathy Mitchell while you were at Circle K?
6    A    Can you define "disagreement"?
7    Q    No.  I mean it in the most common and basic
8  sense.  Do you understand what a disagreement is?
9    A    I asked you first.
10    Q    Well, Mr. Combee, I'm -- I scheduled the
11  deposition, so I get to ask the questions.  So my
12  question is, did you have any disagreements with Kathy
13  Mitchell while you were at Circle K?
14    A    I'd rather not answer that question.
15    Q    At the end of your employment, sir, did
16  Mrs. Mitchell and you have a disagreement over how a
17  customer situation was handled?
18    A    Will you repeat the question?
19    Q    Sure.  At the end of the time of your
20  employment --
21    A    Uh-huh.
22    Q    -- do you recall having a disagreement with
23  Kathy Mitchell about how a customer situation was
24  handled?
25    A    At the end of the time of my employment?

1    Q    Towards the end of your employment.  That will

2    be the time frame.

3    A    Will you repeat the question?

4    Q    I'll try and rephrase the question, how's that?

5    A    Okay.

6    Q    During the time frame at the end of your

7    employment with Circle K --

8    A    Uh-huh.

9    Q    -- did you and Ms. Mitchell have a disagreement

10   over how an incident involving a $20 bill from the ATM

11   machine was handled with a customer?

12   A    And you said disagreement, right?

13   Q    Yes.

14   A    And, there again, will you -- will you define

15   disagreement for me?

16   Q    Did you-all not agree on how it was handled?

17   A    I would say that's fair to say.

18   Q    And Kathy Mitchell was the assistant store

19   manager, right, at the time?

20   A    Kathy Mitchell was, yeah, at the time.

21   Q    Did you scream at Kathy Mitchell or become loud

22   in the store when you -- well, do you recall discussing

23   the incident with Kathy Mitchell?

24   A    Yes, I recall.

25   Q    Do you recall it was in the store that you

1    discussed it?

2        A    Sir?

3        Q    Do you recall it was in the store that you

4    discussed it, right?  That's where the discussion

5    happened?

6        A    Oh, in the store?

7        Q    Yes.

8        A    The discussion did happen in the store, yes.

9        Q    Do you recall becoming loud and argumentative

10   with Kathy during the discussion?

11       A    No, I did not get loud and --

12       Q    Okay.  Why don't you recount for me what

13   happened during the discussion.

14       A    I'd rather not answer that question.

15       Q    If a witness to the discussion were to testify

16   that you became loud and screamed at Kathy Mitchell --

17   you became loud and raised your voice to Kathy, would

18   that person be lying?

19       A    And I'm assuming you're talking about Evan's

20   statement, correct?  Not correct?

21       Q    Sure.  If Evan were to testify that you became

22   loud --

23       A    I would definitely disagree with him.

24       Q    Okay.

25       A    Because he didn't even know what -- he didn't

1  even know what we were talking about.  And it says it in

2  the statement, now, don't it, if you read on?  There

3  should be two statements.

4      Q    What I'm asking you is this:  If Evan was to

5  say that you raised your voice or were disrespectful and

6  insubordinate to Kathy in front of customers, would you

7  agree or disagree with that?

8      A    Disagree wholeheartedly.

9      Q    Okay.  Did you ever discuss this incident with

10  Janice Teeter or Heather Rainey?

11      A    What incident's that?

12      Q    The one involving Kathy Mitchell.

13      A    Heather Rainey and Janice?

14      Q    Either of them.

15      A    Both of them.

16      Q    Did you discuss it with both of them?

17      A    About what transpired between Ms. Mitchell and

18  I?

19      Q    Yes.

20      A    Yes.

21      Q    Okay.

22      A    We discussed it.

23      Q    When did you have that discussion?

24      A    On the day that I was terminated.

25      Q    And did they show you statements from Evan and

1    Kathy that day?

2        A    I'd rather not answer that question.

3        Q    Well, you said Evan made two statements --

4    wrote out two statements, right?  You just said that a

5    minute ago in the deposition, right?

6        A    Yes, I did.

7        Q    How did you know that?

8        A    I'd rather not answer that question.

9        Q    If I were to show you -- do you still have

10   copies of those statements?

11       A    I'd rather not answer that question.

12       Q    Okay.  Did you -- was your -- was your

13   conversation with Janice and Heather in person or on the

14   phone the day you were terminated?

15       A    In person.

16       Q    In person.  And is that the second time you

17   guys had met?  In other words, I know you had met before

18   that when you had talked about the sexual relationship

19   with Renee, right?  So is this the next meeting, or were

20   there any other meetings?

21       A    Could you rephrase the question?

22       Q    Sure.  The meeting with Heather and Janice

23   about -- about the Kathy Mitchell incident, okay?

24       A    Okay.

25       Q    That meeting happened after the time you met

1   with them about the Renee sex stuff, right?

2      A   You mean, you're asking me did it happen after?

3      Q   Yes. How many times did you -- let me ask a

4   different way. How many times did you meet with Heather

5   Rainey and Janice Teeter about anything?

6      A   I'd rather not answer that question.

7      Q   Okay. We did talk about a meeting between

8   you --

9      MR. COHEN: Certify that.

10   BY MR. COHEN:

11      Q   We did talk about a meeting between you and

12   Janice and -- and Heather, right?

13      A   Uh-huh.

14      Q   Where you -- and Renee, where you discussed the

15   Renee sexual relationship, right? We talked about that

16   earlier in the deposition, right?

17      A   You know, I need a little break, if you don't

18   mind. Can you give me, like, two minutes to get some

19   fresh air?

20      Q   Yeah. Mr. Combee, any time you need a break,

21   yeah, absolutely. No problem at all.

22      (Brief recess.)

23   BY MR. COHEN:

24      Q   All right.

25      MR. COHEN: What number are we on? I

1    apologize.

2         THE COURT REPORTER:  I believe we're on 7.  7.

3    BY MR. COHEN:

4         Q    Okay.  Mr. Combee, this is Deposition Exhibit

5    No 8.

6         MR. COHEN:  Let's mark this as --

7         THE COURT REPORTER:  I'm sorry.  This will be

8    7.

9         MR. COHEN:  This will be 7.  I apologize.

10        (Thereupon, Deposition Exhibit No. 7 was

11    marked for purposes of identification.)

12   BY MR. COHEN:

13        Q    Here you go.  (Document tendered.)  I mailed

14   this document to you a while back.  Do you recall

15   receiving that?

16        A    Yeah.

17        Q    Okay.  What that document is, is a request for

18   production of documents.

19        A    Uh-huh.

20        Q    That is my way in this lawsuit of formally

21   asking you to produce documents to Circle K, or to me,

22   really, for this lawsuit, okay?

23        A    Okay.

24        Q    That's what that is.  That's how the courts

25   tell us to do things.  All right.

1    A    And I've already given up a lot of my documents

2    today to you.

3    Q    You have?  I mean -- well, I haven't -- you

4    haven't given me any documents today.

5    A    Orally, right?  This is --

6    Q    Well, no.  I mean, I'm -- I'm -- I'm -- well,

7    no, you have not.  I am entitled to -- actually, any

8    documents you have I am entitled to actually receive,

9    and that's what I'm asking.

10    A    Yeah, but I'm already deposed.

11    Q    Okay.

12    A    Right?

13    Q    Yeah.  But I -- I don't -- when you -- well,

14    you're being deposed.

15    A    Yeah.

16    Q    But, so --

17    A    Right?

18    Q    Yeah, you are definitely being deposed right

19    now.

20          The statements that you refer to from Evan,

21    Evan's two statements, do you have those documents

22    somewhere?

23    A    Yes, I do.

24    Q    Okay.  How did you get those documents?

25    A    I'd rather not answer that question.

1    Q    If I ask you for those specific documents in a
2  request for production of documents, will you send them
3  to me?

4    A    I'd rather not answer that question.

5    Q    Did you -- do you have any statements from any
6  other Circle K employees besides Evan?  Employees or
7  former employees besides Evan's?

8    A    I'd rather not answer that question.

9         MR. COHEN:  We're certifying those.

10 BY MR. COHEN:

11   Q    Do you have any of the evaluations or writeups
12 that are addressed -- or that you talk about in your
13 complaint?

14   A    I'd rather not answer that question.

15        MR. COHEN:  All right.  Let's go ahead and
16     we're going to mark this Exhibit No. 8.

17        (Thereupon, Deposition Exhibit No. 8 was
18     marked for purposes of identification.)

19 BY MR. COHEN:

20   Q    Did you receive any documents from the EEOC?

21   A    In what sense?  I mean, what do you mean?

22   Q    Any documents, any Circle K -- any statements
23 or anything like that, from the EEOC?

24   A    I'd rather not answer that question.

25   Q    Okay.  Here's a -- let me show you what I'm

1   going to mark as Exhibit 8, Mr. Combee.  At the top it

2   says "Counseling Notice," right?

3       A    Uh-huh.

4       Q    Yes?

5       A    Yes.

6       Q    Is that your signature down there at the

7   bottom?

8       A    It looks like it is, but I do not believe it

9   is.

10      Q    Okay.  Why do you not believe that that is your

11  signature?

12      A    I'd rather not answer that question.

13      Q    Do you recall -- do you recall receiving this

14  document to sign?

15      A    I'd rather not answer that question.

16      Q    Okay.  Do you recall an issue involving cash

17  handling procedures where you had too much money in the

18  cash drawer there?

19      A    I recall -- I recall something like that.

20      Q    And did Renee bring that up to you?

21      A    If I recall right, she threw something on her

22  desk there that looked similar to that, or what sounds

23  like that actually.

24      Q    And it was basically just saying, "Hey, you

25  had" -- well, let me ask, at Circle K there's a --

1   you're not supposed to have over a certain amount of

2   money in the cash drawer, right?  That's one of the

3   company's policies?

4       A    That's correct.  That's correct.

5       Q    Okay.  And what this counseling notice is about

6   is that you had over that limit in your cash drawer at

7   the time -- on one occasion, at least; is that right?

8       A    Is that what it says?

9       Q    I think so.  You can read it and tell me what

10  you think.

11      A    I don't know why we're even litigating these.

12  These aren't even legal.  They're not legal documents.

13  They're not legal.

14      Q    Okay.  But --

15      A    Why are we litigating whether I did this or

16  didn't do that.  That's -- that's -- that might be

17  within the ramification of the complaint, but not in the

18  charge.  It's not relevant.

19      Q    Mr. Combee, I'm not --

20      A    Come on.

21      Q    I'm not litigating whether you had -- I'm

22  not -- whether you had too much money or not enough

23  money.  I'm just asking, did you receive this counseling

24  notice?  Did you sign the counseling notice?  That's

25  it.  Because you've already said that if you signed it

1    and you didn't say you disagreed with it, then you got

2    counseled.

3          Are you -- are you aware that other people in

4    Circle K receive notices just like this?

5    A    Am I aware?

6    Q    Yes.

7    A    Can you rephrase the question?

8    Q    Inside the Circle K organization, are you aware

9    that a lot of people receive counseling notices for

10   various issues?

11   A    I'd rather not answer that question.

12   Q    Okay.  Do you recall having too much money in

13   your cash drawer?

14   A    No, I don't recall that.

15   Q    Okay.  But if you didn't agree with this

16   counseling notice, Exhibit 8, it would have said so on

17   it, right?

18   A    Which one are we looking at?

19   Q    The one right in front of you, Deposition

20   Exhibit 8.

21   A    What you got in your hand?

22   Q    The same exact one.  It's just another copy so

23   I can look at it at the same time as you do.

24   A    Okay.  What was the question?

25   Q    If you received this document and signed it and

1    you did not agree with it, you would have said so,

2    right?  You obviously know how to say when you don't

3    agree with something, right?

4         A    That -- that sounds logical, but I believe, if

5    I recall, there might be two, maybe -- maybe two,

6    possibly three, I might have signed, out of duress,

7    without saying "These statements are false."

8         Q    Okay.

9         A    I wouldn't say duress, because I can't really

10   define duress, but you know what I'm saying?  Just

11   because you don't see "These statements are false,"

12   doesn't mean, you know...

13        Q    Did you sign this document under duress,

14   Exhibit 8?

15        A    I don't even know if that's really the right

16   word, duress, you know.

17             But this here, this document, not mine.  Not

18   mine.

19        Q    So this is not your signature now?

20        A    No.  What's the next one?  Want to go to the

21   next one?  There should be a bunch of them in there,

22   right?  Are we almost through with this deposition?  I

23   mean, I've been here a long time.  I'm not trying to be

24   rude or anything, but this is really...

25             MR. COHEN:  This is No. 9.

1      (Thereupon, Deposition Exhibit No. 9 was marked

2      for purposes of identification.)

3  BY MR. COHEN:

4      Q    I'm going to give you Deposition Exhibit

5  No. 9.  It's another counseling notice.

6      A    Okay.

7      Q    This one talks about excessive tardiness and

8  absenteeism.  Do you recall signing this document?

9      A    I believe I did sign that.

10      Q    Okay.

11      A    Sure looks like it.

12      Q    This is No. 10.

13          MR. COHEN:  Mark this as Deposition Exhibit

14      No. 10.

15          (Thereupon, Deposition Exhibit No. 10 was

16      marked for purposes of identification.)

17  BY MR. COHEN:

18      Q    Can you take a look at this document?

19      A    Okay.  I recognize that document.

20      Q    Okay.  And that says down there at the

21  bottom -- it says in handwriting -- it says, "Steve

22  Combee refused to sign per Sharon Pulaski, or whatever,

23  right?  Per Sharon?

24      A    Right.

25      Q    Sharon was the assistant manager at that time?

1      A     Yes.

2      Q     Was it Sharon who presented this counseling

3  notice to you?

4      A     Yes, she did.

5      Q     And you didn't agree with it?

6      A     No, I did not.

7      Q     Did you explain that to Sharon?  Sorry.

8  (Staples document.)

9      A     Did I explain it to her?  That's a, you know --

10     Q     Did you talk to her about it?

11     A     Yeah.  I told her I disagreed with it, yeah.

12     Q     Now, was this an issue that Sharon had?  Why

13  did Sharon present it to you; do you know?

14     A     Well, maybe you could help me out.  I brought

15  some glasses.  I didn't bring my regular glasses.

16     Q     Okay.

17     A     Maybe you could, like, read it to me or

18  something.

19     Q     Sure.  I can read it to you.  It says:

20  "Description of Occurrence:"

21     A     Okay.

22     Q     "On June 29th at 10:05 customer complained

23  about having to wait 11 minutes for someone to check her

24  out.  Val came in at 10:05 told Steve she had to go to

25  the bathroom before he left.  As soon as she went to the

1    bathroom Steve left leaving people in line.  Val came

2    out at 10:13, and there was a long line of people

3    waiting."

4         A    And?  You want to know is this the document

5    that was presented to me?

6         Q    No.  I want to know why -- or no, if this

7    was -- if this was Sharon's issue.  Who took this up

8    with you?

9         A    And, like -- like I want to -- like I -- like I

10   said before, these are issues that shouldn't be

11   litigated.

12        Q    Okay.

13        A    They're not legal documents, for one, you know,

14   and I'd rather just say, you know, whatever.  You

15   know --

16        Q    All right.

17        A    -- don't want to go into litigating.

18        Q    Did you discuss this with Renee, this issue?

19        A    Which one's that?

20        Q    Number 10, the one we were just looking at.  Or

21   was it just Sharon?  Sharon is the one who signed it at

22   the bottom.

23        A    I don't recall.

24        Q    All right.  No. 11.

25             (Thereupon, Deposition Exhibit No. 11 was

1          marked for purposes of identification.)

2     BY MR. COHEN:

3          Q     All right.  This is dated in December of 2008.

4     And earlier we discussed that there was a counseling

5     notice that was presented to you by Heather Rainey and

6     Janice Teeter --

7          A     Okay.

8          Q     -- and that you signed.  Is this that

9     counseling notice?  And I think you said it was about

10    cooking the food, and that's what this was one is.

11         A     I'm not 100 percent sure, but I believe it is.

12    I mean, you know, it looks like it.

13         Q     This -- this one says something about cooking

14    the food in it.

15         A     It's the same.  Well --

16         Q     See if you see it right there.  (Indicating.)

17    Cooking food.

18         A     Can I see it for a second?

19         Q     Well, it's right in front of you.

20         A     Well, can I see yours?

21         Q     Sure.  I'll let you see mine.  Sure.

22         A     Not that I don't trust you.  I'm not 100

23    percent sure, but more than probable that is.

24         Q     Okay.

25         A     The one that Heather Rainey gave me.

1     Q    And that's your signature down there if it is,

2  in fact, that one, right?

3     A    Let me see.  Yeah.

4         MR. COHEN:  Okay.  And this is No. 12.

5         (Thereupon, Deposition Exhibit No. 12 was

6    marked for purposes of identification.)

7  BY MR. COHEN:

8     Q    I'll tell you what I'm going to do.  To make it

9  easier, I'm going to give you the official deposition

10  copy, and I'm going to give you mine, too, you know,

11  with my highlights on it.

12        Does that look like your -- it looks like your

13  handwriting and signature at the bottom?

14     A    That -- that is my document.

15     Q    Okay.  And what you wrote at the bottom of

16  this, this is your explanation, right, as to what

17  they're talking about in here, right?

18     A    Yeah.  And --

19     Q    Do you recall who gave you this one?

20     A    Renee.

21     Q    Okay.  Were there any witnesses to that

22  conversation, that you can recall?

23     A    On the situation with the -- it was the Lotto

24  scratch-off, if I recall right.  Something to do with

25  another cashier, maybe.

1     Q    This says an improper shift change and a

2  seventy --

3     A    Five dollar --

4     Q    -- five-dollar shortage for the store.  That's

5  what this says.

6     A    Yeah, I recall that.  I know exactly who was

7  working with me, too.

8     Q    Who?

9     A    Her name was Paula.

10     Q    Paula?

11     A    I don't remember her last name, but...

12     Q    Okay.  All right.  Here's No. 13 --

13     MR. COHEN:  Is that what we're on?

14     THE COURT REPORTER:  Yes.

15     MR. COHEN:  13.

16     (Thereupon, Deposition Exhibit No. 13 was

17    marked for purposes of identification.)

18  BY MR. COHEN:

19     Q    I'm going to have to staple this together here.

20  You can look through that document.  It's No. 13.  Do

21  you recall receiving this?

22     A    You mean the document?

23     Q    Well, let me ask.  I mean, I stapled -- I

24  stapled, I think, let's see, five, six pieces of paper

25  together.  Let's talk about the top piece first, okay?

1     A    Okay.

2     Q    Okay.  Do you recall receiving this document?

3     A    I recall this document.

4     Q    Is that your handwriting at the bottom where it

5 says, "These statements are false"?

6     A    No, sir, it's not.  It's not my signature

7 either.

8     Q    Okay.  Okay.  Do you recall receiving this

9 document, the first page of Exhibit 13?

10    A    Yes.  I remember this document very well.

11    Q    Okay.  What do you remember from -- when did

12 you see it first?

13    A    Well, it says prepared on 4/07.

14    Q    '09, right.  Do you think it was around that

15 date?

16    A    I don't want to speculate.

17    Q    Okay.  Do you recall the circumstances you saw

18 it?  In other words, who showed it to you?  Who gave it

19 to you?

20    A    Yes.  Yes, I do.

21    Q    Who was that?

22    A    Renee McCorkle.

23    Q    But that's not your signature at the bottom?

24    A    That is not my signature, and that is not my

25 writing.

1    Q    Do you know whose writing that is?

2    A    I'd rather not answer that question.

3    Q    Have you ever seen the second page there of

4  this deposition exhibit?

5         MR. COHEN:  Certify that.

6    A    Will you repeat the question?

7    Q    The second page there of the deposition

8  exhibit --

9    A    Uh-huh.

10   Q    -- it looks like an e-mail with a bunch of

11 handwriting on it.  Did you ever receive -- do you ever

12 recall seeing this document before today?

13   A    I'd rather not answer that question.

14   Q    Do you know whose handwriting this is?

15   A    I'd rather not answer that question.

16   Q    How about the third page of this deposition

17 exhibit?  Let me ask about the third, fourth, fifth, and

18 sixth pages.  Do you recall seeing any of these pages

19 prior to today?

20   A    I'd rather not answer that question.

21   Q    In your complaint you talk about counseling

22 notices where you wrote, quote, "These statements are

23 false."  Do you have copies of those counseling notices?

24   A    The originals?

25   Q    Or copies.  Yes.  The ones you're talking about

1  in your complaint, do you have copies of those?

2      A    Yes, I do.

3      Q    Do you have them here with you today?

4      A    Huh?

5      Q    Do you have them with you today here?

6      A    I'd rather not answer that question.

7      Q    Is that part of your lawsuit?

8      A    That's a smidgen of it.

9      Q    Well, then, sir, I'm entitled to see the

10 documents you're talking about in your complaint.  You

11 put them in your complaint.  I should be able to see

12 them.  So, do you have them that you can give me so I

13 can look at and ask you about them?

14     A    Can you rephrase the question?

15     Q    The documents that you reference in your

16 complaint --

17     A    Uh-huh.

18     Q    -- the writeups, do you have them so that I can

19 ask you questions -- so that I can see them and ask you

20 questions about them?

21     A    You've already seen them.

22     Q    I've seen them?

23     A    You don't need to see them again, right?

24 You've done seen them today, right?

25     Q    Sir, you have not given me any documents

1    today.

2         A     I think I have.

3         Q     Okay.  Have you given me the -- have you given

4    me a piece of paper today, Mr. Combee?

5         A     I'd rather not answer that question.

6         Q     Sir, you have not given me a piece of paper

7    today, have you?

8         A     Not physically.

9         Q     So just to be really clear, I'm going to -- I'm

10   going to read this to you.  Okay.  I'm going to read --

11   and you tell me -- you say, "I even wrote on the

12   writeups, quote, 'These statements are false.'"

13        A     Correct.

14        Q     Is it your testimony today that you are not

15   going to provide me with the writeups that you are

16   talking about?

17        A     I've already provided them to you.

18        Q     When?  I haven't received them.

19        A     You've already got them.

20        Q     Where are they?

21        A     They're right there.  (Indicating.)

22        Q     In the stack of documents that you're referring

23   to?  In the deposition --

24        A     You know where they're at.

25        Q     In the deposition exhibits?  Is that where they

1    are, Mr. Combee?  I'm not playing games.  They're not --

2    they're not in front of me.  I've asked you about every

3    counseling notice I have, sir, that I -- that I was

4    provided to by Circle K.  Every one.

5         A    Okay.  Can you -- can you clarify the question,

6    so I can answer appropriately?

7         Q    The writeups that you talk about in your

8    complaint --

9         A    Uh-huh.

10        Q    -- that you wrote, "These statements are

11   false" --

12        A    Right.

13        Q    -- do you have copies of those?

14        A    Yeah, I got copies of those and I got originals

15   of those.

16        Q    Are those documents that we've discussed today

17   that are deposition exhibits -- in other words, are

18   those documents that you're talking about deposition

19   exhibits?  You can look through the -- all the

20   deposition exhibits right there if you want to figure it

21   out.

22        A    Really, at this point, I'd rather not answer

23   that question.

24        Q    In the request for production of documents, I

25   asked you for those writeups.  Will you produce them to

1    me?  Send me copies of them, what you're talking about?

2        A    Why should I when you got all of them right

3    here?

4        Q    When you say "right here," you're referring to

5    the deposition exhibits, right?

6        A    That's the whole -- that's -- that's the

7    writeups.

8        Q    So the deposition exhibits are the writeups,

9    right?

10       A    Exactly.

11       Q    Okay.

12       A    So I don't need to provide you with those,

13   correct?

14       Q    If you agree with me, sir -- I don't know what

15   you have, Mr. Combee.  So that's why I want you to

16   produce it to me, and I'm entitled to it, and I'm going

17   to take it up with the court.  With that said, if you

18   tell me that -- you're under oath, right?  You

19   understand that you swore to tell the truth, the whole

20   truth, nothing but the truth, right?

21       A    Of course.

22       Q    Okay.  If you tell me that in these -- this

23   pile of deposition exhibits, 1 through --

24            MR. COHEN:  13?

25            THE COURT REPORTER:  Yeah.

1   BY MR. COHEN:

2       Q    -- 1 through 13, that that's all of the

3   counseling notices that you were given, then for right

4   now I'm certainly going to believe you.  If there's

5   other ones that I'm missing, then I'm asking you to

6   clarify that for me so that we can --

7       A    Where's the --

8       Q    Okay.  Here.  I'll -- I think -- I think they

9   started on No. 8.  There you go.

10      A    Okay.  No.  There's missing.

11      Q    There are some missing?

12      A    Yeah.  Yeah.  If I recall right -- if I recall

13  right, there's another one missing that -- that is --

14  I'm going to hang myself here.  Right now I believe

15  there is one that -- as I recall, there's one that's

16  missing that's dated -- date prepared, I believe,

17  6/5/09, which was a refusal to sign.  And if I recall

18  right, it was the last one that was presented to me

19  before I was terminated.  And it had to do with Kathy --

20  me and Kathy Mitchell.  Okay.

21      Q    Do you have that document anywhere?

22      A    Yeah, I have it.

23      Q    Okay.

24      A    I have it.  And I also have some documents that

25  show that I was written up even after I was terminated.

1    How about that?

2         Q    For what?

3         A    For something that happened -- you got to

4    under -- you got to understand, why would a person wait

5    three weeks to write somebody up to start with?  Well, I

6    just need to -- we're getting way off base here.  I just

7    done said too much here.

8              But as I recall, I'll go back.  I recall there

9    is one missing here, what I can tell right now.  6/5/09.

10   And I could have it backwards, but I believe there's

11   another computer-generated one that -- it's like 7/6

12   oh-something.  And then we got a lot of fill-ins of

13   missing documents, which that will be coming out in

14   court.  So, you know, what can I say?

15             A lot of junk, isn't it?  I've been -- I've

16   been through a lot, let's put it that way.  I've been

17   through a lot.

18        Q    In your complaint, Mr. Combee, you describe as

19   part of the hostile work environment -- so, I'm going to

20   just ask one more time.  I've asked you -- you said your

21   work hours were reduced.  I asked you what else, and

22   you -- what other harassment you were subjected to, and

23   you refused to answer.  So I'm going to ask you one more

24   time if you'll tell me, besides the reduced work hours,

25   what else it was -- what other conduct you believe was

1  harassment toward you.

2      A    Like I said before, it's in the complaint.

3      Q    So it's screaming -- I believe there's two

4  things.  There's screaming and unwanted sexual contact,

5  right?

6      A    Uh-huh.

7      Q    Is that right?

8      A    Yes, she did.

9      Q    Okay.  Who screamed at you?

10     A    Well, let's put it this way, Renee's been known

11  to scream and yell and carry on unprofessionally.

12     Q    So, is that her reputation?

13     A    Well, I can't -- I can't go as far as saying

14  what somebody's reputation is, but...

15     Q    Okay.

16     A    That's what I received, you know.

17     Q    Is it common -- when you said, "She's known to

18  scream and yell and carry on unprofessionally," is

19  that -- was that common knowledge inside the store?

20     A    I would say, yeah.

21     Q    So, she -- did she scream and yell and carry on

22  unprofessionally to other employees besides yourself?

23     A    Oh, yeah.

24     Q    Okay.  Can you describe -- when you said in

25  your complaint about screaming and yelling and behaving

1    unprofessionally, can you describe to me how -- describe

2    what you're talking about?

3        A    Well, basically, when we talked about earlier

4    when I had to call Janice up, because she was getting so

5    irate about the hours -- my hours being cut.

6        Q    Right.

7        A    Okay.  I had to call her up, and while I was

8    calling Janice up she was yelling and screaming at me,

9    "You just need to go home," and blah, blah, blah, blah,

10   blah.  You know, and just carrying on.

11       Q    Okay.

12       A    And at the time there was another person

13   working across the street now.  It won't -- it won't

14   hold up in court or whatever, but he came over and he --

15   he witnessed it.  But, I mean --

16       Q    That's a -- that's the Circle K across the

17   street, right?

18       A    Yeah.

19       Q    Because there's another one close to that

20   store, right?

21       A    Yeah, right across the street.

22       Q    And I'm sorry.  You were talking about other

23   people.

24       A    Yeah.  For instance, there was a couple

25   cashiers that worked with me.

1     Q     That she yelled at, too?

2     A     Oh, yeah.  Yeah.  It's just one of those

3  things.  Renee wanted a sense of control.  You know,

4  she -- she -- I'm not saying that she doesn't have the

5  mentality to run a store, but she doesn't have the

6  mentality to manage people, okay?  She's not a -- you

7  know, there's a difference.

8     Q     She's not a good manager, generally -- good

9  people manager, generally?

10    A     She had mood swings up and down, I mean, you

11 know.

12    Q     The screaming, the unprofessional conduct

13 towards you --

14    A     Oh, yeah, she was irate, you know.

15    Q     About how many -- was that a daily occurrence?

16 A weekly occurrence?  A monthly occurrence?  About how

17 often did it happen?

18    A     Oh, I've seen her screaming and yelling at

19 people, like, you know, from here to, you know --

20    Q     Across the room and stuff?

21    A     Yeah.  And then she'll come back and say, well,

22 you know, you got to be professional, whatever.  It was

23 one of those things.

24    Q     Do you -- did it happen a lot, or was it -- can

25 you -- can you tell me about how many times a month it

1    happened that she would explode like that?

2        A    Well, I will tell you this, after the

3    relationship -- and I quote relationship.  We're not

4    talking about working relationship.

5        Q    The sexual relationship?

6        A    Yeah, sexual relationship.

7             If I recall right -- if I recall right,

8    everything went sour in early June.  And then if I

9    recall right, it was 21 days and she wrote me up for

10   something that happened previously.  You see what I'm

11   saying?  So why -- why would a manager, an ethical

12   manager, write somebody up almost three weeks after an

13   incidents?  Come on.

14       Q    Okay.  Right.  So let me ask you this --

15       A    I'm really saying too much here.  I mean, I'm

16   just -- you know, I've just been so -- I've just been so

17   drained over this for the last two-and-a-half years.  I

18   mean, I've been -- I've been discriminated against,

19   retaliated against.  I mean, you know -- you know, life

20   is no more pleasurable anymore to me, you know.  I was

21   done wrong, you know.

22       Q    Okay.  Well -- so, the screaming -- you've

23   described to us everything that in your complaint that

24   you can say about screaming, at least you can recall

25   today, is that fair?  I just want to walk through the

1    issues of the complaint, so...

2        A    Kind of solidify it?

3        Q    Well, make sure I understand it all.  Is there

4    anything else about the screaming that you can share

5    with us that you can recall?  The specifics of what she

6    was saying, or why she was doing it, those kinds of

7    things.

8        A    All I will say is this:  It was not unusual to

9    come in the store and hear Renee's screaming at an

10   employee.  Not unusual.

11       Q    Now, you also, in your complaint, describe

12   unwanted sexual content -- I'm sorry.  Unwanted sexual

13   contact --

14       A    Sure did.

15       Q    -- right?

16       A    It happened.

17       Q    Okay.  Can you describe to me what happened,

18   specifically?

19       A    Okay.  What happened is after -- after the

20   incident with Heather Rainey, Human Resource officer

21   came in, and we all talked about it, and they was

22   talking about blah, blah, keep it professional, blah,

23   blah.  I don't know if it was Renee's sense of, "Hey,

24   are we still going to have something going on even

25   after" -- you know, I don't -- I know -- I know -- I

1   don't know the specific time, but I know it was after --

2   I know it was after the -- the meeting with Heather

3   Rainey --

4        Q    Okay.

5        A    -- and the discussion about, "What's y'all's

6   relationship like?"

7            And it wasn't long after that till one day I

8   came in to work -- this is after we're supposed to

9   conduct ourselves in a professional manner, right?  She

10  was at the register here.  I'm over at the lottery

11  machine, okay?  She takes her left hand, okay, and hits

12  me in the testicle, okay?  And I'm thinking, well, you

13  know, that could be an accident, right?  This is after

14  the meeting.  This really happened.  True story.  She's

15  at the register.  I'm at the lottery machine.  It

16  happens again.  I'm thinking to myself, you know, all

17  I'm trying to do is make a living.  You know what I

18  mean?

19           Another time, I'm in the kitchen, got my back

20  turned to her.  She comes up and puts her breasts all on

21  my back.  I mean, you know, just things like that that

22  we were supposed to be detouring from, okay?  And it was

23  just, you know, I -- I didn't want it, you know, but...

24       Q    Did you say anything to her during those two

25  incidences?

1     A     I -- I'd rather not answer that question.

2     Q     Is that -- are those two incidences the

3  unwanted sexual contact that you reference in your

4  complaint?

5     A     Yes, those are the two incidents.

6     Q     Okay.

7     A     I did not want those.

8     Q     Okay.

9     A     But I'm assuming now that she -- she wanted to

10  feel -- she wanted that -- to feel that sense of

11  control, you know.  "I'm the store manager here."  I

12  know -- but, you know, maybe -- maybe she wanted

13  something more than I wanted.  I didn't want anything.

14  I just wanted to, you know --

15     Q     Did you report --

16     A     -- go on.

17     Q     -- other than obviously your report to the

18  EEOC, but did you report those two incidents to anyone,

19  do you recall, Janice Teeter or Heather Rainey, when

20  they happened?

21     A     It happened so quick.  It was like from the

22  time that everything was -- the meeting came about,

23  okay, "What's y'all's relationship," to the time I was

24  terminated, you know -- see, with the company, I -- I

25  don't really know Circle K that well, but obviously we

1  agreed, her and I both, to conduct ourself

2  professionally, okay?  That's where I was headed.  I had

3  my mind made up.

4      Q    And that's the meeting with Heather and Janice?

5      A    Yeah.  And I said, "Yeah, I can conduct myself

6  professionally.  I can go on and do this."

7      Q    Everyone agreed at that meeting, right?

8      A    Renee agreed.  And Heather Rainey said, "I

9  don't want to hear a peep out between both of you.

10  Y'all just keep it" --

11      Q    Professional?

12      A    Yeah.  So, it didn't -- it didn't work that

13  way.  It just started getting worse and worse.

14      Q    Heather and Janice told you that you could call

15  them if there was another incident, right?

16      A    I don't recall that.

17      Q    But in any event, between the time of that

18  meeting and the time of your termination, when these

19  things happened you didn't talk to Heather and Janice

20  about them, right?  About those two incidences you just

21  described, right?

22      A    No.  They're a byproduct, because, see,

23  originally -- I don't want to make speeches here.  But

24  originally EEOC said that I can complain in my complaint

25  anything relating -- you got the charge, and then

1    anything relating that can be put, I can do that.

2       Q    Okay.

3       A    But so, the actual -- there's an actual

4    complaint, and then there's the actual charge, which can

5    only be proven in a court of law.  It's not what I say

6    or he said or she said.  The judge wants to know -- I

7    want to see proof of what happened, you know, that's

8    all.

9       Q    And sometimes what you say can be proof, which

10   is why I'm asking you.  You -- before your termination

11   you never talked to Janice or Heather about those two

12   incidents, right?

13      A    About what incident?

14      Q    The rubbing the breasts on you and the

15   smacking -- or the touching of your testicles?

16      A    Well, see, this was -- I'd rather not -- I'd

17   rather not answer that question, okay?

18      Q    Were there any other witnesses?  Did anyone see

19   her rub her breasts against you, that you know of?

20      A    I'd rather not answer that question.

21      Q    What about touching your testicles, did anyone

22   see that?

23      A    I'd rather not answer that question.

24      Q    Can you -- can you describe to me what happened

25   in the incident with Kathy Mitchell and the $20 bill?

1   Can you tell me what happened?

2       A    What do you want to know?

3       Q    Well, how did it -- how did the thing start,

4   the whole issue start?

5       A    Okay.  I'll try to simplify it and keep it as

6   simple as possible, okay?

7       Q    Sure.

8       A    It was all over a $20 bill that a customer came

9   in and got out of the ATM.

10      Q    Okay.

11      A    As a cashier, I looked at it, and it didn't

12  look right, okay?  And there again, it's in one of those

13  documents, correct?  I don't want to get ahead of myself

14  about the -- it was -- it was the incident on June the

15  1st, correct?  June the 1st, '09.

16      Q    Okay.

17      A    The issue that's in -- well --

18      Q    It's in the statements we discussed earlier,

19  but I haven't seen a statement from you, which is why

20  I'm asking you if you can describe to me what happened.

21      A    Okay.  Yeah, certainly.

22      Q    So, customer walks in the store, they go to the

23  ATM, they get out a $20 bill, they show it to you, and

24  you say "It doesn't look right"?

25      A    Yeah.

1      Q    What happens next?

2      A    So, I believe -- I mean, as I recollect, the

3    customer -- customer was getting irate, because, "Hey,"

4    you know, "I just got that out of y'all's ATM.  It

5    better be good."

6           So I called Renee up.  Called her on the

7    phone.  She goes off on me.  "Ah, Steve, anybody could

8    say they got a $20 bill out of the ATM."  And she

9    wouldn't let me get a word in edgewise, you know.  And

10   then I was like -- finally, I had to just hang up on

11   her, okay?

12          And then Renee calls what I -- what I

13   understand, Renee calls Kathy to come in and take care

14   of the situation, okay?  So, when she gets in there she

15   goes over to the customer, and I think she -- as I

16   recall, she exchanges the money for, like, two fives and

17   a ten, I think.  Okay.  And then -- then I want to

18   simplify this.  But I assure you, there was no -- there

19   was no incidences -- incidents any time that warranted

20   anything for my termination on June the 1st of '09.  I

21   promise you that.

22     Q    Okay.  Well, did you and Kathy discuss the

23   incident with the customer and the $20 bill and

24   everything?

25     A    Did Kathy and I?

1    Q    Yes.

2    A    That wouldn't be -- that wouldn't be fair for

3    me to assume, because it's not really clear, okay?

4    Whether I talked to the customer --

5    Q    I want to know if you talked to Kathy.

6    A    Yes, I did.

7    Q    Okay.

8    A    Yes, I did.

9    Q    And what did you-all talk about?

10    A    Basically, I told Kathy -- I told Kathy that --

11    when she came in, about what happened when I called

12    Renee on the phone, and I couldn't get a word in

13    edgewise, and she was just, blah, blah, blah, blah,

14    blah, blah, you know.

15         And then -- and she pretty much discussed --

16    she said, "Well, whatever. Renee -- I agree with

17    Renee." I'm paraphrasing things. But there -- there

18    was no -- there was no screaming. There was no yelling

19    in front of a school -- I mean, in front of a store full

20    of customers. There was none of that, okay?

21         And next thing I know, I'm being terminated on

22    June the 10th for something that supposingly happened on

23    June the 1st, okay?

24    Q    Did you agree with Kathy on exchanging the

25    money for the customer?

1    A    Did I agree with --

2    Q    Uh-huh.

3    A    Who says there was even an argument?  I mean,

4  you're -- you're implying that there was --

5    Q    I'm not trying to imply anything.  I'm just

6  asking the question.  Did you agree with Kathy's giving

7  the customer -- the exchanging the money?

8    A    There was never a agreement or a disagreement

9  about exchange of money.

10    Q    Okay.  Do you know if Kathy made a complaint to

11  anyone about the situation?

12    A    I'm -- I didn't physically hear her, but it's

13  obviously -- obvious, if there's a situation that

14  arises, and all of a sudden you've got this counseling

15  notice, there was something communicated somewhere,

16  wasn't there?

17    Q    Okay.  So, did you -- did you try to talk to

18  Kathy about what you and Renee had discussed about the

19  incident -- about the $20 bill thing?

20    A    Yeah.  By the coffee pot?

21    Q    Yeah.

22    A    Yeah.  I tried to discuss -- I discussed it

23  with her, yeah.

24    Q    And did you and -- what did Kathy tell you?

25    A    I'd rather not answer that question right now.

1     Q    Did you get aggravated with Kathy -- did you

2 agree what Kathy said to you?

3     A    I'd rather not answer that question at this

4 present time.

5     Q    Did you become upset or raise your voice at

6 Kathy while the two of you were discussing your

7 conversation with Renee?

8     A    I'd rather not answer that question.

9     Q    Did Kathy ask you to take it out of the store

10 area into the back room?  Did you go into the back room

11 with her to discuss it further?

12     A    Yeah, as I recall, we did go to the back room.

13     Q    Did y'all discuss the incident some more there?

14     A    It's very possible.

15     Q    Did Kathy tell you that raising your voice in

16 front of customers was inappropriate?

17     A    No.  I believe what she said -- and I don't

18 know if I can quote word for word, but it's more like

19 this:  "At least raising your" -- you know, I don't

20 recall, and I'm not going to sit here and speculate and

21 guess.  I'm getting -- I'm getting way out -- I guess

22 I'm just getting tired, okay?

23     Q    Okay.

24     A    I really...

25     Q    Okay.  But you were told that this is the --

1    that is the incident as to why you were terminated,

2    right?  That's what you were told, right?

3        A    I wouldn't agree to that.

4        Q    Okay.  I know you don't agree with it.  I'm

5    asking, is that what you were told, or were you told

6    something else?

7        A    Well, it's according to who said what.  I

8    mean --

9        Q    Okay.  What were you told?

10        A    By whom?

11        Q    Who was it that told you you were terminated?

12        A    I guess it goes from the top, right?  But the

13    person -- the person that actually said, "You are

14    terminated" -- and let me educate you.  I believe

15    it's -- let me paraphrase a little bit.  It was by

16    Janice Teeter.  "Steve, we don't need a reason in

17    Florida to terminate someone."

18            I said, "Why are you -- why you terminating me

19    for?"

20            And she said, "For this writeup." Which was the

21    writeup that was supposingly the Kathy Mitchell thing.

22        Q    Okay.

23        A    Okay.  If it was so bad and I was so

24    insubordinate on June the 1st, why did they wait till

25    June the 10th to terminate my employment?  Doesn't make

1  any sense.

2      Q    Okay.

3      A    And also I believe old Mr. John Venuti got a

4  lot to do with this, too.

5      Q    Okay.  Who's John Venuti?

6      A    He's director of operations.

7      Q    And he's Janice Teeter's boss, is that right?

8      A    Yep.

9      Q    And you think that he participated in the

10  decision to terminate you?  Why do you say --

11      A    Oh, I don't think.  I know.

12      Q    Okay.  How do you know that?

13      A    I'd rather not answer that question at this

14  time.

15      Q    Are you still having an affair -- are you still

16  having any kind of sexual relationship with Renee

17  McCorkle?

18      A    Absolutely not.

19      Q    Are you seeking economic damages in this case?

20      A    Can you be more specific?

21      Q    Are you asking for money?

22      A    I'm asking for justice, and I'm also asking for

23  anything that comes with that, whether it be punitive,

24  compensatory damages, you know, whatever.  That's what

25  I'm asking for.  I'm asking for justice.  I was done

1  wrong.  I was discriminated against, okay?  Sexually

2  harassed.  It's all in the complaint.

3       Q    What -- tell me what justice is.

4       A    Okay.  Hopefully, I'll know that at the end of

5  this trial.

6       Q    Okay.  Have you lost any money as a result of

7  the things we've discussed today, the issues in your

8  complaint?

9       A    I'd rather not answer that question.

10      Q    Have you had to seek any kind of counseling or

11  anything like that as a result of these issues you've

12  raised in the complaint?

13      A    I'd rather not answer that question.

14      Q    Has your life changed as a result of what

15  happened?  As a result of the incidents that you

16  described in the complaint?

17      A    Can you be more specific?  Life's a big --

18  life's a big word.

19      Q    I really can't.  I mean, have you experienced

20  any changes in your life that you think are the result

21  of the incidents that happened in the complaint?

22      A    I'd rather not answer that question.

23      Q    How long have you -- how long has it been since

24  you -- excuse me.  How long has it been since -- since

25  your employment with Speed Lane ended?

1    A    As I recall -- as I believe to be the fact, is

2    August of twenty -- August 28th of '10.

3    Q    Okay.  And since then you haven't worked at

4    all?

5    A    No.

6    Q    Have you been looking for a job?

7    A    Sure, every day.  That's another thing, at the

8    peak of, I think, all this economical downfall, and then

9    as being an upstanding -- and I consider myself an

10   upstanding employee there, was let go right in the

11   middle of things.

12   Q    Okay.

13   A    What can I say?

14   Q    Is there anything else you'd like to tell us

15   about the allegations of your lawsuit or your case,

16   Mr. Combee?

17   A    Well, I will say this -- strike that.  No, I

18   won't say that.  Excuse me.

19   Q    I would just ask you one more time if -- are

20   you going to produce any records like we asked for in

21   the request for production that you received?  All

22   you've got to do is drop them in the mail to me.

23   A    Well, I'm already being deposed.  I mean --

24   Q    But -- and maybe you don't understand, but

25   I'm -- in addition to the deposition, I'm allowed under

1    the rules of procedure to get the documents that I've

2    requested.  So I'm asking if you are going to produce

3    them or not.  Yes or no?  And the reason I'm asking is

4    because if you just -- if you say, "No, I'm not going

5    to," then I have to take it up with the court.  And I'm

6    trying right now in good faith to resolve the issue.

7        A    So, specifically, what are you asking for?  You

8    sent me a letter stating what you wanted.

9        Q    The document that we've marked, actually, here

10   as Exhibit 7, I believe it is.  And it simply goes

11   through and it asks for anything that relates to this

12   lawsuit.  Basically, anything that relates to this

13   lawsuit, the allegations in the lawsuit, or Circle K, or

14   your employment there.

15       A    So -- so pretty much what you're saying is that

16   if you don't have it, and when it goes to trial, I can't

17   use it, correct?

18       Q    I would -- well, that's always up to the judge,

19   but I would certainly make that argument, that if I've

20   asked for it and you haven't given it to me, you

21   shouldn't be allowed to use it.

22       A    I think you got pretty much all you need except

23   for maybe a couple of confessions or signed statements.

24   And you've obviously already got those, so I think we're

25   on the same page, you know.

1     Q     So --

2     A     I believe everything that I have, you got, so

3  when it does go to trial there will be no problem.

4     Q     So you're not going to --

5     A     And if I do find anything, I'll call you and

6  let you know.

7     Q     Okay.  All right.  I think the deposition's

8  concluded.

9           Mr. Combee, you have the right to read the

10  deposition transcript or you can waive that right.  You

11  can read it and make changes if you think they're

12  necessary, or you can waive your right to do that.  You

13  just have to say what you want to do.

14     A     When you say "read," can you be more specific?

15           THE COURT REPORTER:  Do you want this on the

16     record or not?

17           MR. COHEN:  Yes.

18  BY MR. COHEN:

19     Q     The court reporter's going to type up

20  everything that we said today --

21     A     Okay.

22     Q     -- and then she's going to put it in a -- like

23  a booklet, and she's going to send that booklet to you

24  and me.  And you have the right to read that and -- and

25  make changes if you want.

1      THE COURT REPORTER:  Actually, he would have to
2   come here.
3      Q    You would have to come here --
4      A    Okay.
5      Q    -- and read it, and she would -- she'll call
6   you and let you know.  So do you want to read or not
7   read?  And what you're doing is you're just making sure
8   that what she said was accurate?
9      A    What she said was accurate.
10      Q    What she types up that we said.
11      A    No, I have confidence.
12      THE COURT REPORTER:  That's a waive?
13      MR. COHEN:  I think so.
14      (The deposition was concluded at approximately
15   2:30 p.m.)
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF OATH

STATE OF FLORIDA           )

                           ) ss

COUNTY OF HILLSBOROUGH)

        I, the undersigned authority, certify that the witness, STEVE COMBEE, personally appeared before me and was duly sworn.

        WITNESS my hand and official seal this 27th day of July, 2011.

_____

RHONDA ELLISON
Notary Public - State of Florida
Commission No. DD 949181

REPORTER'S CERTIFICATE

STATE OF FLORIDA        )

                        ) ss

COUNTY OF HILLSBOROUGH)


        I, RHONDA ELLISON, Court Reporter, certify that
I was authorized to and did stenographically report the
deposition of STEVE COMBEE, that a review of the
transcript was not requested; and that the transcript is
a true record thereof.
        I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorneys or counsel connected with the action, nor am I
financially interested in the action.
        DATED this 27th day of July, 2011.




                        _____
                        RHONDA ELLISON
                        COURT REPORTER

**A**

ability 9:5,11
able 29:17 99:11
absenteeism
    91:8
absolute 43:10
    44:4
absolutely 83:21
    120:18
accident 110:13
accurate 125:8,9
action 4:11
    127:15,16
actual 40:11
    64:1 113:3,3,4
addition 72:22
    122:25
address 11:14
    11:17 12:7
    21:1 27:24
addressed 86:12
advance 76:12
advice 8:19
    14:16
affair 51:14
    120:15
affect 9:5,11
aggravated
    118:1
ago 4:8 5:21
    82:5
agree 10:23
    26:15 30:21
    40:11 42:8,9
    42:23 59:8
    79:16 81:7
    89:15 90:1,3
    92:5 102:14
    116:16,24
    117:1,6 118:2
    119:3,4
agreed 112:1,7,8
agreement
    117:8
Ah 115:7
ahead 43:18

44:10 46:22
    47:15 59:7
    86:15 114:13
ain't 75:19
air 33:5 83:19
allegations 26:2
    122:15 123:13
allege 20:6,22
alleged 18:4
alleging 18:7
    19:6 48:11,14
allowed 8:19,20
    14:22 19:24
    26:2,3 122:25
    123:21
amount 88:1
answer 4:16,25
    8:18 9:14 10:4
    13:18 14:10,25
    15:1,2,6 16:20
    16:24 19:23
    26:25 27:6
    30:14 33:12,18
    34:6,8,22 35:5
    35:21,24 36:2
    36:7 37:3,6,9
    37:14 38:18,23
    39:10,13 42:20
    45:4,7,10,15
    48:8,16 54:24
    56:11,21 57:8
    57:13,18 59:16
    59:25 60:5,10
    60:23 72:12,14
    74:7 76:15
    77:21,25 78:14
    80:14 82:2,8
    82:11 83:6
    85:25 86:4,8
    86:14,24 87:12
    87:15 89:11
    98:2,13,15,20
    99:6 100:5
    101:6,22
    104:23 111:1
    113:17,20,23
    117:25 118:3,8

120:13 121:9
    121:13,22
answering 76:10
answers 4:23
    7:16 16:24
Anthem 1:18
anybody 47:22
    115:7
anymore 108:20
apartment
    11:15 12:3,19
    13:1,14 14:1
    15:13,19,24
    16:11 21:17
apologize 13:24
    17:10 28:8
    74:24 84:1,9
APPEARAN...
    2:1
appeared 126:8
Applicants 3:5
applicant's 43:6
application
    44:15
applied 34:25
    43:13,13
apply 30:12
    37:12
appropriately
    101:6
approximate
    16:5 17:3
approximately
    18:3 34:13
    125:14
area 118:10
argument 53:3
    53:20,20 54:2
    54:5 117:3
    123:19
argumentative
    80:9
arised 21:10
arises 117:14
asked 7:10,12
    13:20 15:11,13
    19:3,5,23 32:6

51:16 59:14
    64:24,25 67:2
    69:9,10 74:22
    74:24 76:21
    78:9 101:2,25
    104:20,21
    122:20 123:20
asking 19:25
    25:8,23 26:9
    33:24,25 34:1
    41:10,11 42:12
    47:3 51:24
    55:12 56:4,6
    59:18,20 69:2
    70:14 76:8,10
    81:4 83:2
    84:21 85:9
    88:23 103:5
    113:10 114:20
    117:6 119:5
    120:21,22,22
    120:25,25
    123:2,3,7
asks 123:11
assertion 25:12
assistant 28:6,10
    28:21 29:2,4,7
    29:11 36:10,17
    36:19,23 40:19
    40:24 46:24
    48:1 55:11
    79:18 91:25
assistants 47:2
assisted 11:6
assume 12:3
    21:4 25:12
    116:3
assumed 58:2
assuming 29:16
    55:25 56:5
    69:7 80:19
    111:9
assumption
    66:20
assure 115:18
ATM 79:10
    114:9,23 115:4

115:8
attempt 77:3
attend 23:17,18
attitude 55:6,16
attorney 4:10
    127:13
attorneys
    127:15
August 122:2,2
authority 126:7
authorized
    127:8
award 33:16
aware 48:4,5
    89:3,5,8
a.m 1:15,15

**B**

back 33:16 38:6
    48:21 59:9,13
    61:9 63:2
    74:19 76:23,25
    84:14 104:8
    107:21 110:19
    110:21 118:10
    118:10,12
backwards
    104:10
bad 53:8,20 54:2
    54:8 119:23
Bajo 2:3
ball 25:17,21
base 66:9 104:6
based 25:12
    27:24 29:25
    33:16
basic 78:7
basically 18:9
    19:8 34:12
    50:25 53:19
    69:2 87:24
    106:3 116:10
    123:12
bathroom 92:25
    93:1
becoming 80:9
began 50:6,14

52:3 55:1
**BEHALF** 2:2
**behaving** 105:25
**believe** 7:11
 13:11 14:23
 19:22 22:20
 44:18,22 57:6
 57:11,16 59:21
 59:23 69:12,12
 77:23 84:2
 87:8,10 90:4
 91:9 94:11
 103:4,14,16
 104:10,25
 105:3 115:2
 118:17 119:14
 120:3 122:1
 123:10 124:2
**believed** 42:7
**benefit** 51:25
**benefits** 34:16
 35:1,3
**best** 6:2 26:15
 27:15 35:9,15
 50:14 61:13
 65:18 68:25
 70:25 73:25
**better** 54:19
 55:23 70:18
 71:20 75:24
 115:5
**big** 75:17 121:17
 121:18
**bill** 79:10 113:25
 114:8,23 115:8
 115:23 117:19
**birthday** 11:10
**bit** 7:5 33:4
 119:15
**blah** 106:9,9,9,9
 106:10 109:22
 109:22,22,23
 116:13,13,13
 116:13,14,14
**blunt** 71:21
**booklet** 124:23
 124:23

**boss** 37:24 74:10
 120:7
**bottle** 33:6
**bottom** 10:16
 43:9 87:7
 91:21 93:22
 95:13,15 97:4
 97:23
**boyfriend** 67:1
**boyfriend-girl...**
 49:25 50:2
 67:4,9 70:17
**break** 5:16
 14:12 32:25
 39:3 48:21,25
 59:8,11 83:17
 83:20
**breaking** 63:1
**breakup** 62:24
 62:24 71:8
**breasts** 110:20
 113:14,19
**Brief** 14:13 33:8
 83:22
**briefly** 37:22
**bring** 46:24
 47:19,22 87:20
 92:15
**broad** 39:2
**broke** 63:2
**brought** 92:14
**Buchman** 20:24
 21:6,11,16
**bunch** 4:15
 90:21 98:10
**business** 32:15
 33:11 49:10
**businesses** 32:22
**busted** 60:21
**byproduct**
 112:22

**C**

**C** 11:15 14:1
 15:13,19
**calculate** 34:4,4
**call** 8:22 21:8

51:14 58:15,19
 58:20 59:3
 67:21 74:7,9
 74:10,11 106:4
 106:7 112:14
 124:5 125:5
**called** 40:1,7
 58:12,12,14,16
 58:24,25 59:2
 63:3,4,5,5,7,14
 63:14,17,18
 64:21 74:16,19
 75:17 115:6,6
 116:11
**calling** 106:8
**calls** 115:12,13
**camel's** 63:2
**care** 115:13
**cared** 54:16
**career** 7:12
**carried** 71:2
**carry** 105:11,18
 105:21
**carrying** 106:10
**case** 1:5 7:7 8:14
 14:21 19:1,6
 19:10,15 23:12
 19:20 122:15
**cash** 87:16,18
 88:2,6 89:13
**cashier** 24:24
 95:25 114:11
**cashiers** 106:25
**cell** 58:24
**certain** 29:14,14
 76:24 88:1
**certainly** 103:4
 114:21 123:19
**certainty** 75:11
**CERTIFICA...**
 2:23,23 126:1
 127:1
**certify** 15:4
 16:23 20:3
 27:7 34:7,23
 35:6 36:3,8
 37:10,15 38:19

39:14 42:21
 48:9,17 57:9
 57:14,19 60:1
 60:6,25 83:9
 98:5 126:7
 127:7,12
**certifying** 45:11
 86:9
**change** 54:17,19
 54:23 55:7,20
 56:18 96:1
**changed** 121:14
**changes** 121:20
 124:11,25
**charge** 3:3 9:22
 9:24 10:2,11
 10:19,23 11:2
 11:7 18:22
 50:8,9 88:18
 112:25 113:4
**check** 92:23
**chronology** 26:7
**Circle** 1:7 2:8
 3:7 4:10 5:11
 6:14 10:13
 11:4,8,23
 14:17 18:9
 19:8,16,19,21
 20:1 25:9,25
 26:3,3,6,11,13
 26:13,22,24
 27:2,5,10,13
 27:25 28:14,22
 28:24 29:22
 30:4,12,17,20
 33:10,14,19
 35:11,19,23
 36:1,5,6,12,16
 37:2,5,12,18
 37:20,21 38:9
 38:17,22,25
 39:4,9,12,17
 39:20,23 40:20
 40:24 41:9,12
 43:13 44:17
 46:8,11,17
 47:7 48:6,11

48:15 49:4,7
 49:17 52:15
 54:19 55:11
 57:7,11,17,22
 58:16 59:17,22
 60:3,8,12,18
 61:2 64:2 71:2
 73:4 78:2,5,13
 79:7 84:21
 86:6,22 87:25
 89:4,8 101:4
 106:16 111:25
 123:13
**circumstances**
 52:23 97:17
**City** 11:16 12:13
 14:3 15:13,16
 15:19,25 20:15
 20:25,25 23:4
 23:22,23 24:17
 27:21 64:2
**civil** 76:11
**clar** 37:19
**clarify** 49:19
 60:19 73:1
 78:3 101:5
 103:6
**class** 28:16
**classification**
 60:22
**clear** 66:13 75:8
 75:9 100:9
 116:3
**client** 14:17,20
**clients** 12:24
**close** 30:20
 106:19
**Cochuyt** 29:18
**coffee** 117:20
**cohabitants** 22:1
**Cohen** 2:3,3,22
 4:6,7 10:6,9
 14:12,14 16:23
 16:25 18:13,16
 20:3,4 27:7,8
 31:15,17 33:9
 34:7,9,23,24

35:6,7 36:3,4,8 36:9 37:10,11 37:15,16 38:19 38:20 39:14,15 42:21,22 43:5 43:18,22 44:6 44:9 45:11,12 45:16,19 48:9 48:10,17,24 49:2 57:9,10 57:14,15,19,20 59:7,12 60:1,2 60:6,7,25 61:1 83:9,10,23,25 84:3,6,9,12 86:9,10,15,19 90:25 91:3,13 91:17 94:2 95:4,7 96:13 96:15,18 98:5 102:24 103:1 124:17,18 125:13

**college** 24:6,6
**column** 46:2
**Combee** 1:3,10 4:2,7 5:6 7:5 8:21 12:23 13:9 14:15 16:4 18:17 19:16,18 25:8 33:19 34:3 43:7 44:12 59:14 76:7 78:10 83:20 84:4 87:1 88:19 91:22 100:4 101:1 102:15 104:18 122:16 124:9 126:8 127:9
**come** 37:12 38:6 48:21 51:3 55:10 58:4 59:8 63:15 76:4 88:20 107:21 108:13

109:9 115:13 125:2,3
**comes** 26:13 34:1 110:20 120:23
**coming** 104:13
**Commission** 126:17
**common** 78:7 105:17,19
**communicate** 38:13
**communicated** 117:15
**Community** 24:6
**company** 11:3,7 38:10,11,12,14 48:3,4,5 111:24
**company's** 88:3
**compensatory** 120:24
**complain** 112:24
**complained** 58:17 92:22
**complaining** 19:1
**complaint** 3:4 18:19 33:21 50:7,8 51:12 77:6,9 86:13 88:17 98:21 99:1,10,11,16 101:8 104:18 105:2,25 108:23 109:1 109:11 111:4 112:24 113:4 117:10 121:2,8 121:12,16,21
**complex** 13:15 16:11 21:18
**computer-gen...** 104:11
**concerned** 53:11 53:15

**concluded** 124:8 125:14
**conditions** 69:19 69:25 70:3
**conduct** 104:25 107:12 110:9 112:1,5
**confessed** 65:5
**confessions** 123:23
**confidence** 125:11
**conflict** 47:4,6 47:11,17
**confused** 68:19 71:15
**connected** 127:15
**connection** 9:2
**consensual** 52:11
**consider** 77:20 122:9
**considered** 75:25
**consistent** 62:10
**constructive** 40:19
**contact** 105:4 109:13 111:3
**content** 109:12
**control** 107:3 111:11
**convenience** 24:22 49:22
**conversation** 63:11 82:13 95:22 118:7
**convicted** 9:18
**cooking** 94:10 94:13,17
**copies** 82:10 98:23,25 99:1 101:13,14 102:1
**copy** 89:22 95:10

**corner** 3:13 10:20 43:9
**Corporation** 1:7
**correct** 5:9,12 6:7 7:7 9:17 12:5,11 14:6,8 15:16,19,20,22 15:25 16:1 17:6 20:8,10 20:12,15,19,20 25:10,16 27:22 28:4,6,7,12 30:2,11 33:23 33:24 41:12,19 41:24 42:1 45:14 49:8 50:17 56:2 60:16 61:12 80:20,20 88:4 88:4 100:13 102:13 114:13 114:15 123:17
**counsel** 39:1,6 127:13,15
**counseled** 38:24 39:4,8 89:2
**counseling** 3:11 3:12,14,15,16 3:17 40:1,7,11 40:18,23 41:13 41:20 42:7 55:1 58:7 73:10,10,14 87:2 88:5,23 88:24 89:9,16 91:5 92:2 94:4 94:9 98:21,23 101:3 103:3 117:14 121:10
**County** 24:16 126:5 127:5
**couple** 106:24 123:23
**course** 17:4 52:13 102:21
**court** 1:1,21 4:16 5:24 6:8

7:17 15:3 16:7 18:19 26:4 31:13,25 33:16 34:4 76:8 84:2 84:7 96:14 102:17,25 104:14 106:14 113:5 123:5 124:15,19 125:1,12 127:7 127:22
**courts** 84:24
**crazy** 57:1
**crime** 9:19
**criticism** 40:19
**CSR** 28:17 60:18 73:3
**current** 11:14 15:11
**currently** 15:18 24:11
**customer** 28:14 37:18 78:17,23 79:11 92:22 114:8,22 115:3 115:3,15,23 116:4,25 117:7
**customers** 81:6 116:20 118:16
**cut** 75:15,18 76:23 106:5
**cutting** 75:14,22 76:1 77:4
**Cuva** 2:3
**C-O-C-H-U-Y...** 29:18

**D**
**dad** 7:21
**daily** 107:15
**damages** 23:11 25:9,11 33:16 33:24 34:2 120:19,24
**Darrell** 2:7 6:11 6:12
**date** 1:13 16:5,5

26:14 30:18,19
30:22,24 43:13
52:8 57:25
58:20 61:6
72:17 97:15
103:16
dated 3:11,12,14
3:15,16,17
94:3 103:16
127:17
dates 16:7 26:12
26:15 34:12,13
34:14,15,15,18
34:20,21 51:11
51:13 61:12
day 35:12,12
64:6,19 81:24
82:1,14 110:7
122:7 126:10
127:17
days 63:13
74:10,12,15,18
108:9
DD 126:17
December 70:13
72:15 94:3
decision 120:10
decrease 30:8
60:12
decreases 60:14
defendant 1:8
2:2 4:11
Defendant's 3:2
3:10
defending 14:20
defense 26:4,5
defenses 26:4
define 78:6
79:14 90:10
definitely 80:23
85:18
delivered 10:13
demoted 60:17
60:19
deposed 85:10
85:14,18
122:23

deposition 1:10
4:12 6:15,20
6:21 7:13,19
8:4,5,8,10,13
8:21 9:2 10:7
10:24 15:3,5
18:14,18 43:1
43:3,20,23
44:7 45:17,21
66:18 76:7,14
78:11 82:5
83:16 84:4,10
86:17 89:19
90:22 91:1,4
91:13,15 93:25
95:5,9 96:16
98:4,7,16
100:23,25
101:17,18,20
102:5,8,23
122:25 124:10
125:14 127:9
deposition's
124:7
describe 52:22
76:22 104:18
105:24 106:1,1
109:11,17
113:24 114:20
described 47:7
65:25 67:7
72:6 108:23
112:21 121:16
describing 64:20
Description
92:20
desk 87:22
detail 8:7
details 53:18
detouring
110:22
difference 107:7
differences 74:9
different 19:6
21:13 22:17
39:1,5,6 56:7
57:1 83:4

DIRECT 2:22
4:5
directly 46:16
46:18 47:4,11
66:4 68:8
director 2:8
6:12 120:6
disability 35:1
disagree 80:23
81:7,8
disagreed 42:4
89:1 92:11
Disagreeing
42:14
disagreement
78:6,8,16,22
79:9,12,15
117:8
disagreements
78:4,4,12
discriminated
20:6,23 108:18
121:1
discriminating
53:22
discrimination
3:3 9:23,24
10:1,3,12,19
10:23 11:3,7
18:4,22 50:8,9
57:22 77:13
discrimination's
62:22
discuss 6:20
73:6 81:9,16
93:18 115:22
117:22 118:11
118:13
discussed 67:25
80:1,4 81:22
83:14 94:4
101:16 114:18
116:15 117:18
117:22 121:7
discussing 79:22
118:6
discussion 80:4

80:8,10,13,15
81:23 110:5
disputes 78:1,3
disrespectful
81:5
dissolve 22:18
DISTRICT 1:1
1:1
DIVISION 1:2
divorced 22:13
22:19
document 10:2
10:14,14,15,17
10:22,25 11:1
18:17,21 44:1
44:12 45:2,3,5
45:6,9,14,21
45:24 46:4
51:20 77:11
84:13,14,17
87:14 89:25
90:13,17 91:8
91:18,19 92:8
93:4 95:14
96:20,22 97:2
97:3,9,10
98:12 103:21
123:9
documentation
18:10,12 62:1
documents 3:10
8:9,11,13 9:1,1
18:23,24 19:3
20:5 44:14
50:9,11,21
67:25 84:18,21
85:1,4,8,21,24
86:1,2,20,22
88:12 93:13
99:10,15,25
100:22 101:16
101:18,24
103:24 104:13
114:13 123:1
doing 32:22
73:25 75:23,24
76:3,21 109:6

125:7
dollar 96:3
doubt 51:25
downfall 122:8
drained 108:17
drawer 87:18
88:2,6 89:13
driving 9:19
drop 122:22
drugs 9:9
duly 4:3 126:9
duplex 16:12
duress 90:6,9,10
90:13,16
duties 73:2,16

E
earlier 37:7
59:14 60:11,15
64:24 77:21
83:16 94:4
106:3 114:18
early 51:22 52:7
53:2 62:25,25
108:8
ease 7:5
easier 51:19
95:9
East 11:15 12:7
15:13
economic
120:19
economical
122:8
edgewise 115:9
116:13
educate 119:14
education 24:5
EEOC 10:12
51:21 86:20,23
111:18 112:24
either 16:16
29:18 56:23
81:14 97:7
Ellison 1:21
126:16 127:7
127:22

employed 24:11
24:13,25 25:5
36:16 38:22
employee 3:6
30:2 32:23
41:17 43:24
65:6 109:10
122:10 127:13
127:14
employees 3:5,9
36:5 86:6,6,7
105:22
employer 4:11
5:11 11:3
employment 3:5
11:22 26:12
28:13 29:5
30:17 32:10,14
43:7 49:18
71:2 78:15,20
78:25 79:1,7
119:25 121:25
123:14
ended 11:23
22:14 51:10,20
51:21 52:6,23
53:9,15,17
54:6,11,20
55:7,21 70:16
70:23 121:25
endurance 5:18
entire 27:25
28:2,13
entitled 25:24
50:23 85:7,8
99:9 102:16
environment
104:19
ESQUIRE 2:3
estimate 11:20
21:3
estimating 21:2
21:3 31:1
61:11
estimation 11:19
ethical 108:11
evaluations

86:11
Evan 29:10,15
29:17,17 37:7
80:21 81:4,25
82:3 85:20
86:6
Evan's 80:19
85:21 86:7
event 112:17
events 9:11
everybody 73:23
exact 58:20 61:6
61:12 72:17
89:22
exactly 63:10
73:17 96:6
102:10
exaggeration
7:14
EXAMINATI...
2:22 4:5
examined 4:4
exceptional
56:23
excessive 91:7
exchange 117:9
exchanges
115:16
exchanging
116:24 117:7
excuse 32:2 38:2
121:24 122:18
exhibit 2:22 3:1
10:6,7 18:13
18:14,18,21
20:5,5 43:2,3
43:20,23 44:6
44:7 45:17,21
77:7 84:4,10
86:16,17 87:1
89:16,20 90:14
91:1,4,13,15
93:25 95:5
96:16 97:9
98:4,8,17
123:10
exhibits 100:25

101:17,19,20
102:5,8,23
expect 16:6
Expectation 3:8
3:8
expectations
54:17,18 72:24
73:1,3
experienced
121:19
explain 7:15
19:18,20 41:17
49:13 92:7,9
explained 77:2
explanation 5:1
95:16
explode 108:1
expound 38:4
Express 24:14
24:21 25:4
30:16,23 31:6
31:7,11,16,23
32:4,11,13
extraordinary
56:22
extremely 23:16
e-mail 98:10

**F**
fact 36:1,6 95:2
122:1
fair 9:15 26:18
27:23 39:21
41:15,22 42:25
51:8 52:10
54:3,12 55:19
56:9 57:23
58:6 62:13
70:21 79:17
108:25 116:2
fairly 8:20 40:10
40:14
faith 123:6
false 41:25 42:3
42:8,11,19
58:2 68:1 90:7
90:11 97:5

98:23 100:12
101:11
familiar 73:17
far 53:11,15
55:22 77:11
105:13
fashion 15:10
father 7:20
fault 13:25
February 11:11
federal 18:19,22
50:21 76:11
feel 111:10,10
feelings 54:2,8
fifth 76:16,18
98:17
figure 20:17
101:20
file 9:25 44:17
76:8
filed 5:10 10:12
11:2 14:16
18:19,21 33:14
33:21 50:21
51:21
filing 11:7 76:12
fill-ins 104:12
finally 115:10
financially
127:16
find 25:24 124:5
fine 24:19 48:23
59:10 70:22
76:25
finish 48:21
fired 25:14
first 3:10 4:3 9:7
43:6 51:6,6
63:5,6 68:23
78:9 96:25
97:9,12
five 96:3,24
fives 115:16
five-dollar 96:4
flag 58:3
flip 44:5
Florida 1:1,19

2:4 6:13 12:13
20:25 119:17
126:3,16 127:3
foggy-headed
55:13
follows 4:4
food 94:10,14,17
force 15:1 76:9
forged 45:2
form 3:8 40:4
41:16 42:24
formal 40:10,14
formally 84:20
former 4:11
5:10 86:7
forty-plus 62:2
fourth 98:17
frame 19:1
76:24 79:2,6
Franklin 1:18
free 33:3
fresh 33:4 83:19
fridge 33:7
friendship 49:24
front 15:5 33:16
44:10 73:24
77:8 81:6
89:19 94:19
101:2 116:19
116:19 118:16
full 5:4 116:19
further 118:11
127:12

**G**
game 12:25
games 101:1
general 40:13
generally 107:8
107:9
gentleman 6:13
getting 55:13
56:4 63:10
66:9 104:6
106:4 112:13
115:3 118:21
118:21,22

girlfriend 67:1
give 5:1 8:19
  11:19,20 13:4
  14:15 16:3
  49:12 56:21
  73:22 74:11
  83:18 91:4
  95:9,10 99:12
given 40:18,22
  41:16 77:2
  85:1,4 99:25
  100:3,3,6
  103:3 123:20
giving 117:6
glasses 92:15,15
go 8:7 19:5
  43:18 44:10
  46:22 47:14
  52:9 53:18,21
  55:25 59:7
  63:19 68:4
  69:13 76:25
  77:7,16 84:13
  86:15 90:20
  92:24 93:17
  103:9 104:8
  105:13 106:9
  111:16 112:6
  114:22 118:10
  118:12 122:10
  124:3
goes 55:22 65:3
  115:7,15
  119:12 123:10
  123:16
going 4:15,19
  7:17 8:5 10:10
  10:11 12:22
  13:8,13 14:12
  14:24 15:3,4,6
  15:7,9 16:20
  18:5 19:5,19
  23:13 25:6,12
  25:20 29:17
  30:18 33:15
  34:3 43:25
  45:13 56:11

62:22,23,25
  63:8,16 67:22
  68:17 74:22
  76:8,13,15
  86:16 87:1
  91:4 95:8,9,10
  96:19 100:9,10
  100:10,15
  102:16 103:4
  103:14 104:19
  104:23 109:24
  109:24 118:20
  122:20 123:2,4
  124:4,19,22,23
good 59:5 65:2
  107:8,8 115:5
  123:6
gotten 53:3
government
  10:24 18:22
  34:17 35:3
  50:21
graduate 24:1
gross 29:23
guess 20:16 21:4
  56:12 59:5,6
  61:11 73:21
  118:21,21
  119:12
guessing 58:18
guide 3:6 43:24
  44:16
guys 7:23 52:8
  54:1 64:19
  68:23 82:17

H
half 31:1
half-hour 48:20
hand 10:10
  89:21 110:11
  126:10
handled 78:17
  78:24 79:11,16
handling 87:17
handwriting
  3:13 91:21

95:13 97:4
  98:11,14
handwritten
  46:3
hang 103:14
  115:10
happen 47:21
  69:15 75:10
  80:8 83:2
  107:17,24
happened 41:18
  57:1 61:7
  70:13 72:3
  80:5,13 82:25
  104:3 108:1,10
  109:16,17,19
  110:14 111:20
  111:21 112:19
  113:7,24 114:1
  114:20 116:11
  116:22 121:15
  121:21
happening
  52:12,17 53:25
  68:8
happens 110:16
  115:1
happy 7:16
harass 75:23
harassed 18:8
  19:7 20:20
  57:12 77:24
  121:2
harassing 75:20
  75:25 77:5
harassment 18:4
  21:6,9 44:16
  57:21 76:23
  77:12,13,20
  104:22 105:1
hard 5:24 56:16
head 4:22,25
  27:20 40:15
  41:7
headed 112:2
hear 13:22
  19:24 58:9

109:9 112:9
  117:12
heard 13:24
Heather 63:24
  64:4,5,9,13
  65:1,15,16
  66:2 67:5,5,14
  67:19 68:25
  69:2,9,16 70:7
  71:6 72:1,8,24
  73:6,9,12,12
  75:1,5 81:10
  81:13 82:13,22
  83:4,12 94:5
  94:25 109:20
  110:2 111:19
  112:4,8,14,19
  113:11
help 92:14
Hey 41:24 67:21
  75:18 87:24
  109:23 115:3
high 23:17,18,21
  23:23 24:5
highlights 95:11
Highway 11:15
  12:7 14:1
  15:12,18 20:24
  21:7,12,16
Hillsborough
  24:20 126:5
  127:5
hire 26:14
hired 37:20
hits 110:11
hold 16:8 63:16
  106:14
home 12:19 13:1
  14:9 16:11,12
  21:17,17,18
  58:25 59:2
  106:9
honest 56:20,21
  72:12
honestly 12:24
  20:17 56:11
Hopefully 121:4

hostile 104:19
hotline 58:12,14
  58:15,16,19
hour 31:9
hourly 30:2,8
  31:7
hours 29:25
  31:21,23 61:16
  61:25 62:2,9
  62:10,14 75:14
  75:15,18,22
  76:1,23,25
  77:4 104:21,24
  106:5,5
house 63:15,17
  63:18
how's 79:4
Huh 99:4
Human 2:8 6:12
  58:3,8,10,12
  109:20
hundred 44:21
Hyde 29:9,13
  36:25 37:4,5

I
identification
  10:8 18:15
  43:4,21 44:8
  45:18 84:11
  86:18 91:2,16
  94:1 95:6
  96:17
immediate
  15:14
immediately
  12:7 13:5
  15:23
imply 117:5
implying 117:4
important 4:23
  5:19 14:20,21
improper 96:1
inappropriate
  118:16
incidences
  110:25 111:2

112:20 115:19
**incident** 62:11
  79:10,23 81:9
  82:23 109:20
  112:15 113:13
  113:25 114:14
  115:23 117:19
  118:13 119:1
**incidents** 108:13
  111:5,18
  113:12 115:19
  121:15,21
**incident's** 81:11
**income** 25:13
  33:17
**INDEX** 2:19,22
  3:1
**indicated** 53:17
**Indicating** 94:16
  100:21
**indirectly** 58:8
  67:19,24 74:5
**individual** 38:16
**individuals**
  46:16
**information**
  13:4 76:6
**infractions** 9:19
**initial** 29:21
  30:9
**initialing** 46:4
**initials** 46:1,5
**inside** 89:8
  105:19
**instance** 106:24
**insubordinate**
  81:6 119:24
**interacted** 55:16
  55:20
**interaction** 51:6
  56:6
**interested**
  127:16
**intertwined**
  49:23
**interview** 38:3
**interviewed**

37:17,21
**introduced** 4:8
  37:22
**invited** 50:25
**involuntary**
  32:6
**involving** 79:10
  81:12 87:16
**irate** 63:10
  106:5 107:14
  115:3
**issue** 40:24
  87:16 92:12
  93:7,18 114:4
  114:17 123:6
**issues** 40:20
  89:10 93:10
  109:1 121:7,11
**It'll** 51:19

**J**

**Jackson** 22:10
  23:4
**James** 5:6
**Janice** 37:23,24
  63:3,7,17,18
  63:24 64:3,4,8
  64:13 66:5,6
  67:8,16,18
  68:7,24 69:17
  70:7 71:6,24
  72:8,9,23 73:6
  73:9 74:12,25
  75:5 81:10,13
  82:13,22 83:5
  83:12 94:6
  106:4,8 111:19
  112:4,14,19
  113:11 119:16
  120:7
**Jap** 27:13,14
**job** 24:23 28:16
  37:12,17,18,21
  38:3,8,10,12
  38:14,17 40:20
  54:17,18,19,23
  60:22 61:2

69:13 72:24
  73:1,2 122:6
**John** 120:3,5
**judge** 8:22 15:7
  113:6 123:18
**July** 1:13 51:24
  52:6 126:11
  127:17
**June** 26:14,17
  27:11 30:17
  51:22 52:7,25
  53:2 54:1
  61:18,21 62:3
  62:9,15,16,17
  62:20,25 70:16
  70:24 92:22
  108:8 114:14
  114:15 115:20
  116:22,23
  119:24,25
**junk** 104:15
**justice** 34:1
  120:22,25
  121:3

**K**

**K** 1:7 2:8 3:7
  4:10 5:11 6:14
  10:13 11:4,8
  11:23 14:17
  18:9 19:8,16
  19:19,21 20:1
  25:9,25 26:3,3
  26:6,11,13,22
  26:24 27:2,5
  27:10,13,25
  28:15,22,24
  29:22 30:4,13
  30:17 33:10,14
  33:19 35:11,19
  35:23 36:1,5,6
  36:12,16 37:2
  37:5,13,18,20
  37:21 38:9,17
  38:22,25 39:4
  39:9,12,17,20

39:23 40:20,24
  41:10,12 43:13
  44:17 46:8,11
  46:17 47:7
  48:6,11,15
  49:4,7,17
  52:15 54:19
  55:11 57:7,11
  57:17,22 59:17
  59:22 60:4,8
  60:12,18 61:3
  64:2 71:3 73:4
  78:2,5,13 79:7
  84:21 86:6,22
  87:25 89:4,8
  101:4 106:16
  111:25 123:13
**Katherine** 29:9
  29:13
**Kathy** 28:9,10
  29:2 35:16,17
  35:22,25 36:10
  36:16,19,21,25
  37:1,1,4,5
  46:10 55:6,8
  55:10,15,22
  56:1,6 78:2,5
  78:12,23 79:18
  79:20,21,23
  80:10,16,17
  81:6,12 82:1
  82:23 103:19
  103:20 113:25
  115:13,22,25
  116:5,10,10,24
  117:10,18,24
  118:1,2,6,9,15
  119:21
**Kathy's** 117:6
**keep** 31:25 69:5
  69:14 109:22
  112:10 114:5
**kids** 22:23
**kind** 6:17 21:12
  58:25 69:4,5
  109:2 120:16
  121:10

**kinds** 9:12 109:6
**kitchen** 73:16
  110:19
**knew** 56:1 65:5
  65:6,7,10,10
**know** 7:5 8:8,25
  9:8,22,24 10:1
  10:3 11:18
  16:13,16 19:17
  19:22 20:18
  23:5 38:12
  39:8 45:1 46:7
  46:10 50:23
  51:19 52:2,14
  52:19,21 53:19
  52:15 56:10,11
  56:20 58:9,17
  58:20 59:16,23
  60:3 61:10
  62:14 63:6,10
  64:17 65:6,7
  66:12,12 69:5
  69:6,8,14,17
  69:18 70:14,25
  72:18,20,20,21
  73:19 74:8
  75:14,19,19,21
  76:19,22 77:1
  77:14,14 80:25
  81:1 82:7,17
  83:17 88:11
  90:2,10,12,15
  90:16 92:9,13
  93:4,6,13,14
  93:15 94:12
  95:10 96:6
  98:1,14 100:24
  102:14 104:14
  105:16 106:10
  107:3,7,11,14
  107:19,19,22
  108:16,19,19
  108:20,21
  109:23,25,25
  109:25 110:1,1
  110:2,13,16,17
  110:21,23,23

111:11,12,12
111:14,24,25
113:6,7,19
114:2 115:4,9
116:5,14,21
117:10 118:18
118:19 119:4
120:11,12,24
121:4 123:25
124:6 125:6
**knowledge**
105:19
**known** 5:13
105:10,17
**knows** 73:23
**K's** 26:13 30:20

**L**

**lack** 70:17
**laid** 32:15
**Lane** 24:14,21
25:4 26:9,10
30:16,22 31:6
31:7,11,16,23
32:4,11,13
121:25
**law** 6:8 113:5
**lawsuit** 5:7,10
9:25 13:9
14:16,18 18:7
19:21 25:9
33:13,22 34:5
39:16,19 48:7
48:12,15 60:9
84:20,22 99:7
122:15 123:12
123:13,13
**lawyer** 7:6 14:15
**layoff** 32:18,19
**leaving** 93:1
**left** 10:16,19
37:2,5 54:2,8
92:25 93:1
110:11
**left-hand** 3:13
43:9 46:2
**legal** 8:19 14:16

88:12,12,13
93:13
**letter** 123:8
**letting** 58:8
76:19
**let's** 18:13 43:18
44:6 59:9
62:23 77:7
84:6 86:15
96:24,25
104:16 105:10
**life** 108:19
121:14,20
**life's** 121:17,18
**limit** 88:6
**line** 24:16,18
26:8 93:1,2
**listen** 7:16
**litigated** 93:11
**litigating** 88:11
88:15,21 93:17
**little** 7:4 11:20
33:4 38:4
46:20 54:21
68:19 74:19
83:17 119:15
**live** 11:25 12:6
12:16 13:6
14:4 15:18,21
17:1,21 20:23
21:1,25 23:4
**lived** 11:17
13:10,21,25
15:15,24 16:2
17:2,24 18:2
20:11,14,24
**lives** 23:5
**living** 21:5,9,11
110:17
**loaded** 6:17 7:10
7:25 56:10
**located** 24:15,16
45:6
**location** 27:17
**logical** 48:25
90:4
**long** 11:17 12:16

21:1 22:11
23:12,16 24:25
51:5,9 53:22
74:2 90:23
93:2 110:7
121:23,23,24
**look** 8:12,12
10:13 43:12
44:2,10 45:20
45:22 46:1
62:16,19 76:25
77:7 89:23
91:18 95:12
96:20 99:13
101:19 114:12
114:24
**looked** 8:16
44:15 45:22
87:22 114:11
**looking** 8:17,24
9:1 60:8 89:18
93:20 122:6
**looks** 43:17
44:13,20 45:25
46:5 51:23
87:8 91:11
94:12 95:12
98:10
**loss** 33:17
**lost** 25:13,23
121:6
**lot** 76:14 85:1
89:9 104:12,15
104:16,17
107:24 120:4
**lottery** 110:10
110:15
**Lotto** 95:23
**loud** 79:21 80:9
80:11,16,17,22
**lower** 60:22
**lunch** 59:11
**lying** 80:18

**M**

**machine** 79:11
110:11,15

**mad** 54:10,11,13
**maiden** 22:9
**mail** 122:22
**mailed** 84:13
**maintain** 21:13
**making** 75:19
125:7
**manage** 47:24
47:25 107:6
**manager** 28:2,6
28:10 29:8
36:10,17 40:19
40:20,23,24
47:3 48:1 49:6
55:11 79:19
91:25 107:8,9
108:11,12
111:11
**managers** 28:21
29:2,4
**manner** 110:9
**mark** 10:6 18:13
43:18 44:6
45:16 84:6
86:16 87:1
91:13
**marked** 10:7
18:14,18 43:1
43:3,20,23
44:7 45:17
84:11 86:18
91:1,16 94:1
95:6 96:17
123:9
**marriage** 22:14
22:18
**marriages** 22:16
**married** 22:3,5
22:11,21
**match** 55:13
**matter** 12:21,23
**McCorkle** 13:7
28:3 35:9,11
46:7,17 49:3,6
49:9,13,16
50:1 52:15,19
56:8 63:24

77:19,24 97:22
120:17
**mean** 8:2,3
16:10 20:17
21:4 25:6
32:21 34:13
38:2 41:1
43:17 51:2
56:2,10,21
57:3 61:18
65:3 68:13
71:13 73:19
78:7 83:2 85:3
85:6 86:21,21
90:12,23 94:12
96:22,23
106:15 107:10
108:15,18,19
110:18,21
115:2 116:19
117:3 119:8
121:19 122:23
**means** 40:10
**meant** 51:23
**medication** 9:5
9:10,14,15
**meet** 64:3,4,12
64:19 83:4
**meeting** 63:14
63:16,20 64:21
64:23 65:16,16
65:22,25 66:6
67:3,7 68:9,12
68:13,14,18,24
68:24 69:20
70:5,6,9,12,13
70:15 71:5,12
71:24 72:6,10
72:15,19,22
73:3,7,11 74:3
74:14,16,25
75:16 82:19,22
82:25 83:7,11
110:2,14
111:22 112:4,7
112:18
**meetings** 82:20

| | | | | |
|---|---|---|---|---|
| memory 19:4 | 88:2,22,23 | 12:20 13:2,10 | occurrence | 32:17,20 33:13 |
| mentality 107:5 | 89:12 115:16 | 13:14,15,21 | 92:20 107:15 | 33:19,24 34:2 |
| 107:6 | 116:25 117:7,9 | 14:2,4,24 | 107:16,16 | 34:3,7 35:14 |
| mentioned 37:7 | 120:21 121:6 | 15:15,24 16:9 | offered 38:8,10 | 35:16 36:20 |
| met 13:7 64:8 | month 31:1,1 | 16:18 17:2,12 | 38:12,17 | 37:1,24 38:7 |
| 65:16 82:17,17 | 107:25 | 17:15,18,22 | offering 38:14 | 38:13 40:10,16 |
| 82:25 | monthly 107:16 | 18:2 20:11,15 | office 63:15,23 | 41:4,8,16,20 |
| middle 1:1 | mood 107:10 | 21:12 | 63:25 64:10,11 | 42:12,17 43:11 |
| 122:11 | mother 7:20 | Northeast 14:1 | 64:12,21 74:20 | 43:12,14,16,18 |
| military 24:9 | motion 76:8,13 | 15:19 | officer 109:20 | 44:3,14,25 |
| mind 33:1,2 | mouth 19:25 | Notary 1:22 | official 95:9 | 45:3 46:7,21 |
| 83:18 112:3 | move 11:22 | 126:16 | 126:10 | 46:22,25 47:6 |
| mine 59:5 90:17 | moved 11:24 | notice 3:11,12 | Oh 17:10 41:1 | 47:14,18 48:6 |
| 90:18 94:21 | 13:25 | 3:14,15,16,17 | 66:13,20 67:6 | 48:19,22,24 |
| 95:10 | moving 12:6 | 15:8 41:13 | 68:13 76:2,2 | 49:1,13,24 |
| minute 4:8 5:21 | 15:23 | 73:10,10,14 | 80:6 105:23 | 50:3,5 51:2,5,9 |
| 82:5 | mutual 53:12 | 87:2 88:5,24 | 107:2,14,18 | 52:2,8,11,14 |
| minutes 58:18 | **N** | 88:24 89:16 | 120:11 | 52:19,22 53:5 |
| 83:18 92:23 | name 5:4,14 | 91:5 92:3 94:5 | oh-something | 53:6,9,12,15 |
| missing 103:5 | 22:7,9 23:23 | 94:9 101:3 | 104:12 | 53:16,24,25 |
| 103:10,11,13 | 28:8 29:11,18 | 117:15 | okay 4:9,14,18 | 54:10,17 55:6 |
| 103:16 104:9 | 42:11,15 96:9 | notices 40:1,7,23 | 4:21 5:4,13,16 | 55:19 56:15,22 |
| 104:13 | 96:11 | 41:20 42:7 | 5:17,19,25 | 57:6,25 58:5,5 |
| Mitchell 28:10 | names 17:25 | 55:1 58:7 89:4 | 6:11,14,18,23 | 58:5,11,24 |
| 28:20 29:3 | name's 4:7 | 89:9 98:22,23 | 6:25 7:2,9,17 | 59:9,13,19,21 |
| 35:16,17,22,25 | necessary 50:19 | 103:3 | 7:22,23,23 8:1 | 59:24 60:11,17 |
| 36:10,17,21 | 50:20 124:12 | November 26:14 | 8:4,6,9 9:4,10 | 60:24 61:14,21 |
| 37:1,1 46:10 | need 4:16 5:16 | 27:10 62:5 | 9:18,23 10:5 | 61:24 62:3,5,7 |
| 46:18 48:2 | 26:5 32:25 | number 29:25 | 10:13,22,23 | 62:20,21 63:1 |
| 55:8,10,22 | 61:12 76:17 | 31:20 83:25 | 11:2,6,10,25 | 63:5,12,13,16 |
| 56:7 78:2,5,13 | 77:18 83:17,20 | 93:20 | 12:9,12,24 | 63:17 64:3,16 |
| 78:16,23 79:9 | 99:23 102:12 | nutshell 69:4 | 13:7,24 14:7,9 | 64:18,22 65:5 |
| 79:18,20,21,23 | 104:6 106:9 | | 14:16,23,24 | 65:7 66:5,8,13 |
| 80:16 81:12,17 | 119:16 123:22 | **O** | 15:23 16:4,7,8 | 66:14,16,20 |
| 82:23 103:20 | never 30:7,9 | oath 2:23 6:6 | 16:17,17,22 | 67:3,6,13,23 |
| 113:25 119:21 | 58:11 60:11,17 | 102:18 126:1 | 18:12,20,24 | 68:3,5,19,20 |
| Mitchell's 55:6 | 113:11 117:8 | obvious 17:5 | 19:10,13,24 | 68:21 70:9,19 |
| 55:15 | New 3:6 43:24 | 63:6 117:13 | 20:3,6 21:11 | 71:1,17,20,25 |
| mobile 14:9 | nicknames 5:14 | obviously 13:8 | 22:16 23:15,17 | 72:14,18,22 |
| 16:12 21:18 | night 27:12,14 | 15:1 71:1 90:2 | 23:21 24:1,19 | 73:18,20 74:12 |
| mom 7:21 | nodding 4:24 | 111:17,25 | 25:11,21 26:4 | 74:17,21,21 |
| moment 20:21 | Nods 4:22 27:20 | 117:13 123:24 | 26:12,18,21,24 | 75:10,11,14,15 |
| 69:23 | 40:15 41:7 | occasion 88:7 | 27:1,16 28:2 | 75:22 76:5,12 |
| money 12:24 | nonverbal 18:5 | occur 72:10 | 28:17 29:13,15 | 76:17,20,21 |
| 25:8,11 31:15 | noon 48:20,24 | occurred 18:5 | 29:21 30:3,7 | 77:1,15,23 |
| 33:25 34:1,4 | North 2:4 12:9 | 21:6 70:15 | 30:16,20,25 | 79:5 80:12,24 |
| 75:19 87:17 | | 71:8 72:15 | 31:3,5 32:9,13 | 81:9,21 82:12 |

82:23,24 83:7
84:4,17,22,23
85:11,24 86:25
87:10,16 88:5
88:14 89:12,15
89:24 90:8
91:6,10,19,20
92:16,21 93:12
94:7,24 95:4
95:15,21 96:12
96:25 97:1,2,8
97:8,11,17
100:3,10 101:5
102:11,22
103:8,10,20,23
105:9,15,24
106:7,11 107:6
108:14,22
109:17,19
110:4,11,11,12
110:22 111:6,8
111:23 112:2
113:2,17 114:5
114:6,10,12,16
114:21 115:11
115:14,17,22
116:3,7,20,23
117:10,17
118:22,23,25
119:4,9,22,23
120:2,5,12
121:1,4,6
122:3,12 124:7
124:21 125:4
**old** 23:2 120:3
**once** 34:19,20
**ones** 42:2,3,17
98:25 103:5
**one's** 32:5,5
93:19
**operating** 49:21
**operations**
120:6
**opportunity**
19:18 49:13
**Orally** 85:5
**organization**

89:8
**originally**
112:23,24
**originals** 98:24
101:14
**ourself** 112:1
**outside** 49:4,10
49:17,17,20
64:5 66:18
**owed** 34:5
**owned** 17:9
21:24

**P**

**page** 2:20 43:6
44:11 45:23
97:9 98:3,7,16
123:25
**pages** 98:18,18
**paid** 31:6 32:23
**paper** 73:13
96:24 100:4,6
**paperwork** 58:2
**paraphrase**
119:15
**paraphrasing**
116:17
**parents** 6:24 7:2
7:18,21
**park** 14:9 16:12
21:18 27:18,19
27:23 53:3
54:2,5 64:2
**part** 18:8 19:13
19:14 25:11
26:4,5 28:5,9
36:11,15 39:16
39:19 49:21
70:6 76:23
99:7 104:19
**Participant** 3:6
43:24
**participated**
120:9
**participation**
44:15
**parties** 127:13

127:14
**partly** 36:14
**Paul** 20:24 21:6
21:11,16
**Paula** 96:9,10
**pay** 29:22 33:16
33:16 60:12,13
**peak** 122:8
**peep** 112:9
**people** 32:22
89:3,9 93:1,2
106:23 107:6,9
107:19
**percent** 44:21
46:6 64:18
94:11,23
**perfect** 16:6
**performance**
73:2
**period** 18:2,4
26:22 27:10
**person** 5:19 9:9
17:25 38:11,13
38:16 80:18
82:13,15,16
104:4 106:12
119:13,13
**personal** 70:20
70:23 71:9,14
**personally** 67:10
126:8
**personnel** 44:17
**persons** 48:4
**pharmacist** 9:8
**phone** 58:11,25
58:25,25 59:2
67:21 82:14
115:7 116:12
**physically** 100:8
117:12
**physician** 9:8
**picked** 58:11
**piece** 73:12
96:25 100:4,6
**pieces** 96:24
**pile** 102:23
**place** 1:18 13:3

13:5,7,9 24:13
50:25
**places** 26:8
**plaintiff** 1:4
3:10 5:7
**Plant** 11:15
12:13 14:2
15:13,16,19,24
20:15,24,25
23:4,22,23
24:17 27:21
64:2
**play** 55:10
**playing** 101:1
**plead** 76:16,18
**please** 3:10
16:23 19:20,25
20:13 39:18
40:3,21 45:20
77:2
**pleasurable**
108:20
**plural** 34:18
**point** 48:25 49:4
49:9 62:8 63:1
74:14 101:22
**policies** 3:7 88:3
**policy** 44:16
**Polk** 24:20
**popped** 58:3
**portion** 36:16
**position** 60:18
76:19
**possession** 45:8
**possibility** 29:12
52:16 64:15
69:21 75:9
**possible** 43:10
65:19,20,20
114:6 118:14
**possibly** 47:5,16
90:6
**post** 24:5
**pot** 117:20
**powwow** 74:19
**preceding** 12:8
13:6

**prepare** 6:15
7:11
**prepared** 97:13
103:16
**preparing** 9:2
**presence** 64:6
**present** 2:6
20:21 26:3
69:23 92:13
118:4
**presented** 19:3
41:13 92:2
93:5 94:5
103:18
**presenting** 73:9
**pretty** 4:14 8:3
53:8,8,20 62:9
63:9 64:24
65:2 69:3,3
116:15 123:15
123:22
**previously** 36:13
108:10
**prior** 12:6 13:20
15:14 26:24
46:7 54:25
55:16,18 65:15
65:16,22 66:5
67:3,7 75:15
75:16 98:19
**privately** 64:5
**probable** 94:23
**probably** 11:20
30:21
**problem** 58:9
83:21 124:3
**problems** 21:9
**procedure** 76:11
123:1
**procedures** 3:7
87:17
**process** 4:14
**produce** 84:21
101:25 102:16
122:20 123:2
**production** 3:10
84:18 86:2

101:24 122:21
**professional**
69:5,13 71:1
107:22 109:22
110:9 112:11
**professionally**
69:8 112:2,6
**professionals**
69:14
**promise** 115:21
**promotions**
30:12
**pronounce**
29:10,18
**proof** 113:7,9
**prove** 45:1,2
**proven** 113:5
**provide** 100:15
102:12
**provided** 100:17
101:4
**Public** 1:22
126:16
**Pula** 56:15
**Pulaski** 28:6,20
29:2 41:6
46:16 48:2
91:22
**punitive** 34:2
120:23
**purposes** 10:8
10:24 18:15
43:4,21 44:8
45:18 84:11
86:18 91:2,16
94:1 95:6
96:17
**put** 7:4 15:4,6
42:10 51:11
77:8 99:11
104:16 105:10
113:1 124:22
**puts** 110:20
**putting** 15:8
**P.A** 2:3
**p.m** 1:16,16
125:15

**Q**

**question** 6:1,3
6:17 7:9,10,12
7:25 8:18,23
9:13 10:4
13:18 14:11
15:2,6,7,17
16:20,23 17:8
17:14 18:6
19:2,20,23
20:3,13 26:25
27:3,6 28:23
30:14 32:6,8
32:17 33:12,18
34:6,22 35:5
35:21,24 36:2
36:7 37:3,6,9
37:14 38:15,18
38:19,23 39:2
39:9,10,13,18
40:3,21 42:6
42:20 45:4,7
45:10,15 46:23
47:3,9 48:8,13
48:16 49:5,15
51:16,17 52:24
54:19,24 55:12
56:10 57:8,13
57:18 59:16,18
59:25 60:5,10
60:23 65:24
68:16 70:1,4
71:4 72:13,14
73:5 74:22,25
75:24 76:15
77:22,25 78:12
78:14,18 79:3
79:4 80:14
82:2,8,11,21
83:6 85:25
86:4,8,14,24
87:12,15 89:7
89:11,24 98:2
98:6,13,15,20
99:6,14 100:5
101:5,23 111:1
113:17,20,23
117:6,25 118:3
118:8 120:13
121:9,13,22
**questions** 4:15
6:2 7:9,14 8:20
12:22 14:18,22
15:1,4 23:14
34:8 36:3
76:10 78:11
99:19,20
**quick** 111:21
**quite** 63:1
**quote** 98:22
100:12 108:3
118:18

**R**

**races** 51:1,3
**Rainey** 63:24
64:4,5,9,13
66:2 67:5,14
67:19 75:5
81:10,13 83:5
94:5,25 109:20
110:3 111:19
112:8
**raise** 30:7 60:13
118:5
**raised** 80:17
81:5 121:12
**raises** 30:3
**raising** 118:15
118:19
**ramification**
88:17
**range** 8:20
**rate** 29:21 30:9
30:9
**read** 10:14
18:23 19:22
51:12 77:17
81:2 88:9
92:17,19
100:10,10
124:9,11,14,24
125:5,6,7

**real** 66:13 75:8,9
**really** 5:24 8:7
23:7 25:7
29:10 30:20
51:10 53:18
56:18 84:22
90:9,15,24
100:9 101:22
108:15 110:14
111:25 116:3
118:24 121:19
**reason** 32:18
33:15 44:17,22
44:24 71:11
119:16 123:3
**reasonable**
15:10
**recall** 7:1 8:15
8:16,17,24,25
9:1,3,11 11:9
12:17 16:15
19:4,5 20:19
20:20 22:12,20
25:1 26:16
27:12 29:1,9
29:10,21 30:13
35:2,9,10,18
35:22 37:22
38:9 40:2 41:3
41:8,11,21
42:10 43:8,14
43:14 46:4
48:2 50:14
52:18 55:2,5
55:18 56:13,13
56:14,18,21,22
57:5,25 58:23
58:24 59:18,20
61:6,8,9,16,17
61:19,25 62:24
63:9,13 64:14
64:18 65:1,23
67:13,17 68:10
68:15,25 69:22
69:25 70:3,11
71:10 72:15,17
72:25 73:8,9

73:12,15 74:23
74:24 75:11
78:22 79:22,24
79:25 80:3,9
84:14 87:13,13
87:16,19,19,21
89:12,14 90:5
91:8 93:23
95:19,22,24
96:6,21 97:2,3
97:8,17 98:12
98:18 103:12
103:12,15,17
104:8,8 108:7
108:7,9,24
109:5 111:19
112:16 115:16
118:12,20
122:1
**recap** 15:11
**receive** 38:21
85:8 86:20
88:23 89:4,9
98:11
**received** 30:3,6
30:7 34:15,25
42:23 55:1
60:12,13 89:25
100:18 105:16
122:21
**receiving** 34:16
41:8,11 84:15
87:13 96:21
97:2,8
**recess** 14:13
33:8 83:22
**recognize** 10:15
10:17 11:1
43:25 44:1
91:19
**recollect** 12:17
21:9 26:17
27:15 30:19
50:15 52:7
57:2 61:10
63:14 73:25
115:2

recollection 16:6
18:25 51:13
52:3 77:18
record 5:5 48:18
59:3,13 73:23
124:16 127:11
records 26:13
30:21 122:20
recount 80:12
red 58:3
reduced 61:15
61:25 62:14
104:21,24
refer 39:25 50:7
50:10 85:20
reference 99:15
111:3
referred 10:22
referring 66:18
100:22 102:4
refresh 19:3
51:13 77:18
refreshes 18:25
refusal 15:6
16:24 103:17
refused 34:8
42:8 59:15
91:22 104:23
refusing 13:13
regard 56:23
regarding 18:25
40:20
regards 7:19
8:13 23:11
47:7,11
register 110:10
110:15
regular 92:15
relates 123:11
123:12
relating 112:25
113:1
relationship
49:3,10,14,17
49:25 50:4,6
50:14,22,23
51:5,7,14,20

51:22 52:3,23
52:25 53:10
54:6,11,14,20
54:25 55:7,17
55:21 56:1,8
56:17,19 64:25
65:1,22 66:3,7
66:11,12,15,17
66:19,21,23
67:1,4,9,14,15
67:16 69:3
70:10,16,18,20
70:23 71:1,9
71:12,14,16,19
71:21,22 72:4
72:11,23 75:2
75:3,6 82:18
83:15 108:3,3
108:4,5,6
110:6 111:23
120:16
relative 127:12
127:14
release 76:6
relevant 7:3
13:11 14:20,24
23:7 88:18
relive 21:8
remember 35:15
65:18 70:13,15
96:11 97:10,11
Renee 13:7 28:3
35:8,10 37:22
46:7 49:3,6
54:25 55:17,21
56:8,19 61:8
62:14 63:5,6,9
63:23 64:9,13
65:22 66:3,7
69:19,24 70:2
70:5,9,23 71:5
71:6,9,12 72:1
72:4,8,11,18
72:23 75:2,6
75:15 76:22
77:5,19,24
82:19 83:1,14

83:15 87:20
93:18 95:20
97:22 107:3
112:8 115:6,12
115:13 116:12
116:16,17
117:18 118:7
120:16
Renee's 36:19
36:23 37:24
64:5,10,11,12
67:15 105:10
109:9,23
rent 12:3 17:4
17:11,18 21:23
rented 17:9
repeat 15:17
17:14 18:6
19:2 20:13
27:3 28:23
38:15 39:18
40:3,21 42:6
47:9 48:13
49:5,15 51:17
52:24 54:4
64:7 65:24
70:1 71:4
78:18 79:3
98:6
rephrase 6:3
32:8 79:4
82:21 89:7
99:14
report 46:18
47:4 57:21,24
111:15,17,18
127:8
reported 1:21
46:17 47:8,12
reporter 1:21
4:16 5:24 15:3
16:7 31:13,25
84:2,7 96:14
102:25 124:15
125:1,12 127:7
127:22
reporter's 2:23

7:17 124:19
127:1
Reporting 1:18
represent 4:10
10:11
representative
28:14 37:18
representing 7:6
48:5
reputation
105:12,14
request 3:10
84:17 86:2
101:24 122:21
requested 123:2
127:10
require 76:11
residence 11:14
12:1 13:3,5,18
13:19 14:23
15:12,14 16:9
16:18 17:12,12
17:15,18,21
21:17
residences 13:20
21:14
resident 17:5,5
resign 32:3,10
resolve 76:12
77:3 123:6
resort 21:19,20
53:4
Resource 109:20
Resources 6:12
58:3,8,10,12
Resources/Tr...
2:8
respond 20:2
rest 27:16
result 14:17
25:13 72:19
121:6,11,14,15
121:20
retaliated 18:9
19:7 20:7
57:16 108:19
retaliation 77:14

retaliation's
62:23
reveal 8:11
review 8:9,12
127:9
Rhonda 1:21
126:16 127:7
127:22
right 4:17 5:8,11
6:6,13 7:1 8:4
9:4,5,16,16
10:18,25 12:4
12:25 13:6
14:5,7 15:21
16:2 18:5,9
19:8,11,13,15
20:20 21:6
25:9,13,21
26:20 28:11,14
28:18,19 29:19
30:1,4,5,8,10
30:18 31:18
32:25 33:13,20
33:22,25 36:12
36:13,17,18
37:25 40:8,9
40:11,14 41:9
41:10,14,18,21
41:25 42:4,5,9
42:19,24 44:5
44:18,23 46:17
47:12 48:18
49:4,7,10 50:1
51:25 54:8
55:12,13,17
56:24 57:2
58:21,22 60:12
60:14,18 61:12
61:18,18 62:6
63:17 64:9,11
68:11,15 70:6
70:16,24 71:3
71:9,14 72:2,4
73:14 74:3,9
74:21 76:7,13
77:3,8,11,12

79:12,19 80:4
82:4,5,19 83:1
83:12,15,16,24
84:25 85:5,12
85:17,18 86:15
87:2,21 88:2,7
89:17,19 90:2
90:3,15,22
91:23,24 93:16
93:24 94:3,16
94:19 95:2,16
95:17,24 96:12
97:14 99:23,24
100:21 101:12
101:20 102:2,4
102:5,9,18,20
103:3,12,13,14
103:18 104:9
105:5,7 106:6
106:17,20,21
108:7,7,9,14
109:15 110:9
110:13 112:7
112:15,20,21
113:12 114:12
114:24 117:25
119:2,2,12
120:7 122:10
123:6 124:7,9
124:10,12,24
**Road** 12:9,20
13:2,10,14,15
13:21 14:2,4
14:24 15:15,24
16:10,18 17:2
17:13,16,19,22
18:3 20:12,15
21:12 24:16
27:13,14,18,19
27:23 64:2
**RODEN** 2:7
**room** 4:20
107:20 118:10
118:10,12
**rub** 113:19
**rubbing** 113:14
**rude** 90:24

**rules** 76:11
123:1
**run** 107:5
**running** 49:21
**RV** 21:19,20,21
21:25 22:1
53:3,3 54:2,5

**S**

**S** 1:18
**salary** 30:8
**sanctions** 76:9
**saw** 97:17
**saying** 32:1
42:15 68:6
87:24 90:7,10
105:13 107:4
108:11,15
109:6 123:15
**says** 4:20 10:18
46:2 74:10
81:1 87:2 88:8
91:20,21,21
92:19 94:13
96:1,5 97:5,13
117:3
**SC** 46:3,3
**schedule** 61:8,15
61:15,17,19
62:19
**scheduled** 62:10
77:1 78:10
**school** 23:17,18
23:21,23 24:5
24:6 116:19
**scratched** 51:23
**scratch-off**
95:24
**scream** 79:21
105:11,18,21
**screamed** 80:16
105:9
**screaming** 63:9
105:3,4,25
106:8 107:12
107:18 108:22
108:24 109:4,9

116:18
**seal** 126:10
**second** 82:16
94:18 98:3,7
**Security** 35:1
**see** 10:18,20
18:24 46:2
53:21,21 58:23
71:15 90:11
94:16,16,18,20
94:21 95:3
96:24 97:12
99:9,11,19,23
108:10 111:24
112:22 113:7
113:16,18,22
**seeing** 98:12,18
**seek** 121:10
**seeking** 23:11
120:19
**seen** 65:19 98:3
99:21,22,24
107:18 114:19
**segment** 25:20
**self-employed**
32:20 33:11
**send** 86:2 102:1
124:23
**sense** 56:25 78:8
86:21 107:3
109:23 111:10
120:1
**sent** 123:8
**separate** 32:13
**separation** 31:4
**service** 28:14
37:18
**seven** 22:12
**seventeen-or-s...**
7:12
**seventy** 96:2
**sex** 65:3 71:19
71:21,22 72:11
83:1
**sexual** 44:16
49:25 51:21
66:24 72:3,23

82:18 83:15
105:4 108:5,6
109:12,12
111:3 120:16
**sexually** 19:7
57:12 121:1
**share** 109:4
**Sharon** 28:5
29:2 41:5
46:15,18 56:15
56:15,16,17
91:22,23,25
92:2,7,12,13
93:21,21
**Sharon's** 93:7
**she'll** 107:21
125:5
**shift** 96:1
**shortage** 96:4
**show** 18:18 43:1
81:25 82:9
86:25 103:25
114:23
**showed** 97:18
**sic** 14:1 15:19
58:16
**sides** 54:3,8
**sign** 41:18,21,23
42:4,9 87:14
88:24 90:13
91:9,22 103:17
**signature** 10:16
43:8,25 44:1
44:11,18,21,23
45:23 87:6,11
90:19 95:1,13
97:6,23,24
**signed** 10:25
42:11,17,18
68:1,1 73:11
73:13 88:25
89:25 90:6
93:21 94:8
123:23
**signing** 42:2,15
91:8
**similar** 87:22

**simple** 4:14
114:6
**simplify** 114:5
115:18
**simply** 56:6
123:10
**single** 7:13
**single-family**
16:11 21:17
**sir** 11:5 16:12,20
17:15 34:10
45:20 46:9
78:15 80:2
97:6 99:9,25
100:6 101:3
102:14
**sit** 7:16 45:5
118:20
**Site** 3:8
**sitting** 4:17 6:13
**situation** 46:20
78:17,23 95:23
115:14 117:11
117:13
**six** 96:24
**sixth** 98:18
**slide-it-under-...**
69:6
**slow** 32:15
**smacking**
113:15
**Small** 19:14
**smidgen** 99:8
**Smith** 67:5
**Social** 34:25
**solely** 19:12
**solidify** 109:2
**somebody** 17:6
74:8,9 104:5
108:12
**somebody's**
105:14
**someone's** 74:7
**son** 23:1
**soon** 92:25
**sorry** 10:19
13:19 17:10

31:25 32:2
47:14 64:4
71:15 84:7
92:7 106:22
109:12
**sort** 63:2 76:9
**sound** 29:19
**sounded** 7:10
**sounds** 26:20
28:19 40:9
60:16 73:17
87:22 90:4
**sour** 108:8
**space** 41:17
**speak** 54:9
**speaking** 35:22
**specific** 6:19
8:25 10:2
30:24 34:14
36:14 37:19
39:7 54:21
60:20 61:10
86:1 110:1
120:20 121:17
124:14
**specifically** 8:16
11:18 51:16
109:18 123:7
**specifics** 12:17
69:22 109:5
**speculate** 20:16
97:16 118:20
**speeches** 112:23
**Speed** 24:14,21
25:4 26:9,10
30:16,22 31:6
31:7,11,15,23
32:3,10,13
121:25
**speeding** 9:19
**spoke** 23:6
35:17
**spoken** 35:10
36:5
**ss** 126:4 127:4
**St** 1:18
**stack** 100:22

**staple** 96:19
**stapled** 96:23,24
**Staples** 92:8
**start** 30:22
104:5 114:3,4
**started** 53:22,25
62:6 103:9
112:13
**state** 5:4 6:13
126:3,16 127:3
**statement** 80:20
81:2 114:19
**statements**
42:10 58:2,6
68:1 81:3,25
82:3,4,10
85:20,21 86:5
86:22 90:7,11
97:5 98:22
100:12 101:10
114:18 123:23
**STATES** 1:1
**stating** 123:8
**stenographica...**
127:8
**STEPHEN** 2:3
**Steve** 1:3,10 4:2
4:7 5:6 65:4
91:21 92:24
93:1 115:7
119:16 126:8
127:9
**stopping** 48:25
**store** 24:22 27:9
27:24 28:2,10
28:21,22,24
29:1 36:10,17
46:24 47:19,21
47:22,24,25
49:4,6,22 64:1
65:19 68:8
70:10 79:18,22
79:25 80:3,6,8
96:4 105:19
106:20 107:5
109:9 111:11
114:22 116:19

118:9
**stores** 1:7 2:8
3:7 5:11 14:17
**story** 110:14
**street** 2:4 106:13
106:17,21
**strike** 54:18
71:5 75:23
122:17
**strong** 75:9
**stuff** 5:20 9:20
83:1 107:20
**subjected**
104:22
**sudden** 117:14
**sue** 19:16
**sued** 19:19,21
20:1 33:19
48:6
**suing** 36:1,6
57:6,11
**Suite** 1:19 2:4
**supposed** 88:1
110:8,22
**supposingly**
116:22 119:21
**sure** 6:20 15:18
18:7 20:14
28:24 29:13
34:15,19 36:15
37:20 38:16
39:19 40:4,22
41:2 42:7 44:2
44:4,20,21
46:6 47:10,23
48:14 49:6,16
49:21 51:18,19
52:25 54:5,22
58:14,16 60:21
63:9 64:8
65:25 68:17,23
70:5 72:6 73:2
73:17 74:22
78:19 80:21
82:22 91:11
92:19 94:11,21
94:21,23 109:3

109:14 114:7
122:7 125:7
**suspect** 13:6
**suspended** 61:2
74:2
**suspension** 74:4
**swings** 107:10
**swore** 102:19
**sworn** 4:3 126:9

**T**
**take** 10:13 11:21
14:12 15:7
16:3 44:10
45:20 48:20,25
59:7 61:9
63:11,12 74:10
74:11,12,15,18
91:18 102:17
115:13 118:9
123:5
**taken** 4:12 7:13
9:13
**takes** 110:11
**talk** 5:19 7:2,18
7:24 8:3,22
13:8 18:5
50:22 64:22
65:21 66:2,5
67:23 68:7
72:24 83:7,11
86:12 92:10
96:25 98:21
101:7 112:19
116:9 117:17
**talked** 5:20 7:20
8:4 23:12,15
35:8,25 37:2,4
58:4 65:17
66:6 67:4,8,15
67:18,18 68:18
68:24 82:18
83:15 106:3
109:21 113:11
116:4,5
**talking** 5:23
33:14 40:25

62:5 66:8,9,10
66:21 67:13
70:12 71:13
77:7,10 80:19
81:1 95:17
98:25 99:10
100:16 101:18
102:1 106:2,22
108:4 109:22
**talks** 91:7
**Tammy** 22:8
**Tampa** 1:2,19
2:4,4
**tardiness** 91:7
**Teeter** 37:23,24
63:3,24 64:5,9
66:6 67:8,16
68:7 81:10
83:5 94:6
111:19 119:16
**Teeter's** 120:7
**tell** 6:11 10:15
13:9,14,25
16:4,5,15,17
17:24,25 19:15
19:25 23:13
34:3,12 38:16
44:11,25 45:13
48:6,11,14
50:5,13 52:17
57:24 59:24
61:7 65:15
68:23,25 69:16
69:18 77:4,19
77:23 84:25
88:9 95:8
100:11 102:18
102:19,22
104:9,24
107:25 108:2
114:1 117:24
118:15 121:3
122:14
**telling** 63:8
**ten** 115:17
**tendered** 10:14
18:17 44:12

45:21 50:10
84:13
**tenure** 41:9
**terminate**
  119:17,25
  120:10
**terminated**
  30:17 32:4
  35:23 57:7
  59:15,17,22
  60:3 62:20
  81:24 82:14
  103:19,25
  111:24 116:21
  119:1,11,14
**terminating**
  119:18
**termination**
  35:11,12,19
  58:22 112:18
  113:10 115:20
**test** 5:18
**testicle** 110:12
**testicles** 113:15
  113:21
**testified** 4:4
  36:12 60:11,14
**testify** 9:6,9,11
  80:15,21
**testimony** 6:5
  9:16 100:14
**Texas** 1:7
**thereof** 127:11
**thing** 32:5 64:24
  65:6 69:6
  75:17 114:3
  116:21 117:19
  119:21 122:7
**things** 9:12
  14:19 71:13
  84:25 105:4
  107:3,23 109:7
  110:21 112:19
  116:17 121:7
  122:11
**think** 8:23 9:25
  14:19,21 29:23

30:21 32:25
33:7 34:5
44:25 47:10
51:11 54:10
60:12 65:11,20
76:17 88:9,10
94:9 96:24
97:14 100:2
103:8,8 115:15
115:17 120:9
120:11 121:20
122:8 123:22
123:24 124:7
124:11 125:13
**thinking** 66:12
  71:18,18
  110:12,16
**third** 98:16,17
**thought** 59:14
  66:9,10 77:5
**three** 44:14 90:6
  104:5 108:12
**threw** 87:21
**tickets** 9:20
**till** 110:7 119:24
**time** 1:15 5:16
  5:19,23 7:8
  8:23 12:24
  17:2 18:2,3,11
  18:25 21:13
  23:6,12,16
  26:7,21,22
  27:10,17,25
  28:2,5,9,13
  30:4,15 35:8
  35:10,17 36:11
  36:15,16 49:9
  58:21 60:13
  63:1,11,12
  70:6 72:5
  76:24 78:19,25
  79:2,6,19,20
  82:16,25 83:20
  88:7 89:23
  90:23 91:25
  104:20,24
  106:12 110:1

110:19 111:22
111:23 112:17
112:18 115:19
118:4 120:14
122:19
**times** 21:13
  76:14 83:3,4
  107:25
**tired** 118:22
**today** 4:15 6:5
  6:16 7:19 8:13
  9:2,11 15:10
  18:5 33:15
  45:5,9 85:2,4
  98:12,19 99:3
  99:5,24 100:1
  100:4,7,14
  101:16 108:25
  121:7 124:20
**told** 8:5 26:8
  52:19 62:8
  63:8,10,11,12
  69:17,18 92:11
  92:24 112:14
  116:10,10
  118:25 119:2,5
  119:5,9,11
**tool** 40:13,14
**top** 3:13 10:18
  10:19 87:1
  96:25 119:12
**touching** 113:15
  113:21
**trained** 38:21
**training** 3:6
  38:21 43:24
  44:15
**transcript** 15:5
  124:10 127:10
  127:10
**transpired**
  81:17
**treat** 55:23
**trial** 76:4 121:5
  123:16 124:3
**trick** 7:15 12:25
  39:9 51:11

**tried** 117:22
**true** 42:16
  110:14 127:11
**trust** 94:22
**truth** 102:19,20
  102:20
**truthfully** 9:6,9
**try** 76:11 79:4
  114:5 117:17
**trying** 7:15
  12:25 26:6,7
  51:10 73:21,21
  90:23 110:17
  117:5 123:6
**Tucker** 27:13,14
**Turkel** 2:3
**turned** 110:20
**twenty** 122:2
**two** 12:18 13:21
  14:7 15:15
  16:2 17:1,3
  18:3 21:14
  30:3 34:8 47:2
  50:10 61:17,20
  81:3 82:3,4
  83:18 85:21
  90:5,5 105:3
  110:24 111:2,5
  111:18 112:20
  113:11 115:16
  118:6
**two-and-a-half**
  108:17
**two-week** 61:15
**type** 4:19 5:24
  9:8 10:2 14:23
  16:9,18 69:6
  124:19
**types** 125:10
**typical** 7:14

**U**

**uh-huh** 4:24
  5:22 6:10
  12:14 25:22
  28:25 29:20
  31:12,24 32:1

47:1 52:5 53:7
55:9 62:4 66:1
71:7 72:7
78:21 79:8
83:13 84:19
87:3 98:9
99:17 101:9
105:6 117:2
**uh-uh** 4:24
**undersigned**
  126:7
**understand** 5:2
  6:1,3,5,9 25:19
  25:19 26:5
  33:22 38:1,2,5
  47:14 68:6
  70:4 76:20,20
  78:8 102:19
  104:4 109:3
  115:13 122:24
**unemployment**
  34:10,16,19
  35:4
**unfortunately**
  22:16 69:15
**UNITED** 1:1
**Unjustly** 39:24
**unprofessional**
  107:12
**unprofessiona...**
  105:11,18,22
  106:1
**unusual** 109:8
  109:10
**unwanted** 105:4
  109:12,12
  111:3
**upset** 54:13 63:6
  118:5
**upstanding**
  122:9,10
**use** 40:4 123:17
  123:21

**V**

**v** 1:5 2:3
**Val** 92:24 93:1

various 89:10
vast 8:2
Venuti 120:3,5
verbal 4:24 5:2
    40:18,22 41:1
    41:2 55:2
Verifying 42:13
Vocational 24:6
voice 80:17 81:5
    118:5,15
voluntary 32:5

**W**
wages 25:23
wait 92:23 104:4
    119:24
waiting 93:3
waive 124:10,12
    125:12
walk 25:20 33:3
    108:25
walked 65:11
walks 114:22
want 7:15 8:21
    14:25 15:2
    20:16 21:3
    33:2,3,6 39:3,8
    51:12,14,19
    52:2 53:18
    55:15 69:17,18
    76:6 90:20
    93:4,6,9,17
    97:16 101:20
    102:15 108:25
    110:23 111:7
    111:13 112:9
    112:23 113:7
    114:2,13
    115:17 116:5
    124:13,15,25
    125:6
wanted 107:3
    111:9,10,12,13
    111:14 123:8
wants 113:6
warnings 40:23
warranted

115:19
wasn't 13:19
    49:21 64:13
    66:11 110:7
    117:16
waste 8:23 12:23
watch 51:1,3
water 33:6,7
wax 25:17,21
way 7:19 19:6
    39:2,9 46:3
    51:18 54:23
    55:20 70:18,21
    83:4 84:20
    104:6,16
    105:10 112:13
    118:21
ways 22:17 39:1
    39:6
week 29:24
weekly 107:16
weeks 61:17,20
    104:5 108:12
went 30:9 31:6
    58:3 92:25
    108:8
weren't 32:23
    74:2 76:24
we'll 48:25
    71:21
we're 13:8 18:5
    25:19 30:18
    33:14,15 40:25
    45:11 59:13
    61:11 62:5
    70:12 77:7
    84:2 86:9,16
    88:11 96:13
    104:6 108:3
    110:8 123:24
we've 18:18 43:1
    43:23 44:14
    101:16 121:7
    123:9
wholeheartedly
    81:8
wide 8:2,20

wife's 22:7
Wiggins 12:9,20
    13:2,10,14,15
    13:21 14:2,4
    14:24 15:15,24
    16:9,18 17:2
    17:12,16,18,22
    18:3 20:12,15
    21:12
witness 4:3
    23:10 31:14
    32:2 48:23
    59:10 80:15
    126:8,10
witnessed
    106:15
witnesses 95:21
    113:18
woman 4:16
women 56:23
word 90:16
    115:9 116:12
    118:18,18
    121:18
words 4:24 30:8
    40:25 52:12
    65:10 74:3
    82:17 97:18
    101:17
work 26:10,24
    27:1,4,9,16
    31:6,20 33:11
    46:24 48:20
    52:14 53:21
    55:17 62:10
    63:7 66:12,18
    69:8 77:1
    104:19,21,24
    110:8 112:12
worked 25:24
    25:25 26:6,8,9
    26:11,22 27:1
    27:4,12 28:22
    28:24 29:25
    32:21 36:12
    46:11 74:9
    106:25 122:3

working 30:22
    32:24 46:8
    57:3,17 66:21
    67:14,15,16
    69:19,25 70:2
    70:10 71:18,18
    75:2,3,6 96:7
    106:13 108:4
worse 55:24
    112:13,13
wouldn't 50:2
    55:25 90:9
    115:9 116:2,2
    119:3
write 4:25 7:17
    42:18 104:5
    108:12
writeup 40:11
    41:1 42:23
    119:20,21
writeups 39:25
    40:1,4,5 41:9
    58:1 86:11
    99:18 100:12
    100:15 101:7
    101:25 102:7,8
writing 97:25
    98:1
written 39:11,16
    39:20,22 41:9
    41:12 55:2
    72:19 73:10
    103:25
wrong 13:22,24
    28:8 32:7
    41:10 48:12,15
    108:21 121:1
wrongfully 57:7
    59:15,22
wrote 16:7
    41:24 58:1,6
    82:4 95:15
    98:22 100:11
    101:10 108:9
W-I-G-G-I-N-S
    12:10
W-2 32:23

**Y**
yeah 7:22 11:1
    22:15 23:8
    27:15 29:23
    33:4,6 35:13
    40:6 54:7
    55:23 56:16
    57:4 58:8 59:2
    61:4 62:13,19
    67:6,11 68:7
    69:10 71:23
    74:13 76:16
    79:20 83:20,21
    84:16 85:10,13
    85:15,18 92:11
    92:11 95:3,18
    96:6 101:14
    102:25 103:12
    103:12,22
    105:20,23
    106:18,21,24
    107:2,2,14,21
    108:6 112:5,5
    112:12 114:21
    114:25 117:20
    117:21,22,23
    118:12
year 11:12,20
    20:9 22:19
    24:3 25:2,3
years 12:18
    13:22 14:7
    15:15 16:2
    17:1,3 18:3
    22:12 108:17
yell 105:11,18
    105:21
yelled 107:1
yelling 105:25
    106:8 107:18
    116:18
Yep 74:1 120:8
you-all 22:18
    53:13 55:20
    64:22 79:16
    116:9

**y'all** 65:3 69:4,4
  69:8 112:10
  118:13
**y'all's** 110:5
  111:23 115:4

---

**$**

**$20** 79:10
  113:25 114:8
  114:23 115:8
  115:23 117:19

---

**0**

**02/06/2009** 3:16
**04/07/2009** 3:17
**06/20/2008** 3:11
  3:12
**07** 27:11 62:5
**07/03/2008** 3:14
**08** 52:6,7 53:1,2
  62:25 70:16,24
**09** 26:17,19
  27:11 61:18
  62:9,15,17,17
  62:20 97:14
  114:15 115:20

---

**1**

**1** 3:3 10:6,7
  18:21 20:5
  62:15,17
  102:23 103:2
**1st** 61:21 114:15
  114:15 115:20
  116:23 119:24
**10** 3:3,14 91:12
  91:14,15 93:20
  122:2
**10th** 26:17 30:17
  62:20 116:22
  119:25
**10:05** 92:22,24
**10:13** 93:2
**100** 1:19 2:4
  46:6 64:18
  94:11,22
**101** 1:18

---

**11** 3:15 26:14
  92:23 93:24,25
**11/20/07** 26:18
**11:20** 48:18
**11:44** 1:15
**12** 3:16 95:4,5
**12/13/2008** 3:15
**12:30** 1:16 59:9
**126** 2:23
**127** 2:23
**13** 3:17 96:12,15
  96:16,20 97:9
  102:24 103:2
**18** 3:4 62:15
**18th** 61:21
**19** 1:13
**1900** 2:4
**1965** 11:13
**1994** 22:20

---

**2**

**2** 3:4 18:13,14
  18:18 20:5
  77:7
**2:30** 1:16 125:15
**20** 26:14
**2007** 26:14
**2008** 18:8 20:7,9
  20:9,11,14
  50:16 52:4
  54:1 70:13
  72:16 94:3
**2009** 18:8 20:7,9
  20:11,14 26:15
  30:18 51:23,24
  61:22,23 62:3
**2011** 1:13
  126:11 127:17
**21** 23:3 108:9
**21st** 11:11
**2210** 27:18,23
  64:2
**27th** 126:10
  127:17
**28th** 122:2
**29th** 92:22

---

**3**

**3** 2:22 3:5 43:2,3
**30** 58:17
**31** 62:2 75:19
**320** 29:24
**33566** 11:16
  12:15 14:3
  20:25
**33602** 1:19 2:4
**3601** 20:24 21:6
  21:16
**3701** 11:15 12:6
  13:25 15:12
**3710** 15:18

---

**4**

**4** 2:22 3:6 43:19
  43:20,23
**4/07** 97:13
**40** 62:1
**43** 3:5,6
**44** 3:7
**45** 3:8
**45-minute** 48:21

---

**5**

**5** 3:7 44:6,7
**501** 24:16

---

**6**

**6** 3:8 45:16,17
  45:21
**6/10** 26:19
**6/5/09** 103:17
  104:9
**615** 12:9 13:1,15
  13:21 14:2,4
  15:15,24 16:9
  16:18 17:2,12
  17:15,18,22
  18:2 20:11,14
  21:12

---

**7**

**7** 3:10 84:2,2,8,9
  84:10 123:10
**7/6** 104:11

---

**8**

**8** 3:11 84:5
  86:16,17 87:1
  89:16,20 90:14
  103:9
**8:11-CV-0010...**
  1:5
**84** 3:10 24:4
**86** 3:11

---

**9**

**9** 3:12 90:25
  91:1,5
**9:32** 1:15
**91** 3:12,14
**92** 11:15 12:7
  14:1 15:12,19
**93** 3:15
**949181** 126:17
**95** 3:16 21:3
**96** 3:17

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


STEVE COMBEE,

      Plaintiff,

v.                  Case No.: 8:11-CV-00108-T-33MAP


CIRCLE K STORES, INC.,
a Texas Corporation,

      Defendant.
_____/




CERTIFIED QUESTION FROM THE DEPOSITION OF

STEVE COMBEE

JULY 19, 2011

1      The following questions are certified from the

2   Deposition of STEVE COMBEE, taken July 19, 2011:

3

4   Beginning at Page 8, Line 16:

5   BY MR. COHEN:

6      Q    You don't recall specifically what you looked

7   at.  Do you recall looking at anything?

8      A    I'd rather not answer that question.

9

10  Beginning at Page 16, Line 17:

11  BY MR. COHEN:

12     Q    Okay.  Okay.  Well, then why don't you tell me

13  what 615 North Wiggins Road -- what type of residence

14  that was.

15          Are you going to answer the question, sir?

16     A    No, I'm not.

17

18  Beginning at Page 19, Line 24:

19  BY MR. COHEN:

20     Q    Okay.  But I'm allowed to hear it from your

21  mouth, so that's why I'm asking you to please tell me

22  why you sued Circle K.

23     A    I'd rather not respond to that.

24

25

1  Beginning at Page 26, Line 24:

2  BY MR. COHEN:

3      Q    Okay.  Where did you work prior to Circle K?

4      A    I'd rather not answer that question.

5

6  Beginning at Page 27, Line 4:

7  BY MR. COHEN:

8      Q    Did you work anywhere before you worked at

9  Circle K?

10      A    I'd rather not answer that question.

11

12  Beginning at Page 30, Line 12:

13  BY MR. COHEN:

14      Q    Did you ever apply for any promotions at Circle

15  K, if you can recall?

16      A    I'd rather not answer that question at this

17  time.

18

19  Beginning at Page 33, Line 10:

20  BY MR. COHEN:

21      Q    So before Circle K, have you ever been

22  self-employed, or did you always work for a business?

23      A    I'd rather not answer that question.

24

25

1    Beginning at Page 33, Line 13:

2    BY MR. COHEN:

3         Q    Okay.  All right.  In the lawsuit that you

4    filed against Circle K and that we're talking about

5    today, the reason we're here, are you going to ask the

6    court to award you back pay or front pay, damages based

7    on loss of income?

8         A    I'd rather not answer that question.

9

10   Beginning at Page 34, Line 3:

11   BY MR. COHEN:

12        Q    Okay.  Tell me, Mr. Combee, how you're going to

13   calculate or ask the court to calculate the money that

14   you think you're owed from this lawsuit?

15        A    I'd rather not answer that question

16

17   Beginning at Page 34, Line 19:

18   BY MR. COHEN:

19        Q    Sure.  If you were on unemployment only once,

20   then those dates.  If it was more than once, then all

21   the dates, if you can.

22        A    I'd rather not answer that question.

23

24

25

1    Beginning at Page 35, Line 3:

2    BY MR. COHEN:

3        Q    What about any other government benefits other

4    than unemployment?

5        A    I'd rather not answer that question.

6

7    Beginning at Page 35, Line 16:

8    BY MR. COHEN:

9        Q    Okay.  What about Kathy Mitchell; when was the

10    last time you spoke with Kathy Mitchell?

11        A    I don't recall.

12        Q    Was it before your termination from Circle K,

13    or after?

14        A    I'd rather not answer that question.

15

16    Beginning at Page 35, Line 22:

17    BY MR. COHEN:

18        Q    Do you recall speaking with Kathy Mitchell

19    after you were terminated from Circle K?

20        A    I'd rather not answer that question.

21

22    Beginning at Page 35, Line 25:

23    BY MR. COHEN:

24        Q    Have you ever talked to Kathy Mitchell about

25    the fact that you're suing Circle K?

1      A    I'd rather not answer that question.

2

3    Beginning at Page 36, Line 5:

4    BY MR. COHEN:

5      Q    Have you spoken to any Circle K employees about

6    the fact that you're suing Circle K?

7      A    I'd rather not answer that question.

8

9    Beginning at Page 37, Line 1:

10   BY MR. COHEN:

11     Q    Okay.  Kathy Mitchell.  So Kathy Mitchell, have

12   you talked to her since you left Circle K?

13     A    I'd rather not answer that question.

14

15   Beginning at Page 37, Line 4:

16   BY MR. COHEN:

17     Q    What about Kathy Hyde?  Have you talked to

18   Kathy Hyde since you left Circle K?

19     A    I'd rather not answer that question.

20

21   Beginning at Page 37, Line 7:

22   BY MR. COHEN:

23     Q    What about Evan, who you mentioned earlier;

24   have you --

25     A    I'd rather not answer that question.

1   Beginning at Page 37, Line 12:

2   BY MR. COHEN:

3       Q    How did you come to apply for a job at Circle

4   K?

5       A    I'd rather not answer that question.

6

7   Beginning at Page 38, Line 16:

8   BY MR. COHEN:

9       Q    Sure.  Did a person, an individual, tell you

10  that you were being offered a job with Circle K?

11      A    I'd rather not answer that question.

12

13  Beginning at Page 38, Line 21:

14  BY MR. COHEN:

15      Q    Who trained you?  Did you receive any training

16  when you became employed by Circle K?

17      A    I'd rather not answer that question.

18

19  Beginning at Page 39, Line 8:

20  BY MR. COHEN:

21      Q    No.  I want to know if you were ever counseled

22  in any way at Circle K.  It's not a trick question.

23      A    I'd rather not answer that question.

24

25

1  Beginning at Page 39, Line 11:

2  BY MR. COHEN:

3    Q    Were you ever written up while you were at

4  Circle K?

5    A    I'd rather not answer that question.

6

7  Beginning at Page 42, Line 17:

8  BY MR. COHEN:

9    Q    Okay.  But the ones that you signed -- and

10  there were some that you signed and you didn't write

11  that they're false on, right?

12    A    I'd rather not answer that question.

13

14  Beginning at Page 45, Line 3:

15  BY MR. COHEN:

16    Q    Okay.  What document is that?

17    A    I'd rather not answer that question.

18

19  Beginning at Page 45, Line 5:

20  BY MR. COHEN:

21    Q    Where is that document?  As we sit here today,

22  where is that document located?

23    A    I'd rather not answer that question.

24

25

1    Beginning at Page 45, Line 8:

2    BY MR. COHEN:

3        Q    Do you have possession -- do you have -- is the

4    document with you today?

5        A    I'd rather not answer that question.

6

7    Beginning at Page 45, Line 13:

8    BY MR. COHEN:

9        Q    So you're not going to tell me where the

10   document is; is that correct?

11       A    I'd rather not answer that question.

12

13   Beginning at Page 48, Line 6:

14   BY MR. COHEN:

15       Q    Okay.  So can you tell us why you sued Circle K

16   in this lawsuit?

17       A    I'd rather not answer that question.

18

19   Beginning at Page 48, Line 14:

20   BY MR. COHEN:

21       Q    Sure.  Can you tell me what you are alleging

22   that Circle K did wrong in this lawsuit?

23       A    I'd rather not answer that question.

24

25

1    Beginning at Page 54, Line 22:

2    BY MR. COHEN:

3        Q    Sure.  Your -- your -- well, no, actually I

4    can't.  In any way, did your job change?

5        A    I'd rather not answer that question.

6

7    Beginning at Page 57, Line 6:

8    BY MR. COHEN:

9        Q    Okay.  Do you believe that you are you suing

10   Circle K because you were wrongfully terminated?

11       A    I'd rather not answer that question.

12

13   Beginning at Page 57, Line 11:

14   BY MR. COHEN:

15       Q    Are you suing Circle K because you believe you

16   were sexually harassed?

17       A    I'd rather not answer that question.

18

19   Beginning at Page 57, Line 16:

20   BY MR. COHEN:

21       Q    Do you believe that you were retaliated against

22   while you were working at Circle K?

23       A    I'd rather not answer that question.

24

25

1  Beginning at Page 57, Line 16:

2  BY MR. COHEN:

3     Q    Okay.  I'll ask it again.  Do you believe you

4  were wrongfully terminated from Circle K?

5     A    I don't believe.  I know I was.

6     Q    Okay.  Can you tell me why that is?

7     A    I'd rather not answer that question.

8

9  Beginning at Page 60, Line 3:

10 BY MR. COHEN:

11    Q    Do you know why you were terminated from Circle

12 K?

13    A    I'd rather not answer that question.

14

15 Beginning at Page 60, Line 8:

16 BY MR. COHEN:

17    Q    What are you looking for from Circle K in this

18 lawsuit?

19    A    I'd rather not answer that question.

20

21 Beginning at Page 60, Line 21:

22 BY MR. COHEN:

23    Q    Well, sure.  Well, were you ever busted down to

24 a lower job classification?

25    A    I'd rather not answer that question.

1    Beginning at Page 75, Line 22:

2    BY MR. COHEN:

3        Q    Okay.  Besides cutting down your hours, what

4    else was she doing to harass you, if anything?  Strike

5    that.  Let me ask a better question.  Was she doing

6    anything else that you considered harassing besides

7    cutting down your hours?

8        A    Oh, yes.  Oh, yes.

9        Q    What was she doing?

10       A    It will come out in trial.

11       Q    Okay.

12       A    I don't want to release that information.

13

14   Beginning at Page 77, Line 17:

15   BY MR. COHEN:

16       Q    So, why don't you read this, and maybe it will

17   refresh your recollection, if that's what you need, and

18   tell me what it is that Renee McCorkle did that you

19   consider to be harassment.

20       A    And, like I said earlier, I'd rather not answer

21   that question.

22

23   Beginning at Page 77, Line 23:

24   BY MR. COHEN:

25       Q    Okay.  Can you tell me why you believe that

1    Renee McCorkle would have harassed you?

2        A    I'd rather not answer that question.

3

4    Beginning at Page 78, Line 10:

5    BY MR. COHEN:

6        Q    Well, Mr. Combee, I'm -- I scheduled the

7    deposition, so I get to ask the questions.  So my

8    question is, did you have any disagreements with Kathy

9    Mitchell while you were at Circle K?

10       A    I'd rather not answer that question.

11

12   Beginning at Page 80, Line 12:

13   BY MR. COHEN:

14       Q    Okay.  Why don't you recount for me what

15   happened during the discussion?

16       A    I'd rather not answer that question.

17

18   Beginning at Page 81, Line 25:

19   BY MR. COHEN:

20       Q    And did they show you statements from Evan and

21   Kathy that day?

22       A    I'd rather not answer that question.

23

24

25

1    Beginning at Page 82, Line 3:

2    BY MR. COHEN:

3        Q    Well, you said Evan made two statements --

4    wrote out two statements, right?  You just said that a

5    minute ago in the deposition, right?

6        A    Yes, I did.

7        Q    How did you know that?

8        A    I'd rather not answer that question.

9

10   Beginning at Page 82, Line 9:

11   BY MR. COHEN:

12       Q    If I were to show you -- do you still have

13   copies of those statements?

14       A    I'd rather not answer that question.

15

16   Beginning at Page 83, Line 3:

17   BY MR. COHEN:

18       Q    Yes.  How many times did you -- let me ask a

19   different way.  How many times did you meet with Heather

20   Rainey and Janice Teeter about anything?

21       A    I'd rather not answer that question.

22

23   Beginning at Page 85, Line 24:

24   BY MR. COHEN:

25       Q    Okay.  How did you get those documents?

1     A    I'd rather not answer that question.

2

3   Beginning at Page 86, Line 1:

4   BY MR. COHEN:

5     Q    If I ask you for those specific documents in a

6   request for production of documents, will you send them

7   to me?

8     A    I'd rather not answer that question.

9

10  Beginning at Page 86, Line 5:

11  BY MR. COHEN:

12    Q    Did you -- do you have any statements from any

13  other Circle K employees besides Evan?  Employees or

14  former employees besides Evan's?

15    A    I'd rather not answer that question.

16

17  Beginning at Page 86, Line 11:

18  BY MR. COHEN:

19    Q    Do you have any of the evaluations or writeups

20  that are addressed -- or that you talk about in your

21  complaint?

22    A    I'd rather not answer that question.

23

24

25

1    Beginning at Page 86, Line 22:

2    BY MR. COHEN:

3        Q    Any documents, any Circle K -- any statements

4    or anything like that, from the EEOC?

5        A    I'd rather not answer that question.

6

7    Beginning at Page 87, Line 10:

8    BY MR. COHEN:

9        Q    Okay.  Why do you not believe that that is your

10   signature?

11       A    I'd rather not answer that question.

12

13   Beginning at Page 87, Line 13:

14   BY MR. COHEN:

15       Q    Do you recall -- do you recall receiving this

16   document to sign?

17       A    I'd rather not answer that question.

18

19   Beginning at Page 89, Line 8:

20   BY MR. COHEN:

21       Q    Inside the Circle K organization, are you aware

22   that a lot of people receive counseling notices for

23   various issues?

24       A    I'd rather not answer that question.

25

1    Beginning at Page 98, Line 1:

2    BY MR. COHEN:

3         Q     Do you know whose writing that is?

4         A     I'd rather not answer that question.

5

6    Beginning at Page 98, Line 10:

7    BY MR. COHEN:

8         Q     -- it looks like an e-mail with a bunch of

9    handwriting on it.  Did you ever receive -- do you ever

10   recall seeing this document before today?

11        A     I'd rather not answer that question.

12        Q     Do you know whose handwriting this is?

13        A     I'd rather not answer that question.

14        Q     How about the third page of this deposition

15   exhibit?  Let me ask about the third, fourth, fifth, and

16   sixth pages.  Do you recall seeing any of these pages

17   prior to today?

18        A     I'd rather not answer that question.

19

20   Beginning at Page 99, Line 5:

21   BY MR. COHEN:

22        Q     Do you have them with you today here?

23        A     I'd rather not answer that question.

24

25

1    Beginning at Page 100, Line 3:

2    BY MR. COHEN:

3        Q    Okay.  Have you given me the -- have you given

4    me a piece of paper today, Mr. Combee?

5        A    I'd rather not answer that question.

6

7    Beginning at Page 101, Line 16:

8    BY MR. COHEN:

9        Q    Are those documents that we've discussed today

10   that are deposition exhibits -- in other words, are

11   those documents that you're talking about deposition

12   exhibits?  You can look through the -- all the

13   deposition exhibits right there if you want to to figure

14   it out.

15       A    Really, at this point, I'd rather not answer

16   that question.

17

18   Beginning at Page 110, Line 24:

19   BY MR. COHEN:

20       Q    Did you say anything to her during those two

21   incidences?

22       A    I -- I'd rather not answer that question.

23

24

25

1  Beginning at Page 113, Line 14:

2  BY MR. COHEN:

3      Q    The rubbing the breasts on you and the

4  smacking -- or the touching of your testicles?

5      A    Well, see, this was -- I'd rather not -- I'd

6  rather not answer that question, okay?

7      Q    Were there any other witnesses?  Did anyone see

8  her rub her breasts against you, that you know of?

9      A    I'd rather not answer that question.

10     Q    What about touching your testicles, did anyone

11 see that?

12     A    I'd rather not answer that question.

13

14 Beginning at Page 117, Line 24:

15 BY MR. COHEN:

16     Q    And did you and -- what did Kathy tell you?

17     A    I'd rather not answer that question right now.

18

19 Beginning at Page 118, Line 1:

20 BY MR. COHEN:

21     Q    Did you get aggravated with Kathy -- did you

22 agree what Kathy said to you?

23     A    I'd rather not answer that question at this

24 present time.

25

1   Beginning at Page 118, Line 5:

2   BY MR. COHEN:

3       Q    Did you become upset or raise your voice at

4   Kathy while the two of you were discussing your

5   conversation with Renee?

6       A    I'd rather not answer that question.

7

8   Beginning at Page 120, Line 12:

9   BY MR. COHEN:

10      Q    Okay.  How do you know that?

11      A    I'd rather not answer that question at this

12  time.

13

14  Beginning at Page 121, Line 6:

15  BY MR. COHEN:

16      Q    Okay.  Have you lost any money as a result of

17  the things we've discussed today, the issues in your

18  complaint?

19      A    I'd rather not answer that question.

20

21  Beginning at Page 121, Line 10:

22  BY MR. COHEN:

23      Q    Have you had to seek any kind of counseling or

24  anything like that as a result of these issues you've

25  raised in the complaint?

1      A    I'd rather not answer that question.

2

3    Beginning at Page 121, Line 19:

4    BY MR. COHEN:

5      Q    I really can't.  I mean, have you experienced

6    any changes in your life that you think are the result

7    of the incidents that happened in the complaint?

8      A    I'd rather not answer that question.

9

10

11    _____

12                    RHONDA ELLISON, COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

addressed
 2025:20
aggravated
 2029:21
ago 2024:5
agree 2029:22
alleging 2019:21
allowed 2012:20
answer 2012:8
 2012:15
 2013:4,10,16
 2013:23
 2014:8,15,22
 2015:5,14,20
 2016:1,7,13,19
 2016:25
 2017:5,11,17
 2017:23
 2018:5,12,17
 2018:23
 2019:5,11,17
 2019:23
 2020:5,11,17
 2020:23
 2021:7,13,19
 2021:25
 2022:20
 2023:2,10,16
 2023:22
 2024:8,14,21
 2025:1,8,15,22
 2026:5,11,17
 2026:24
 2027:4,11,13
 2027:18,23
 2028:5,15,22
 2029:6,9,12,17
 2029:23
 2030:6,11,19
 2031:1,8
apply 2013:14
 2017:3
asking 2012:21
award 2014:6
aware 2026:21

**B**

back 2014:6
based 2014:6
Beginning
 2012:4,10,18
 2013:1,6,12,19
 2014:1,10,17
 2015:1,7,16,22
 2016:3,9,15,21
 2017:1,7,13,19
 2018:1,7,14,19
 2019:1,7,13,19
 2020:1,7,13,19
 2021:1,9,15,21
 2022:1,14,23
 2023:4,12,18
 2024:1,10,16
 2024:23
 2025:3,10,17
 2026:1,7,13,19
 2027:1,6,20
 2028:1,7,18
 2029:1,14,19
 2030:1,8,14,21
 2031:3
believe 2020:9
 2020:15,21
 2021:3,5
 2022:25
 2026:9
benefits 2015:3
better 2022:5
breasts 2029:3,8
bunch 2027:8
business
 2013:22
busted 2021:23

**C**

calculate
 2014:13,13
Case 2011:6
certified
 2011:14
 2012:1
change 2020:4
changes 2031:6

**Circle** 2011:7
 2012:22
 2013:3,9,14,21
 2014:4
 2015:12,19,25
 2016:5,6,12,18
 2017:3,10,16
 2017:22
 2018:4
 2019:15,22
 2020:10,15,22
 2021:4,11,17
 2023:9
 2025:13
 2026:3,21
classification
 2021:24
**COHEN** 2012:5
 2012:11,19
 2013:2,7,13,20
 2014:2,11,18
 2015:2,8,17,23
 2016:4,10,16
 2016:22
 2017:2,8,14,20
 2018:2,8,15,20
 2019:2,8,14,20
 2020:2,8,14,20
 2021:2,10,16
 2021:22
 2022:2,15,24
 2023:5,13,19
 2024:2,11,17
 2024:24
 2025:4,11,18
 2026:2,8,14,20
 2027:2,7,21
 2028:2,8,19
 2029:2,15,20
 2030:2,9,15,22
 2031:4
**Combee** 2011:3
 2011:15
 2012:2
 2014:12
 2023:6 2028:4
**come** 2017:3

 2022:10
complaint
 2025:21
 2030:18,25
 2031:7
consider
 2022:19
considered
 2022:6
conversation
 2030:5
copies 2024:13
Corporation
 2011:8
correct 2019:10
counseled
 2017:21
counseling
 2026:22
 2030:23
court 2011:1
 2014:6,13
 2031:12
cutting 2022:3,7

**D**

damages 2014:6
dates 2014:20
 2014:21
day 2023:21
Defendant
 2011:9
deposition
 2011:14
 2012:2 2023:7
 2024:5
 2027:14
 2028:10,11,13
different
 2024:19
disagreements
 2023:8
discussed
 2028:9
 2030:17
discussing
 2030:4

discussion
 2023:15
DISTRICT
 2011:1,1
DIVISION
 2011:2
document
 2018:16,21,22
 2019:4,10
 2026:16
 2027:10
documents
 2024:25
 2025:5,6
 2026:3 2028:9
 2028:11
doing 2022:4,5,9

**E**

earlier 2016:23
 2022:20
EEOC 2026:4
ELLISON
 2031:12
employed
 2017:16
employees
 2016:5
 2025:13,13,14
evaluations
 2025:19
Evan 2016:23
 2023:20
 2024:3
 2025:13
Evan's 2025:14
exhibit 2027:15
exhibits 2028:10
 2028:12,13
experienced
 2031:5
e-mail 2027:8

**F**

fact 2015:25
 2016:6
false 2018:11

fifth 2027:15
figure 2028:13
filed 2014:4
FLORIDA
  2011:1
following
  2012:1
former 2025:14
fourth 2027:15
front 2014:6

**G**
given 2028:3,3
going 2012:15
  2014:5,12
  2019:9
government
  2015:3

**H**
handwriting
  2027:9,12
happened
  2023:15
  2031:7
harass 2022:4
harassed
  2020:16
  2023:1
harassing
  2022:6
harassment
  2022:19
hear 2012:20
Heather
  2024:19
hours 2022:3,7
Hyde 2016:17
  2016:18

**I**
incidences
  2028:21
incidents 2031:7
income 2014:7
individual
  2017:9

information
  2022:12
Inside 2026:21
issues 2026:23
  2030:17,24

**J**
Janice 2024:20
job 2017:3,10
  2020:4
  2021:24
July 2011:16
  2012:2

**K**
K 2011:7
  2012:22
  2013:3,9,15,21
  2014:4
  2015:12,19,25
  2016:5,6,12,18
  2017:4,10,16
  2017:22
  2018:4
  2019:15,22
  2020:10,15,22
  2021:4,12,17
  2023:9
  2025:13
  2026:3,21
Kathy 2015:9,10
  2015:18,24
  2016:11,11,17
  2016:18
  2023:8,21
  2029:16,21,22
  2030:4
kind 2030:23
know 2017:21
  2021:5,11
  2024:7 2027:3
  2027:12
  2029:8
  2030:10

**L**
lawsuit 2014:3

2014:14
2019:16,22
2021:18
left 2016:12,18
life 2031:6
Line 2012:4,10
  2012:18
  2013:1,6,12,19
  2014:1,10,17
  2015:1,7,16,22
  2016:3,9,15,21
  2017:1,7,13,19
  2018:1,7,14,19
  2019:1,7,13,19
  2020:1,7,13,19
  2021:1,9,15,21
  2022:1,14,23
  2023:4,12,18
  2024:1,10,16
  2025:3,10,17
  2026:1,7,13,19
  2027:1,6,20
  2028:1,7,18
  2029:1,14,19
  2030:1,8,14,21
  2031:3
located 2018:22
look 2028:12
looked 2012:6
looking 2012:7
  2021:17
looks 2027:8
loss 2014:7
lost 2030:16
lot 2026:22
lower 2021:24

**M**
McCorkle
  2022:18
  2023:1
mean 2031:5
meet 2024:19
mentioned
  2016:23
MIDDLE

2011:1
minute 2024:5
Mitchell 2015:9
  2015:10,18,24
  2016:11,11
  2023:9
money 2014:13
  2030:16
mouth 2012:21

**N**
need 2022:17
North 2012:13
notices 2026:22

**O**
offered 2017:10
Oh 2022:8,8
okay 2012:12,12
  2012:20
  2013:3 2014:3
  2014:12
  2015:9
  2016:11
  2018:9,16
  2019:15
  2020:9 2021:3
  2021:6 2022:3
  2023:14
  2024:25
  2026:9 2028:3
  2029:6
  2030:10,16
once 2014:19,20
ones 2018:9
organization
  2026:21
owed 2014:14

**P**
page 2012:4,10
  2012:18
  2013:1,6,12,19
  2014:1,10,17
  2015:1,7,16,22
  2016:3,9,15,21

2017:1,7,13,19
2018:1,7,14,19
2019:1,7,13,19
2020:1,7,13,19
2021:1,9,15,21
2022:1,14,23
2023:4,12,18
2024:1,10,16
2024:23
2025:3,10,17
2026:1,7,13,19
2027:1,6,14,20
2028:1,7,18
2029:1,14,19
2030:1,8,14,21
2031:3
pages 2027:16
  2027:16
paper 2028:4
pay 2014:6,6
people 2026:22
person 2017:9
piece 2028:4
Plaintiff 2011:5
please 2012:21
point 2028:15
possession
  2019:3
present 2029:24
prior 2013:3
  2027:17
production
  2025:6
promotions
  2013:14

**Q**
question
  2011:14
  2012:8,15
  2013:4,10,16
  2013:23
  2014:8,15,22
  2015:5,14,20
  2016:1,7,13,19
  2016:25
  2017:5,11,17

2017:22,23
2018:5,12,17
2018:23
2019:5,11,17
2019:23
2020:5,11,17
2020:23
2021:7,13,19
2021:25
2022:5,21
2023:2,8,10,16
2023:22
2024:8,14,21
2025:1,8,15,22
2026:5,11,17
2026:24
2027:4,11,13
2027:18,23
2028:5,16,22
2029:6,9,12,17
2029:23
2030:6,11,19
2031:1,8
questions
 2012:1 2023:7

**R**
Rainey 2024:20
raise 2030:3
raised 2030:25
read 2022:16
really 2028:15
 2031:5
reason 2014:5
recall 2012:6,7
 2013:15
 2015:11,18
 2026:15,15
 2027:10,16
receive 2017:15
 2026:22
 2027:9
receiving
 2026:15
recollection
 2022:17
recount 2023:14

refresh 2022:17
release 2022:12
Renee 2022:18
 2023:1 2030:5
REPORTER
 2031:12
request 2025:6
residence
 2012:13
respond 2012:23
result 2030:16
 2030:24
 2031:6
retaliated
 2020:21
RHONDA
 2031:12
right 2014:3
 2018:11
 2024:4,5
 2028:13
 2029:17
Road 2012:13
rub 2029:8
rubbing 2029:3

**S**
scheduled
 2023:6
see 2029:5,7,11
seeing 2027:10
 2027:16
seek 2030:23
self-employed
 2013:22
send 2025:6
sexually 2020:16
show 2023:20
 2024:12
sign 2026:16
signature
 2026:10
signed 2018:9
 2018:10
sir 2012:15
sit 2018:21
sixth 2027:16

smacking
 2029:4
speaking
 2015:18
specific 2025:5
specifically
 2012:6
spoke 2015:10
spoken 2016:5
statements
 2023:20
 2024:3,4,13
 2025:12
 2026:3
STATES 2011:1
STEVE 2011:3
 2011:15
 2012:2
STORES
 2011:7
Strike 2022:4
sued 2012:22
 2019:15
suing 2015:25
 2016:6 2020:9
 2020:15
sure 2014:19
 2017:9
 2019:21
 2020:3
 2021:23

**T**
taken 2012:2
talk 2025:20
talked 2015:24
 2016:12,17
talking 2014:4
 2028:11
TAMPA 2011:2
Teeter 2024:20
tell 2012:12,21
 2014:12
 2017:9 2019:9
 2019:15,21
 2021:6
 2022:18,25

 2029:16
terminated
 2015:19
 2020:10
 2021:4,11
termination
 2015:12
testicles 2029:4
 2029:10
Texas 2011:8
things 2030:17
think 2014:14
 2031:6
third 2027:14,15
time 2013:17
 2015:10
 2029:24
 2030:12
times 2024:18
 2024:19
today 2014:5
 2018:21
 2019:4
 2027:10,17,22
 2028:4,9
 2030:17
touching 2029:4
 2029:10
trained 2017:15
training 2017:15
trial 2022:10
trick 2017:22
two 2024:3,4
 2028:20
 2030:4
type 2012:13

**U**
unemployment
 2014:19
 2015:4
UNITED 2011:1
upset 2030:3

**V**
v 2011:6
various 2026:23

voice 2030:3

**W**
want 2017:21
 2022:12
 2028:13
way 2017:22
 2020:4
 2024:19
we're 2014:4,5
we've 2028:9
 2030:17
Wiggins
 2012:13
witnesses 2029:7
words 2028:10
work 2013:3,8
 2013:22
worked 2013:8
working
 2020:22
write 2018:10
writeups
 2025:19
writing 2027:3
written 2018:3
wrong 2019:22
wrongfully
 2020:10
 2021:4
wrote 2024:4

**1**
1 2016:9 2025:3
 2027:1
 2029:19
10 2013:19
 2023:4 2026:7
 2027:6
 2030:21
100 2028:1
101 2028:7
11 2018:1
 2020:13
 2025:17
110 2028:18
113 2029:1

**117** 2029:14
**118** 2029:19
  2030:1
**12** 2013:12
  2017:1
  2023:12
  2030:8
**120** 2030:8
**121** 2030:14,21
  2031:3
**13** 2014:1
  2019:7
  2026:13
**14** 2019:19
  2029:1
**16** 2012:4,10
  2015:7 2017:7
  2020:19
  2021:1 2028:7
**17** 2012:10
  2018:7
  2022:14
**19** 2011:16
  2012:2,18
  2014:17
  2031:3

**2**

**2011** 2011:16
  2012:2
**21** 2017:13
  2021:21
**22** 2015:16
  2020:1 2022:1
  2026:1
**23** 2022:23
**24** 2012:18
  2013:1
  2024:23
  2028:18
  2029:14
**25** 2015:22
  2023:18
**26** 2013:1
**27** 2013:6

**3**

**3** 2014:10
  2015:1
  2018:14
  2021:9 2024:1
  2024:16
  2028:1
**30** 2013:12
**33** 2013:19
  2014:1
**34** 2014:10,17
**35** 2015:1,7,16
  2015:22
**36** 2016:3
**37** 2016:9,15,21
  2017:1
**38** 2017:7,13
**39** 2017:19
  2018:1

**4**

**4** 2013:6
  2016:15
**42** 2018:7
**45** 2018:14,19
  2019:1,7
**48** 2019:13,19

**5**

**5** 2016:3
  2018:19
  2025:10
  2027:20
  2030:1
**54** 2020:1
**57** 2020:7,13,19
  2021:1

**6**

**6** 2019:13
  2020:7
  2030:14
**60** 2021:9,15,21
**615** 2012:13

**7**

**7** 2016:21
**75** 2022:1

**77** 2022:14,23
**78** 2023:4

**8**

**8** 2012:4
  2017:19
  2019:1
  2021:15
  2026:19
**8:11-CV-0010...**
  2011:6
**80** 2023:12
**81** 2023:18
**82** 2024:1,10
**83** 2024:16
**85** 2024:23
**86** 2025:3,10,17
  2026:1
**87** 2026:7,13
**89** 2026:19

**9**

**9** 2024:10
**98** 2027:1,6
**99** 2027:20